.IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**No. 22-1587**

_____

**COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,**

**Appellants**

v.

**THOMAS E. PROCTOR HEIRS TRUST**

_____

**BRIEF FOR APPELLANTS AND JOINT APPENDIX VOL. I**

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
ENTERED DECEMBER 3, 2021

JOSH SHAPIRO
*Attorney General*

Office of Attorney General
15th Floor, Strawberry Square        BY:    MICHAEL J. SCARINCI
Harrisburg, PA 17120                        *Deputy Attorney General*
Phone: (717) 857-2184
FAX:   (717) 772-4526                       J. BART DELONE
                                            *Chief Deputy Attorney General*
DATE: June 7, 2022                          *Appellate Litigation Section*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

STATEMENT OF JURISDICTION........................................................... 1

STATEMENT OF ISSUES .......................................................................... 2

INTRODUCTION ........................................................................................... 3

STATEMENT OF THE CASE .................................................................. 6

Pleadings and Pre-Trial Proceedings ...................................................... 6

Trial… ............................................................................................................... 8

Chain of Title and Assessment .................................................................. 8

Evidence of Reporting .................................................................................. 14

The District Court's Opinion and Order ................................................. 17

Certification for Interlocutory Appeal .................................................... 19

STATEMENT OF RELATED CASES .................................................. 20

SUMMARY OF ARGUMENT .................................................................. 21

ARGUMENT ................................................................................................... 24

    Under Long-Established Pennsylvania Law, Either Where a Separate
    Subsurface Interest Was Not Reported to the County Commissioners
    *or* Where the Property Was Assessed as Whole, a Subsequent Tax
    Sale Results in a "Title Wash." ................................................................. 24

    A.    Neither Proctor nor the Proctor Trust ever reported their
        subsurface interest. ............................................................................ 34

    B.    Even if Proctor or the Proctor Trust had reported, the property
        was, undisputedly, assessed as a whole, and they are time-
        barred from challenging that assessment a century later. ................. 36

i

C.    Contrary to the district court's conclusion, *Herder Spring* controls the outcome here. ................................................................40

    1.    The district court's distinction between the duty to pay taxes and the lack of personal liability is contrary to Pennsylvania law......................................................................44

    2.    The district court's ruling upends Pennsylvania law and the settled expectations of landowners. ....................................47

CONCLUSION .........................................................................................51

CERTIFICATE OF COUNSEL ..............................................................52

CERTIFICATE OF SERVICE ................................................................53

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Appeal of Gault*, 33 Pa. 94 (1859) ........................................................5, 46

*Bannard v. N.Y. State Natural Gas Corp.*, 293 A.2d 41 (Pa. 1972) ............... passim

*Breisch v. Coxe*, 81 Pa. 336 (Pa. 1876) ...................................................45

*Brundred v. Egbert*, 164 Pa. 615 (Pa. 1894) .................................... 37, 39

*Carns v. Matthews*, 174 A. 840 (Pa. Super. 1934) .................................38

*Caul v. Spring*, 2 Watts 390 (Pa. 1834) ...............................................32

*City of Philadelphia v. Miller*, 182 Pa. Super. 239 (Pa. Super. 1956)............. 42, 45

*City of Reading v. Finney*, 73 Pa. 467 (Pa. 1873) ...................................35

*Clement v. U.S. Pipe Line Co.*, 97 A. 1070 (Pa. 1916) ...........................47

*Cornwall Mtn. Investments, L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017) ........................................................................ passim

*Coxe v. Gibson*, 27 Pa. 160 (Pa. 1856) ................................................48

*Erwin v. Helm*, 13 Serg. & Rawle 151 (Pa. 1825) ........................... 26, 47

*F.H. Rockwell & Co. v. Warren Cty.*, 77 A. 665 (Pa. 1910) ........................ 27, 37

*Foote v. Smullen & Barry*, 84 Pa. Super. 420 (Pa. Super. 1925) ...........................47

*Frick v. Sterrett*, 4 Watts & Serg. 269 (Pa. 1842) ....................................34

*Heft v. Gephardt*, 65 Pa. 510 (Pa. 1870) ...............................................35

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016) .................. passim

*Herder Spring Hunting Club v. Keller*, 93 A.3d 465 (Pa. Super. 2014) .................33

*Hess v. Herrington*, 73 Pa. 438 (Pa. 1873) ...............................................................28

*Hubley v. Keyser*, 2 Pen. & W. 496 (Pa. 1831) ......................................... 30, 31, 38

*Hunter v. Cochran*, 3 Pa. 105 (Pa. 1846).................................................................46

*Hutchinson v. Kline*, 49 A. 312 (Pa. 1901) .......................................... 29, 31, 35, 42

*Hutchison v. Ash*, 74 Pa D. & C. 481 (Ct of Common Pleas, Lycoming Cty. 1949) .................................................................................................................................46

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)............................ 24, 36

*Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337 (3d Cir. 2013) ............. 24, 36

*Kaiser Energy, Inc. v. Dep't of Envt'l Res.*, 535 A.2d 1255 (Pa. Cmwlth. 1988)...38

*Keta Gas & Oil Co. v. Proctor*, No. 1975 MDA 2018, 2019 WL 6652174 (Pa. Super. 2019) .......................................................................................................25

*Lacy v. Montgomery*, 124 A.2d 492 (Pa. Super. 1956) ............................................9

*Mayor of Phila. v. Riddle*, 25 Pa. 259 (Pa. 1855) ..................................................45

*McCoy v. Michew*, 7 Watts & Serg. 386 (Pa. 1844) ...........................................4, 45

*McCutcheon v. America's Serv. Co.*, 560 F.3d 143 (3d Cir. 2009).........................24

*McKean & Elk Land & Improvement Co. v. Hacker*, 10 Pa. C.C. 490 (Elk Cty. Ct. of Common Pleas 1891).......................................................................................44

*Morton v. Harris*, 9 Watts 319 (Pa. 1840) ...................................................... 29, 34

*Neill v. Lacy*, 1 A. 325 (Pa. 1885)..................................................................... 33, 44

*Northumberland Co. v. Phila. & Reading Coal & Iron, Co.*, 131 F.2d 562 (3d Cir. 1942)................................................................................................... 27, 31

*Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 2019 WL 6954101 (M.D. Pa. 2019) ..................................................................................................7

*Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 267 A.3d 484 (Pa. 2021) 20, 37

*Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 455 F. Supp. 3d 127 (M.D. Pa. 2020) ...............................................................................................7, 8

*Pa. Game Commission v. Thomas E. Proctor Heirs Trust*, No. 493 M.D. 2017 (Pa. Cmwlth. 2020)................................................................................ 20, 37

*Peters v. Heasley*, 10 Watts 208 (Pa. 1840)..............................................................29

*Potter Gas Co. v. Dunshie*, 42 Pa. Super. 457 (Pa. Super. 1910).................... 31, 41

*Powell v. Lantzy*, 34 A. 450 (Pa. 1896) ........................................................... passim

*Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958) ..... passim

*Reinboth v. The Zerbe Run Improvement Co.*, 29 Pa. 139 (Pa. 1858)....................32

*Robinson v. Williams*, 6 Watts 281 (Pa. 1837) ........................................... 42, 44, 45

*Rockwell v. Keefer*, 39 Pa. Super. 468 (Pa. Super. 1909).......................................32

*Russel v. Werntz*, 24 Pa. 337 (Pa. 1855) ................................................................45

*Ryan v. Bruhin*, 88 Pa. Super. 6 (Pa. Super. 1926)................................................38

*Stewart v. Shoenfelt*, 13 Serg. & Rawle. 360 (Pa. 1825) ........................................31

*Stoetzel v. Jackson*, 105 Pa. 562 (Pa. 1884)..................................................... 26, 41

*Strauch v. Shoemaker*, 1 Watts & Serg. 166 (Pa. 1841)........................................46

*U.S. v. Defreitas*, 29 F.4th 135 (3d Cir. 2022).........................................................50

*Williston v. Colkett*, 9 Pa. 38 (Pa. 1848) ......................................................... 31, 34

*Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996)............................................2

*Yocum v. Zahner*, 29 A. 778 (Pa. 1894)..............................................5, 30

**Statutes**

28 U.S.C. § 1292................................................................. 1, 5, 19

28 U.S.C. § 1332...........................................................................1

72 P.S. § 5981 .............................................................................29

72 P.S. § 6001 .............................................................................29

72 P.S. § 6091 ......................................................................... 30, 38

Act of 1806, Mar. 28, P.L. 644, 4 Sm. L. 346 ........................... 14, 38

Act of June 6, 1887, P.L. 363, No. 248 ...............................................45

**Other Authorities**

36 Energy & Mineral Law Foundation § 21.05 (2015) ...........................32

Black's Law Dictionary, *charge* (1st ed. 1891).......................................46

Black's Law Dictionary, *duty*, (11th ed. 2019).......................................47

Lester L. Greevy & John A. Shoemaker, *Shale Gas Ownership-Tax Sale Titles: An Historical Perspective of the Pennsylvania Title Wash*, 85 Pa. Bar Quarterly 106 (July 2014) ............................................................... passim

Restatement (Second) of Agency, § 1....................................................48

William L. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 15 (1953) ................47

**Rules**

Fed.R.Civ.P. 52 ..........................................................................24

Local Appellate Rule 110.1 .......................................................................50

**Treatises**

John Whitworth, *Tax Sale and Titles*, § 46 (1900) ...................................48

Robert Grey Bushong, *Pennsylvania Land Law*, (1938).........................25

## STATEMENT OF JURISDICTION

This is a quiet title action brought under state law. The district court exercised diversity jurisdiction. *See* 28 U.S.C. § 1332.

This is an appeal from an interlocutory order by permission, over which this Court has jurisdiction by virtue of 28 U.S.C. § 1292(b). The district court certified its December 3, 2021 Opinion and Order for interlocutory appeal on January 28, 2022. This Court granted permission to appeal on March 24, 2022.

# STATEMENT OF ISSUES

*The district court certified for this Court's interlocutory review the following question*:

Under Pennsylvania law in effect at all times relevant to the instant quiet title dispute, did the owner of an unseated surface estate have a legal duty to pay taxes assessed on said surface estate, thereby preventing the owner—or the owner's agent—from acquiring better title to the land at a tax sale induced by the unseated surface owner's default?

*Fairly included within the certified question,[1] is the following*:

Did the district court err in determining that a 1908 tax sale of the subject property resulted in the tax sale purchaser redeeming only the surface interest, not a "title wash" (meaning that separate ownership of the property's surface and subsurface merged in the tax sale purchaser) as that determination amounted to a collateral attack on the assessment and tax sale process that was time-barred under Pennsylvania law?

---

[1] *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996) ("appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court"; therefore, "an appellate court may address any issue fairly included within the certified order") (emphasis in original).

## INTRODUCTION

"Title wash" is a complicated, arcane principle of 19th century Pennsylvania real property law. Yet, despite the complexity of the underlying law, this interlocutory appeal is resolved on a simple issue—the statute of limitations.

In 1894, Thomas E. Proctor transferred a 407-acre property, in Bradford County, to Union Tanning Company, reserving and excepting to himself and his heirs "all the minerals, coal, oil, gas or petroleum found now or hereafter" (the subsurface interest). In 1908, following a series of transfers of the surface interest, the then-surface-owner, Central Pennsylvania Lumber Company (CPLC), did not pay the property taxes. At a treasurer's sale, the property was sold to Calvin H. McCauley, Jr., ostensibly an agent of CPLC, in satisfaction of the delinquent taxes.

The 1908 tax sale is at the heart of this matter. Under Pennsylvania law, the effect of this tax sale was a "title wash," which means that the separate ownership of the surface and subsurface were merged in the tax sale purchaser.

The Proctor Trust[2] had two years to challenge any irregularities in the notice, assessment, and tax sale process. After that time, the tax sale could not be collaterally attacked. This makes sense, after all, because a tax sale purchaser is entitled to finality. Otherwise, the settled expectations of landowners (and subsequent

---

[2] Proctor died in 1894, shortly after he transferred the property to Union.

purchasers of that land), such as the Pennsylvania Game Commission,[3] are upset, while the "long neglect" of a prior owner, "when the land has arisen in value"—as it has here with this property that sits along the Marcellus Shale—is "reward[ed]." *McCoy v. Michew*, 7 Watts & Serg. 386, 390 (Pa. 1844).

After the two-year statutory period, only a jurisdictional defect can void a tax sale. The Proctor Trust does not allege any jurisdictional defect. Instead, the Proctor Trust raises only irregularities in the assessment. Specifically, the Trust maintains that the County Commissioners should have separately assessed the property, surface and subsurface, instead of as a whole. But this fails for two reasons. First, neither Proctor nor the Trust reported to the County Commissioners that the property's ownership had been severed, and that the County Commissioners should have separately assessed the subsurface. Second, even if that severance was reported, the property was still undisputedly assessed as a whole, not separately.

If, as the Proctor Trust now maintains a century later, this assessment was error, it had two years after the tax sale to challenge the assessment. It did not. The Proctor Trust is time-barred from challenging that assessment as irregular now.

---

[3] Following a series of conveyances, the property was transferred to the Game Commission in 1920.

4

Instead of following these principles of Pennsylvania law, the district court made a series of errors. Most important, the district court mistakenly determined that the 1908 tax sale effected only a redemption of CPLC's title to the surface,[4] not a title wash. The result was effectively a "collateral attack" on this century-old tax sale and, ultimately, an award of title to the property's subsurface in the Proctor Trust, not the Game Commission.

The district court's determination was based on a novel interpretation of Pennsylvania law. But there is nothing novel about this case. Its resolution is controlled by the Pennsylvania Supreme Court's seminal 2016 decision—*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016)—which reaffirmed the fundamental principles of Pennsylvania law regarding a "title wash." To the district court's credit, it recognized that there is "substantial ground for difference of opinion" on a "controlling issue of law" in this matter that warrants this Court's interlocutory review. *See* 28 U.S.C. § 1292(b).

For the reasons that follow, this Court should reverse and quiet title to the property's subsurface in the Game Commission.

---

[4] Redemption "is the last chance" of an owner "to recover his property rights" after the tax sale by paying the delinquent taxes. *Appeal of Gault*, 33 Pa. 94, 98 (1859); Act of 1815, P.L. 177, 6 Sm.L. 299, § 4 (JA507-08). A redemption restores title as though the tax sale never occurred. *Yocum v. Zahner*, 29 A. 778, 779 (Pa. 1894).

## STATEMENT OF THE CASE

Appellant Commonwealth of Pennsylvania, Pennsylvania Game Commission (hereinafter the Game Commission), Plaintiff below, and Appellees Thomas E. Proctor Heirs Trust and Margaret Proctor Trust (hereinafter the Proctor Trust), each claim title to the subsurface of certain Commonwealth game lands. The district court held a one-day trial that only focused on a single tract of land (not all the disputed property), known as the Josiah Haines Warrant, and determined that the Proctor Trust is the title owner of the subsurface. The district court, however, recognized that its order satisfied the criteria of 28 U.S.C. § 1292(b), and so certified its opinion and order for interlocutory appeal. This Court then granted the Game Commission permission to appeal.

### Pleadings and Pre-Trial Proceedings

The Game Commission commenced this action a decade ago, in 2012, against the Proctor Trust (a Massachusetts Trust), seeking to quiet title to the subsurface rights of six warrants, consisting of 2,481 acres in Sullivan County. JA75-91 (2nd Am. Complaint). The Proctor Trust counterclaimed for title to the subsurface of these warrants and dozens of others in Sullivan and Bradford Counties, including the Haines Warrant. JA106-07 (Answer).

The matter proceeded through motions to dismiss, discovery, and competing partial summary judgment motions. *See Pa. Game Comm'n v. Thomas E. Proctor*

6

*Heirs Trust*, 2019 WL 6954101 (M.D. Pa. 2019) (Schwab, M.J) (Doc. 155). The latter motion focused solely on the Haines Warrant (on State Game Lands No. 12), as the district court considered it a "bellwether" for the rest of the litigation. JA6 (Memorandum (Memo) Opinion (Op.); *see Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 455 F. Supp. 3d 127, 130 (M.D. Pa. 2020) (Connor, C.J.); JA544 (map of Haines Warrant land).

Initially, the district court granted the Game Commission summary judgment, Doc. 165 at 43; Doc 166. In that order, the district court correctly concluded that (1) the Haines Warrant consisted of "unseated"[5] land, (2) that it was assessed for taxes as a whole (not separately for surface and subsurface), (3) that the taxes, which were chargeable to the land not the owners, went unpaid in 1907; and (4) that in 1908, the property was sold as whole (surface and subsurface) to the tax sale purchaser (Calvin H. McCauley, Jr.). Doc. 165 at 22-23, 29, 33-36. All this meant that, under controlling Pennsylvania law, title to the Haines warrant was "washed." In other words, rights in the surface and subsurface merged in the tax sale purchaser, and that

---

[5] As explained in greater detail later, *see infra* at p.25-26, "unseated" land was considered "wild" or undeveloped land, while "seated" land was developed with residential structures, had personal property, or was producing regular profit through (for example) cultivation. *See Herder Spring*, 143 A.3d at 363-364. The difference was important for assessment and tax sale purposes.

merged title was later passed to the Game Commission. *Id.* at 6 n.3, 31, citing *Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016).

Upon the Proctor Trust's motion for reconsideration, however, the district vacated its order and denied summary judgment. *Proctor Heirs Trust*, 455 F. Supp. 3d at 130 n.1, 154; Doc. 171, 182. The court found several issues of disputed fact that warranted a trial. *Id.* These issues of fact included "*what interest was assessed in 1907 and sold at the 1908 tax sale*," and whether the tax sale purchaser, McCauley, Jr., was acting as CPLC's agent. *Id.* at 154 (emphasis added).

**Trial**

Trial occurred over a single day. No witness testimony was presented as the operative facts occurred a century or longer ago. Instead, the parties entered into evidence numerous exhibits and presented argument. JA172-310 (Trial Transcript (Tr.)). That evidence revealed the following facts:

**Chain of Title and Assessment**

The Haines Warrant consists of approximately 407 acres, located in LeRoy Township, Bradford County, in the northeastern part of the Commonwealth. JA167, ¶¶ 2-3 Stipulation of Facts (S/F); JA543-45 (Wilkinson Report), JA332 (Warrant). In 1793, the Commonwealth warranted this tract of land to Josiah Haines. JA167, ¶ 1 (S/F). A century later, after a series of conveyances, Schrader Mining & Manufacturing Company conveyed the Haines Warrant (along with thousands of

other acres) to Thomas E. Proctor and Jonathan Hill. JA168, ¶ 5 (S/F); JA313-17, 319-23 (chain of title).

Proctor was wealthy. He and several other individuals owned a large portion of Pennsylvania's bark and lumber lands, which were pivotal for the then booming leather industry. Lester L. Greevy & John A. Shoemaker, *Shale Gas Ownership-Tax Sale Titles: An Historical Perspective of the Pennsylvania Title Wash*, 85 Pa. Bar Quarterly 106, 111 (July 2014). These families consolidated their land holdings and created the U.S. Leather Company, one of the original Dow Jones Companies, which had an original capitalization that, in today's dollars, amounted to $3.5 billion. *Id*.

In October 1894, Proctor and Hill, along with their wives, conveyed title to the surface of the Haines Warrant (along with thousands of other acres) to Union Tanning, a subsidiary of U.S. Leather. JA167, 170, ¶¶ 6, 21 (S/F); JA313, 319 (chain of title); JA360-74 (deed); *Shale Gas Ownership*, *supra* at 112. That deed expressly reserved to Proctor and Hill and their heirs, "all the minerals, coal, oil, gas or petroleum found now or hereafter" (Proctor Subsurface Reservation). JA372 (deed).[6] By virtue of the Proctor Subsurface Reservation, title to the Haines Warrant

---

[6] A reservation is simply a retention by the grantor, as expressed in the deed, of some interest in the land. *See Lacy v. Montgomery*, 124 A.2d 492, 496 (Pa. Super. 1956). The actual deed language was "reserve and save." JA372.

was split, with surface ownership in Union and subsurface ownership in Proctor, Hill, and their wives.

Proctor died two months later. JA168, ¶ 8 (S/F); JA516-38 (Proctor Last Will & Testament). Pursuant to his Last Will and Testament, the residue of his estate was devised to his heirs in trust. JA168, ¶ 9 (S/F). The Proctor Trust is the heir of Proctor and to any interest he may have in the Haines Warrant. JA168, ¶ 10 (S/F).

In May 1903, Union conveyed its surface title in the Haines Warrant, with certain reservations not relevant here, (along with thousands of other acres), to the Central Pennsylvania Lumber Company (CPLC), yet another subsidiary of U.S. Leather. JA168, 170 ¶¶ 11, 24 (S/F); JA312-13, 318-19 (chain of title); JA377 (deed); *Shale Gas Ownership*, *supra* at 112.

In 1907, the $44.28 in taxes then owed on the Haines Warrant went unpaid. JA452 (Bradford Cty. List of Unseated Lands and Taxes, 1906-08); JA343 (statement of taxes). As a result, the Treasurer of Bradford County exposed the Haines Warrant (and other lands) to public sale. In accordance with then statutory law,[7] notice of the sale was advertised in Pennsylvania newspapers 60 days ahead of the sale date. JA459-97 (newspaper notices). The date for sale, as set by statute, was the second Monday in June, *i.e.*, June 8, 1908. JA459-97 (newspaper notices);

---

[7] Act of 1815, Mar. 13, P.L. 177. JA506-10.

JA506-10 (Act of 1815); *see Herder Spring*, 143 A.3d at 365. Each notice was entitled, "Treasurer's Sale of *Unseated* Lands." JA459-97 (emphasis added).

On that date, Calvin H. McCauley, Jr., purchased the Haines Warrant from the Bradford County Treasurer in open court. JA169, ¶ 15 (S/F); JA498 (Treasurer's Deed Book). The Treasurer's Deed recounted that the property consisted of "410 acres of *unseated* land in LeRoy Township, assessed in the warrantee name of Josiah Haines." JA498 (Treasurer's Deed Book) (emphasis added); JA318, 326 (chain of title).

The impact of this tax sale, pursuant to the Pennsylvania law, is that the surface and subsurface rights that had been separated, were merged in the tax sale purchaser. He acquired the entire property, and title was washed.

More than two years after the tax sale, in December 1910, McCauley, Jr. and his wife, Florence M. McCauley, in consideration of $1.00, "granted, remised, released, and quit-claimed" title to 45 parcels to CPLC, including the Haines Warrant. JA168, ¶ 16 (S/F); JA499-502 (quitclaim deed). This was after passage of the two-year statutory period for redemption of the delinquent owner(s)' interest(s) by payment of the outstanding taxes. JA507-08 (Act of 1815, Sec. 4). During this two-year time period, the owners could have challenged "the notice, assessment, and tax sale process" for irregularities, such as the failure to separately assess the surface and subsurface. *Cornwall Mtn. Investments, L.P. v. Thomas E. Proctor Heirs Trust*,

158 A.3d 148, 160 (Pa. Super. 2017); *see Herder Spring*, 143 A.3d at 365-66. After that period, only a defect in jurisdiction would suffice to void the tax sale. *See Cornwall*, 158 A.3d at 160.

In 1920, CPLC conveyed more than 7,000 acres, including the Haines Warrant to the Commonwealth, for $18,732.25. JA168, ¶ 17 (S/F); JA389-94 (deed).

It is undisputed that, from 1894 through 1921, the Bradford County Commissioners assessed the Haines Warrant as unseated. JA169, ¶ 14 (S/F).

Graphically, as depicted on the next page, the chain of title appears as follows:



JA553.

**Evidence of Reporting**

The Act of 1806[8] imposed a reporting requirement on "every holder of unseated lands." A holder was required to provide the County Commissioners with a signed statement describing the tract of land and "the name of person or persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title." JA503-04; *see Herder Spring*, 143 A.3d at 368. The Game Commission provided such a signed statement to the Bradford County Commissioners when it acquired the 7,000+ acres from CPLC. JA358-59 (statement); JA669, ¶ 35 (Proctor Trust's Proposed Findings of Fact). There is, however, no signed statement demonstrating that Proctor or the Proctor Trust ever reported their subsurface interest in the Haines Warrant to the Bradford County Commissioners and directed them to assess it separately from the surface.

Instead, the only evidence the Proctor Trust relied on were Assessment Records of LeRoy Township and Bradford County. JA397-458, JA555-86.

The Bradford County Assessment records begin, for LeRoy Township (where the Haines Warrant property was located), in tax year 1894 and run through tax year 1908. At the top of those records, the title reads, "List of Unseated Lands in the County of Bradford and the Taxes Assessed Thereon for the year . . . ." JA397-458.

---

[8] Act of 1806, Mar. 28, P.L. 644, 4 Sm. L. 346. JA503-05.

Below the title are a series of columns listing the number of acres, warrantee name, the township, the valuation of the land, the tax assessed (county, school, town, etc.), who paid the taxes and when. JA406. For example, for the 1895 tax year, Union Tanning paid the taxes assessed on the Haines Warrant on January 8, 1896. JA410. From 1903 until 1906, CPLC paid the taxes assessed on the Haines Warrant. JA440, 443, 446, 449. Nowhere in those records does it indicate that the Proctor Trust[9] reported its interest in the subsurface to the Bradford County Commissioners and directed them to separately assess the property's subsurface interest.

The LeRoy Township Assessment Records, running from 1896 until 1931, provide no evidence as to whether the Proctor Trust reported its interest in the subsurface. For the tax year 1898, for instance, there is a handwritten column stating, "Unseated Lands in Warrant Names Assessed to the Union Tanning Company," under which Haines' name appears (albeit misspelled). JA559, 561. The columns that follow identify only the number of acres, the assessed value, and "remarks," (meaning "additions or abatements made by the board of revision or commissioners"), which is blank. JA561. For 1907, in the "remarks" column next to the Haines Warrant there appears, "C.P.L. Co.," a reference to CPLC. JA575. For 1910, the Haines Warrant is assessed as "unseated land" to CPLC. JA579, 581.

---

[9] Proctor had died by December 1894.

15

These records also do not include any indication that the Proctor Trust reported its interest in the subsurface to the Bradford County Commissioners and directed them to separately assess the property's subsurface interest.

Much of the other evidence the Proctor Trust presented sheds no light on whether the Proctor Trust reported the Proctor Subsurface Reservation. That evidence related to notations for other properties (not the Haines Warrant) in Bradford County and other surrounding counties, for years both before and after the 1908 tax sale. JA664-72 (Trust's Proposed Findings of Fact); JA198-200, 205-06, 208-09, 211-12, 215-17, 222-23, 226-27 (Trial Tr.).

The Proctor Trust also pointed to the reporting practices of the entities in the chain of title. JA221-22, 224-25 (Trial Tr.); JA670-71 (Trust's Proposed Findings of Fact). The Trust's theory was that a notation purportedly identifying unseated land as being assessed to an entity, such as Union, in the township assessment records, was proof that Union reported. JA222 (Trial Tr.); JA563, 575 (LeRoy Township Assessment Records); JA670, ¶ 37 (Trust's Proposed Findings of Fact).

Notably, from 1894 until 1907, neither Proctor nor the Proctor Trust ever paid the taxes owed on the Haines Warrant. Instead, those taxes were paid by Union or CPLC. JA406, 410, 414, 418, 422, 426, 430, 434, 437, 440, 443, 446, 449, 452 (Bradford County List of Unseated Lands & Taxes).

16

Additional evidence was presented on whether McCauley, Jr., was an agent of CPLC when he purchased the Haines Warrant at the 1908 tax sale. However, whether McCauley, Jr., was an agent of CPLC is legally irrelevant to the disposition of this appeal.

### The District Court's Opinion and Order

At the conclusion of the trial, the district court ordered that, on the issue of subsurface ownership to the Haines Warrant, judgment be entered in favor of the Proctor Trust. JA50.

To come to that conclusion, the district court's analysis proceeded through a series of steps. The district court found that CPLC reported its surface interest, that McCauley, Jr., was an agent of CPLC, that CPLC breached a purported duty to pay taxes on the Haines Warrant and, as a result of all this, when McCauley, Jr., purchased the property, it effected only a redemption[10] of CPLC's surface interest, not a title wash that would have merged surface and subsurface in CPLC.

The district court found that Union and CPLC reported their surface interest to the Bradford County Commissioners. JA27, 35. This inference was based on taxes having been assessed on unseated land and paid by Union and CPLC. JA28-30, 35. From this inference, the district court then concluded that the Bradford County

---

[10] *See* fn. 4, *infra,* (explaining the concept of a redemption).

Commissioners "were 'otherwise directed' to assess the surface and subsurface estates of the Josiah Haines warrant separately." JA36.

The district court next found that McCauley, Jr., was an agent for CPLC when he purchased the property during the 1908 tax sale.

Then the district court determined that CPLC had a duty to pay taxes on the property. JA39-40, 48. Believing there was "no case on point," the district court thought it was necessary "to predict how Pennsylvania courts would rule" on whether CPLC had a duty to pay taxes. JA42. Even though, as unseated land, the taxes were chargeable to the land, not the personal responsibility of the owner, the district court reasoned that there is a difference between "personal liability" and the "duty to pay taxes." JA43-44. That distinction was based on the district court's reading of the Pennsylvania Supreme Court's 2016 *Herder Spring* decision and *Powell v. Lantzy*, 34 A. 450 (Pa. 1896). JA43-47.

Pursuant to that analysis, the district court determined that, under the rule of *Powell*, CPLC could not benefit from its failure to pay taxes and acquire better title, *i.e.*, merger of surface and subsurface, through its agent McCauley, Jr. JA48. Therefore, McCauley's purchase at the 1908 tax sale of the Haines Warrant resulted in only a redemption of CPLC's surface ownership, and the Proctor Trust's subsurface ownership was not extinguished by the tax sale. JA48-49.

18

**Certification for Interlocutory Appeal**

The Game Commission moved to certify that order, under 28 U.S.C. § 1292(b), for interlocutory appeal to this Court. The district court granted that motion, and this Court granted the Game Commission's petition for permission to appeal. JA4.

## STATEMENT OF RELATED CASES

This case has not previously been before the Court. Currently pending in the Commonwealth Court is *Pa. Game Commission v. Thomas E. Proctor Heirs Trust*, No. 493 M.D. 2017 (Pa. Cmwlth. 2020) (Ceisler, J.), which raises substantially similar issues to this matter regarding reporting of an interest in land, "title wash" versus redemption, and the statute of limitations. JA640-659; *see Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 267 A.3d 484 (Pa. 2021).

## SUMMARY OF ARGUMENT

The district court erred in quieting title to the subsurface of the Haines Warrant in the Proctor Trust. The district court permitted the Proctor Trust to collaterally attack the 1908 tax sale more than a century after it occurred. This is contrary to Pennsylvania law.

It is undisputed that the property was assessed as a whole (surface and subsurface together). This was because the County Commissioners were never otherwise directed to assess the surface and subsurface separately. So, they continued to assess the property just as they had in the past—as a whole. The district court's conclusion to the contrary—that CPLC otherwise directed the County Commissioners to assess the surface and subsurface separately—was clearly erroneous. The district court jumped to this conclusion from the mere fact that CPLC paid the property taxes. All this proved was that CPLC paid the taxes assessed against the Haines Warrant.

But even if this factual finding was supported by the record (and it is not), it is of no moment. As a matter of law, the Proctor Trust's case fails because the County Commissioners still assessed the property as a whole. If the County Commissioners erred in their assessment, this made the tax sale voidable (not void), but only for two years. After that, any irregularity in the assessment was no basis for upsetting the tax sale. The Proctor Trust's challenge to that assessment a century

later is time-barred. Tax sale purchasers are entitled to finality. The district court overlooked this fundamental part of the analysis. Because the property was assessed as a whole, it was sold at the tax sale as a whole. And that is what the tax sale purchaser acquired—a whole property, not a half interest.

Yet, according to the district court, it did not permit a collateral attack of the assessment and sale. Rather, the court thought it was determining the effect the tax sale had in 1908. That is simply wrong. The district court misread *Herder Spring*, *Powell*, and other Pennsylvania precedent. CPLC had no duty to pay taxes. The land alone was liable. The distinction the district court made between having a duty to pay taxes but having no personal liability finds no support in Pennsylvania law. Indeed, to say, as the district court did, that an owner could have a duty to pay taxes, but no personal responsibility, is illogical. Because the land alone was liable, anyone, even a title owner, could purchase the property at a tax sale. The only exceptions were instances of a contractual or fiduciary obligation between the co-owners. Neither of those existed here.

For all these reasons, the district court erred in allowing the Proctor Trust to collaterally attack this tax sale a century after it occurred. That challenge is time-barred. The effect of the 1908 sale was to convey the entire property (surface and subsurface) to McCauley, Jr., who conveyed it to CPLC who, in turn, conveyed the

property to the Game Commission. Accordingly, the Game Commission is the title owner to the entirety of the Haines Warrant, including the subsurface.

**ARGUMENT**

On appeal from a bench trial, this Court reviews findings of fact for clear error and conclusions of law de novo. *See McCutcheon v. America's Serv. Co.*, 560 F.3d 143, 147 (3d Cir. 2009); *see also* Fed.R.Civ.P. 52. A finding of fact is clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982); *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013).

> **Under Long-Established Pennsylvania Law, Either Where a Separate Subsurface Interest Was Not Reported to the County Commissioners *or* Where the Property Was Assessed as Whole, a Subsequent Tax Sale Results in a "Title Wash."**

Resolution of who has title to the subsurface in the Haines Warrant turns on the concept of "title washing." That principle of law provides that a purchaser at a tax sale of "unseated" land acquired title to the entire property. Thus, even when title to the subsurface and surface was split because of a reservation in a deed, so long as there was no separate assessment of surface and subsurface, the tax sale merged those separate interests in the tax sale purchaser. "Pennsylvania law" has "a long history of accepting the concept of a tax sale reuniting severed estates of unseated property." *Herder Spring*, 143 A.3d at 368. To understand this concept, it is necessary to discuss the distinction between "seated" and "unseated" land, three early 19th century Pennsylvania statutes, and the difference between a "title wash"

24

and a redemption. All of these important concepts are explained in the Pennsylvania Supreme Court's 2016 *Herder Spring* decision.

In that decision, now-Chief-Justice Baer wrote a "comprehensive and scholarly" opinion "extensive[ly] review[ing] . . . the historical law regarding tax sales of unseated land in Pennsylvania." *Herder Spring*, 143 A.3d at 359; *id.* at 379 (Todd, J., concurring). The analysis of the historical law in that "seminal" case is pivotal to understanding the issues raised here. *See Keta Gas & Oil Co. v. Proctor*, No. 1975 MDA 2018, 2019 WL 6652174, *3 (Pa. Super. 2019).

*Seated v. Unseated Land*

"Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land." *Herder Spring*, 143 A.3d at 363. Seated land was land that (1) "had been developed with residential structures," or (2) "had personal property upon it that could be 'levied upon for the tax due,'" or (3) "was producing regular profit through cultivation, lumbering, or mining." *Id*, quoting Robert Grey Bushong, *Pennsylvania Land Law*, Vol. 1, § 469 (II) at 500-01 (1938). In a word, seated land was developed. Unseated land, in contrast, "is best understood as 'wild' land" but it also "included any land that did not meet the requirements of being seated." *Id.* (citation omitted). The difference was critical for assessment and tax sale purposes. *See id.* at 364; *Bannard v. N.Y. State Natural Gas Corp.*, 293 A.2d 41, 49-50 (Pa.

1972); *Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 475 (W.D. Pa. 1958), *aff'd* 265 F.2d 196 (3d Cir. 1959).

"If the assessor determined that the land was seated," it was the personal responsibility of the landowner to pay the taxes. *See Herder Spring*, 143 A.3d at 364; *Bannard*, 293 A.2d at 49; *Sagamore Big Game Club*, 166 F. Supp. at 475. If, however, the assessor determined that the land was unseated, then the owner was not personally responsible; rather, "the land itself" was liable for the taxes. *See Herder Spring*, 143 A.3d at 364, 379 (the land "is debtor for the public charge"); *Bannard*, 293 A.3d at 49 ("the land, not the owner, is looked to for payment of delinquent taxes"); *Erwin v. Helm*, 13 Serg. & Rawle 151, 154 (Pa. 1825) (owners of unseated land have "no personal responsibility, the land itself is made debtor, and the process of recovery is directly against the thing"); *Sagamore Big Game Club*, 166 F. Supp. at 475 ("Unseated lands are alone liable for taxes assessed thereon").

In other words, the obligation to pay taxes on unseated land was "*in rem*." *Shale Gas Ownership*, *supra* at 108; *Stoetzel v. Jackson*, 105 Pa. 562, 567 (Pa. 1884) ("if seated," the taxes are collected "from some person; but if unseated, from the land itself"); *Sagamore Big Game Club*, 166 F. Supp. at 480 (unseated land tax collection proceedings "are in the nature of an in rem action"). Thus, the taxes were

"imposed on the land itself, in the name of the person to whom the original warrant had been issued," *e.g.*, the Haines Warrant. *See Herder Spring*, 143 A.3d at 364.[11]

Both seated and unseated land "could be divided into surface and subsurface estates," *e.g.* oil, gas, minerals, etc., "which could be separately assessed, taxed, and, if necessary, sold at tax sale." *Id.*, citing *F.H. Rockwell & Co. v. Warren Cty.*, 77 A. 665, 666 (Pa. 1910).[12] This was commonplace. Across the Commonwealth, "hundreds of thousands of acres" were severed in this fashion. *See Shale Gas Ownership*, *supra* at 112.

*The Acts of 1804, 1806, and 1815*

Through three statutes, Pennsylvania established a reporting, assessment, and tax-sale system for unseated land.

---

[11] The reason for this distinction was, with seated land, there were goods and chattels on the land, and the owners were usually residing thereon, against which taxes could be assessed. In contrast, because unseated land was undeveloped and often owned by speculators who lived elsewhere, the land itself was the only security. *See Northumberland Co. v. Phila. & Reading Coal & Iron, Co.*, 131 F.2d 562, 565-66 (3d Cir. 1942) (Maris, J); *see also Herder Spring*, 143 A.3d at 364.

[12] The Proctor family (and other wealthy families) conducted a "general scheme" of conveying their extensive land holdings to one of U.S. Leather's subsidiaries, such as Union, while excepting and reserving title to the oil, gas, and minerals. *Shale Gas Ownership*, *supra* at 112. This was all part of a business plan "to corner the hemlock bark market, and the cattle-hide tanning market along with it." *Id.* at 111.

In 1804, the General Assembly passed a law requiring "deputy surveyors to report to county commissioners all the lands surveyed in the county with a list including the acreage and the surnames of the original warrant." *Herder Spring*, 143 A.3d at 368. The commissioners were required to keep a book with this information. They were also to assess these lands for taxes.[13] *Id.*; *Shale Gas Ownership*, *supra* at 109. Section 5 of the Act of 1804, created the concept of "title washing." *Herder Spring*, 143 A.3d at 366.[14]

Two years later, the General Assembly supplemented the Act of 1804. JA503-05. The Act of 1806 placed the obligation on "every holder of unseated lands" to provide the county commissioners "with a statement describing the tract of land and 'the name of the person or persons to whom the original title from the commonwealth passed, and the nature, number and date of such original title.'" *Herder Spring*, 143 A.3d at 368, quoting Act of 1806, Section 1 (JA503-05). Thus, where "the mineral rights were severed from the surface rights the [land owner] [had

---

[13] The township assessors valued the land, and the county commissioners made the assessment. *See Hess v. Herrington*, 73 Pa. 438, 446 (Pa. 1873).

[14] Specifically, that statute reads:

[S]ales of unseated land, for taxes that are now due . . shall be in law and equity valid and effectual, to all intents and purposes, to vest in the purchaser or purchasers of lands sold as aforesaid, all the estate and interest therein, that the real owner or owners thereof had at the time of such sale, although the land may not have been taxed or sold in the name of the real owner.

to] give[] notice of this fact to the commissioners or to the assessor." *Hutchinson v. Kline*, 49 A. 312 (Pa. 1901) (per curiam).

The duty to report continued for future transfers. "[E]very person . . . becoming a holder of unseated land, by gift, grant, or other conveyance" was obligated "to furnish a like statement." JA504 (Act of 1806). Notably, there was no duty on the county commissioners "to search through deed books to discover whether lands had changed hands." *Herder Spring*, 143 A.3d at 368-69. If a holder failed to report a severance, the penalty was four times the amount of tax that would have been owed. *Id.* at 368. This penalty, however, was solely for the failure to report, not the failure to pay. *Id.*

The Act of 1815 amended the Act of 1804 by adjusting the timing of tax sales and notice requirements and by easing the burden of proving that the tax sale was "rightly done." *Morton v. Harris*, 9 Watts 319, 323 (Pa. 1840); JA506-10 (Act of 1815). Specifically, so that there would be no surprise, tax sales were held on the same biennial date—the second Monday of June 1816, and every two years thereafter. 72 P.S. § 5981; *Herder Spring*, 143 A.3d at 364; *Peters v. Heasley*, 10 Watts 208, 211 (Pa. 1840). Notice (solely in the name of the warrant) had to be published in certain newspapers 60 days ahead of the sale. 72 P.S. § 6001; *Herder Spring*, 143 A.3d at 365. This was unlike tax sales for seated land, which, under the law, required notice to the owner. *Herder Spring*, 143 A.3d at 366.

The Act of 1815, however, did not leave landowners whose land was sold at a tax sale without a remedy. Even after the tax sale, the prior owner still had two years to "redeem" or "recover" the property by paying the outstanding taxes plus interest. 72 P.S. § 6091; *Herder Spring*, 143 A.3d at 366; *see also Yocum*, 29 A. 778 at 779 (noting that redemption operates to nullify a tax sale). During that two-year period, the prior owner could also upset the tax sale by challenging "procedural irregularities in the notice, *assessment*, and tax sale process." *Cornwall Mtn. Investments, L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148, 160 (Pa. Super. 2017) (emphasis added). This included the "failure to assess [the] subsurface estate separately from the surface estate." *Herder Spring*, 143 A.3d at 374.

This two-year period was a statute of limitation. *Cornwall*, 158 A.3d at 160-61; *see also Sagamore Big Game Club*, 166 F. Supp. at 478. This balanced the rights of delinquent owners, giving them the opportunity to redeem the property or rectify any errors in the sale, with those of purchaser, who could expect that the sale would become final within a reasonable time. *Herder Spring*, 143 A.3d at 366.

 After that time, "no alleged irregularity in the assessment, or in the process or otherwise" could affect title in the purchaser. 72 P.S. § 6091; *Herder Spring*, 143 A.3d at 366; *Hubley v. Keyser*, 2 Pen. & W. 496, 502-03 (Pa. 1831); *see also Cornwall*, 158 A.3d at 161 (surface owner's improper motive for assessment—to precipitate default and tax sale so as to gain title to subsurface—was no reason to

void sale). Thus, an assessment "cannot be collaterally attacked fifty years later." *Bannard*, 293 A.2d at 49; *see Northumberland Cty.*, 131 F.2d at 567 ("assessments are not subject to collateral attack"); *see also Williston v. Colkett*, 9 Pa. 38, 39 (Pa. 1848) ("It was clearly the intent of the act of 1815, to make sales for taxes good").

Instead, a tax sale can only be challenged as "void" (not voidable) when "there [are] jurisdictional defects." *Cornwall*, 158 A.3d at 160; *Hubley*, 2 Pen. & W. at 501-02; *see also Stewart v. Shoenfelt*, 13 Serg. & Rawle. 360, 372 (Pa. 1825) (addressing whether assessment was "irregular" or "void"). Jurisdictional defects arise in the following discrete situations:  "where seated property was improperly treated as unseated;" or "where unseated property was not correctly identified;" or "where the taxes were paid;" "or where the deed was forged;" "or where the treasurer lacked the authority to conduct the sale at the time." *Cornwall*, 158 A.3d at 160-61 (citations omitted).

*Title Wash v. Redemption*

Where a severance of the subsurface from the surface was not reported to the County Commissioners, the land was sold as a whole (surface and subsurface) to satisfy the delinquent taxes. *See Herder Spring*, 143 A.3d at 374-75; *Hutchinson*, 49 A. at 312; *cf. Potter Gas Co. v. Dunshie*, 42 Pa. Super. 457, 458 (Pa. Super. 1910) (land was assessed as a whole until gas company requested that county commissioners separately assess the oil, gas, and mineral estate). Similarly, "[w]hen

there is no separate assessment of the" subsurface, irrespective of compliance with the reporting requirement, the property was also sold as a whole. *Sagamore Big Game Club*, 166 F. Supp. at 475; *see Herder Spring*, 143 A.3d at 367, citing *Powell*, 34 A. at 450; *see also Rockwell v. Keefer*, 39 Pa. Super. 468, 475 (Pa. Super. 1909) (noting that where the owner of mineral estate in unseated land "does not have his interest separately assessed," he loses title at a tax sale); 36 Energy & Mineral Law Foundation § 21.05 (2015) ("an unseated tax sale conveyed the entire interest in the property, excepting and reserving only interests which *were separately assessed*") (emphasis added).

If, for either of these reasons (no reporting or reported but still assessed as a whole), the property was sold as a whole, interests that had been separate because of a reservation in a deed (surface and subsurface) were merged in the tax sale purchaser. *See Herder Spring*, 143 A.3d at 368, 374-75. As the Pennsylvania Supreme Court recently reemphasized, "'a tax sale extinguishes all previous titles,' and excludes 'all other claimants to the land of a prior date.'" *Id.* at 366-67, quoting *Reinboth v. The Zerbe Run Improvement Co.*, 29 Pa. 139, 145 (Pa. 1858); *Caul v. Spring*, 2 Watts 390, 396 (Pa. 1834); *Sagamore Big Game Club*, 166 F. Supp. at 475. In a word, "title washes."

A title wash still occurs even when the purchaser at the tax sale is the surface (or subsurface) owner. The Pennsylvania Supreme Court has long held that there is

no "equitable reason for forbidding the surface owner," who failed to pay the taxes, "from purchasing the entire property at [a] tax sale" and so acquire superior title. *Herder Spring*, 143 A.3d at 367, citing *Powell*, 34 A. at 450. Stated differently, the principle that "one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty" by not paying the taxes, has no application. *Powell*, 34 A. at 451.

Thus, this rule, the rule of *Powell*, only applies if there is a *personal* duty to pay taxes, as there is in the case of *seated* land. If there is a personal duty, then an owner who purchases the property at a tax sale redeems only his interest. *See id.* The taxes owed on *unseated* land, however, were "not the landowner's personal responsibility." They were chargeable to the land, *i.e.*, *in rem. See Herder Spring*, 143 A.3d at 367, citing *Powell*, 34 A. at 450; *Neill v. Lacy*, 1 A. 325 (Pa. 1885) (owner of surface, who paid taxes on whole property to avoid tax sale, could not seek contribution from the subsurface owner for his share of the taxes owed because "the unseated land was the debtor, and there was no personal liability").

Although they might seem "at odds with modern legal concepts" or even "harsh," the "tax sale and title wash system" was a "widely acknowledged, uncontroversial feature of Pennsylvania law." *See Herder Spring Hunting Club v. Keller*, 93 A.3d 465, 473 (Pa. Super. 2014), *aff'd* 143 A.3d 358 (Pa. 2016); *Shale Gas Ownership*, *supra* at 111. Indeed, they were "viewed as perfectly natural,

lawful, and valid by court and legal commentators at the time." *Shale Gas Ownership*, *supra* at 109 (collecting authorities).[15]

Having set forth the governing law, for the reasons explained in the next sections, the district court erred by misapplying that law and by determining that there was no title wash here.

### A. Neither Proctor nor the Proctor Trust ever reported their subsurface interest.

The district court clearly erred in finding that the Bradford County Commissioners were "otherwise directed" to separately assess the surface and subsurface. JA35-36. This error flowed from a series of missteps by the district court.

*First*, and notably, the district court never found, as fact, that Proctor or the Proctor Trust ever reported their subsurface interest in the Haines Warrant. Recall, the Act of 1815, required "every person . . . becoming a holder of unseated land" to report their interest to the County Commissioners. JA504. This requirement even applied to those who became holders "by gift, grant, or other conveyance." *Id*. The Act of 1815, thus, clearly applied to those who inherited an interest via a Last Will and Testament. In 1894, Proctor died, and so his interest in the Haines Warrant

---

[15] The law reflected a balance of public interests, ensuring that taxes were paid and land was developed, while protecting the rights of landowners not to lose their land without a reasonable opportunity of notice. *See Herder Spring*, 143 A.3d at 363-64 *Williston*, 9 Pa. at 39; *Frick v. Sterrett*, 4 Watts & Serg. 269, 271-72 (Pa. 1842); *Morton*, 9 Watts at 323.

passed to his heirs. JA168, ¶¶ 9-10 (S/F). The Proctor Heir Trust never reported its interest in the subsurface. So, they failed to comply with the Act of 1815.

*Second*, there is no evidence that CPLC "otherwise directed" the County Commissioners to separately assess the surface and subsurface. JA35-36. The district court drew this conclusion from the mere fact that CPLC paid the taxes assessed on the Haines Warrant. JA30, citing JA440, 443, 446, 449. But all that established was that CPLC paid the taxes that had been assessed against the Haines Warrant. That alone was legally insignificant. Anyone can pay the taxes assessed against the land, even a stranger. *See City of Reading v. Finney*, 73 Pa. 467, 472 (Pa. 1873) ("[p]ayment of the tax, whether by the owner or anyone else, will avoid the sale," and "if the tax be paid, though not by [the owner], it will avail him"). This was certainly not proof that CPLC had reported to the County Commissioners that there was a severance of surface and subsurface ownership between it and the Proctor Trust. *See Herder Spring*, 143 A.3d at 369 (discussing reporting of severance).

*Third*, even after CPLC acquired the property in 1903, the Haines Warrant continued to be assessed as a whole, not separately. This fact should have led to only one conclusion—no one directed the County Commissioners to separately assess the Haines Warrant. *See Hutchinson*, 49 A. at 312; *see also Heft v. Gephardt*, 65 Pa. 510 (Pa. 1870) (tax system treats unseated lands "in reference to the original warrants when not otherwise directed by the owners").

In sum, the district court simply assumed from the mere fact that CPLC paid the taxes assessed on the Haines Warrant that CPLC reported that it owned only the surface and was directing the County Commissioners to assess the surface and subsurface interests separately. This was an entirely unwarranted inference from the facts produced at trial. The district court clearly erred, and this Court must reverse that factual finding. *See generally Inwood Labs., Inc.*, 456 U.S. at 855; *Johnson*, 724 F.3d at 345. Once that finding is reversed, there is no proof that the County Commissioners were otherwise directed to separately assess the subsurface. This means the Haines Warrant was properly sold as a whole.

Yet, even assuming the district court's factual finding is supported by the evidence (and as just detailed, it is not), that led the district court to an analytical error: it is immaterial as a matter of law. As explained in the next section, inquiry into whether the County Commissioners properly sold the property as a whole is time-barred. The statute of limitations is dispositive here.

## B. Even if Proctor or the Proctor Trust had reported, the property was, undisputedly, assessed as a whole, and they are time-barred from challenging that assessment a century later.

Even if Proctor or the Proctor Trust had reported the severance, this is not dispositive. What matters is what was actually assessed. As in *Herder Spring*, "the issues in this case turn on whether the taxes assessed and not paid in [1908] *were assessed* on the [Haines] Warrant as a *whole or merely upon the surface estate*." 143

A.3d at 368 (emphasis added); *see Sagamore Big Game Club*, 166 F. Supp. at 475 (where "*there is no separate assessment*, a purchase of the whole by the owner of the surface divests the title of the owner of the minerals") (emphasis added); *Rockwell*, 39 Pa. Super. at 475 (noting that where an owner of a mineral estate does "*not have his interest separately assessed*," he loses title at the tax sale) (emphasis added). As this Court put it, if surface and subsurface had been severed, "*and if each of the several interests had been separately assessed*," a tax sale would have conveyed title to only the estate in default. *See Sagamore Big Game Club*, 265 F.2d at 199 n.4 (emphasis added).

Most recently, Judge Ellen Ceisler of the Commonwealth Court came to this same conclusion. JA647-48 (*Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, Docket No. 493 M.D. 2017 (Jan. 16, 2021) (Ceisler, J.). Judge Ceisler recognized that "the pertinent question [is] not . . . whether the severance/reservation was reported at all, but only whether the assessment and taxation were on the entire estate . . . .". JA647. Although the Pennsylvania Supreme Court vacated this opinion, it was on other grounds and not because Judge Ceisler misstated the governing law. *Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, 2021 WL 5346728 (Pa. 2021).

The Haines Warrant was, undisputedly, assessed as a whole and, therefore, it was sold at the tax sale as a whole. *See Brundred v. Egbert*, 164 Pa. 615, 622 (Pa. 1894); *Sagamore Big Game Club*, 265 F.2d at 199 n.4. As already detailed, this was

37

because neither Proctor nor the Proctor Trust ever reported their interest and directed the County Commissioners to separately assess the subsurface.

Yet, even if they did so report (or, as the district court found, CPLC complied with the Act of 1806 and so "otherwise directed" the Commissioners to separately assess the surface and subsurface, JA36), no separate assessment of the subsurface actually occurred. If that was an error, then it amounted to an "irregularity." *See Herder Spring*, 143 A.3d at 365-66; *Cornwall*, 158 A.3d at 160; *see also Ryan v. Bruhin*, 88 Pa. Super. 61, 67-68 (Pa. Super. 1926) (allegation that lots should have been separately assessed was time barred).[16] Such an error, if it occurred, made the 1908 tax sale voidable for two years. *See Herder Spring*, 143 A.3d at 374 (if prior owner disputed commissioners' failure to separately assess subsurface, they should have raised that during two-year period); *see also Kaiser Energy, Inc. v. Dep't of Envt'l Res.*, 535 A.2d 1255, 1258 (Pa. Cmwlth. 1988) (challenge to 1823 tax sale was time-barred).

After that two-year statutory period, irregularities are no basis for upsetting the tax sale. *See Herder Spring*, 143 A.3d at 374; *Cornwall*, 158 A.3d at 160; *see also Kaiser Energy*, 535 A.2d at 1258. They are time-barred. 72 P.S. § 6091; *Hubley*, 2 Pen. & W. at 502-03. Again, only jurisdictional defects can void the sale, and there

---

[16] The passage of time is said to "cure" the irregularity. *See Carns v. Matthews*, 174 A. 840, 842 (Pa. Super. 1934).

38

are none alleged here. *Cornwall*, 158 A.3d at 160. In other words, this time bar ultimately renders the question of whether the severance was reported to the County Commissioners and whether the property should have been separately assessed prior to the 1908 tax sale immaterial as a matter of law.

The district court overlooked this key part of the analysis, even though the Game Commission clearly raised this issue. JA624-25. The district court jumped from whether CPLC reported its interest, JA36, to whether CPLC breached a duty to pay taxes, JA39-48. The court did not address the legal significance of the fact that the property was assessed as a whole, and that the Proctor Trust did not challenge that assessment within the two-year statutory period.

Through this mistaken analysis, the district court permitted the Proctor Trust to "collaterally attack" the 1908 tax sale, with the district court asking, "*what was offered for sale*" and "*what interest this tax sale effectively conveyed*." JA38; *Proctor Heirs Trust*, 455 F. Supp. 3d at 154 (summary judgment opinion). This was contrary to Pennsylvania law and the undisputed facts. *See Bannard*, 293 A.2d at 49. To repeat, the Haines Warrant was assessed as a whole, and so sold as whole. *Brundred*, 164 Pa. at 622; *Sagamore Big Game Club*, 265 F.2d at 199 n.4. If that assessment was erroneous, as the Proctor Trust now maintains more than one century and a decade past the statute of limitations, it should have raised that issue by 1910.

Application of the statute of limitations is especially important here. The statute of limitations promotes finality and assures owners that they can develop their land without fear that the land will be returned to a prior owner. *See Herder Spring*, 143 A.3d at 366.

### C. Contrary to the district court's conclusion, *Herder Spring* controls the outcome here.

Through its erroneous analysis, the district court permitted the Proctor Trust to conduct a time-barred collateral attack on the 1908 tax sale. This flowed from the mistaken notion that the district court, as urged on by the Proctor Trust, was merely determining the effect of the 1908 tax sale, and that the effect of the sale was merely a redemption of CPLC's title to the surface. The effect of the sale was a conveyance of the whole property (surface and subsurface), and a wash of title. The district court misread fundamental Pennsylvania precedent governing title wash, and made a distinction between having a duty to pay taxes but no personal liability that is both illogical and contrary to Pennsylvania law.

To reiterate, the rule of *Powell* is that "one cannot profit by his own wrong" and acquire superior title by failing to pay taxes. *Powell*, 34 A. at 451. However, this rule applies only when there is a *personal* duty to pay taxes. *See Herder Spring*, 143 A.3d at 367, discussing *Powell*, 34 A. at 451 (stating that it is the "failure to pay taxes which *he owed* the state," *i.e.*, he personally owed) (emphasis added). The

district court misread *Herder Spring*, *Powell*, and other Pennsylvania precedent in concluding that CPLC had a duty to pay taxes.

That precedent provides that the owner(s) of unseated land is not personally responsible for the taxes. Rather the land itself is liable. The "decisions are many and uniform" for this principle of law. *Sagamore Big Game Club*, 166 F. Supp. at 475, 480; *see Herder Spring*, 143 A.3d at 364; *Bannard*, 293 A.2d at 49; *Stoetzel*, 105 Pa. at 567; *Potter Gas*, 42 Pa. Super. at 459.

The district court found that this principle, that the land (not the person) is liable, did not apply because it could find no case addressing "whether . . . an agent [McCauley, Jr.] who purchases at a tax sale induced by his principal's [CPLC] default takes good title to the entire property." JA40. The district court was simply wrong. The Pennsylvania Supreme Court addressed this very point in *Herder Spring*.

In *Herder Spring*, the Pennsylvania Supreme Court pointed to two important cases: *Powell* (the very case the district court misapplied) and *Hutchinson*. *See Herder Spring*, 143 A.3d at 367. First, in *Powell*, one of the defendants, John Lantzy, purchased the surface rights, in 1883, at a time when the property was in default on its taxes. 34 A. at 451. The next year, Lantzy purchased the property, sold as a whole at a tax sale. *Id.* Years later, the plaintiffs, H.B. and J.F. Powell, purchased a half interest in the coal from a prior owner, Flinn. The Powells sued seeking to eject Lantzy and so recover the coal and minerals from the subsurface.

The *Powell* Court recited the rule that an owner cannot acquire better title by failing to pay the property taxes, but the Court emphasized that this rule is "restricted to cases where it was the duty of the purchaser to pay the tax." *Id.* And in that particular case, Lantzy had "no personal responsibility" to pay the taxes because "[t]he land alone was liable." *Id.*

Moreover, the Court also highlighted, the only exceptions to this rule are where there is a contractual or fiduciary obligation (as in the case of joint tenants or tenants in common) requiring the purchaser to pay the taxes. *Id*. *Id.* But Lantzy and the Powells had no such relationship. *Id.* Lantzy bought the surface from Flinn at a time when taxes were outstanding. This means that Lantzy took the property "subject to whatever taxes had been levied prior" to his purchase of the surface. *City of Philadelphia v. Miller*, 182 Pa. Super. 239, 247 (Pa. Super. 1956); *see also Robinson v. Williams*, 6 Watts 281 (Pa. 1837) (unseated land could still be sold for delinquent taxes seven years after it became seated). Yet, nothing prevented Lantzy from acquiring title to the entire property by purchasing it at the tax sale because, as the *Herder Spring* Court recounted, there was no duty on the landowner to pay taxes. 143 A.3d at 367.

Next, in *Hutchinson*, the plaintiff, Charles Hutchinson, reserved an interest in the gas, coal, iron, and petroleum when conveying the property to Hamlin and Gilpin in 1883. 49 A. at 312. Nine years later, J. Powell, purchased the property at a tax

42

sale. Powell's successor, Kline, claimed title to both the surface and the subsurface as a result of the tax sale. The trial court ruled in favor of Kline, and the Pennsylvania Supreme Court affirmed. Citing *Powell*, the trial court highlighted that there was no contractual or fiduciary relation between Powell and Hutchinson that prevented Powell from purchasing the entire property at the tax sale. *Id.*

In summing up these two cases, a pair of commentators explained, "[t]he fact that the land at issue in *Hutchinson* and [in *Powell*] was purchased at the tax sale by an associate or an intermediary of the land's pre-tax owner is immaterial." *Shale Gas Ownership*, *supra* at 113. This is because the "lands were unseated, and thus the taxes were never assessed against or owed by the owner in the first place—they were only on the land itself." *Id.*; *see also Sagamore Big Game Club*, 166 F. Supp. at 478 (owner may purchase unseated land at tax sale, as he is considered a "stranger" to the title).

Based on *Herder Spring*, *Powell*, and *Hutchinson*, McCauley, Jr.'s purchase of the property at the tax sale, as an agent of CPLC, is immaterial. The land itself was liable for the taxes owed, not CPLC, and not the Proctor Trust. It would only be otherwise if there were a contractual or fiduciary relation between the owners. There was no such relation between CPLC and the Proctor Trust. Indeed, none is claimed.[17]

---

[17] Even if a fiduciary relationship existed between McCauley, Jr., and CPLC, because the former was the latter's agent, only CPLC would have the right to raise

### 1. The district court's distinction between the duty to pay taxes and the lack of personal liability is contrary to Pennsylvania law.

The district court read Pennsylvania law as distinguishing between personal liability and a duty to pay taxes. JA43-48. This was error.[18]

In *Herder Spring*, the Pennsylvania Supreme Court most recently addressed this issue directly. There, the Court recounted that, more than a century earlier, it had "explained the duty, *or lack thereof*, of landowners to pay taxes: 'The whole was subject to a claim for taxes which existed before they acquired title, and which neither the surface nor the subsurface owner was under any obligation to the state to pay. If either the surface or subsurface owner had paid it, he could not have recovered of the other his proportionate share.'" *Herder Spring*, 143 A.3d at 367 (emphasis added), quoting *Powell*, 34 A. at 452 (internal alterations omitted); *see also Neill*, 1 A. at 325 (subsurface owner, who paid taxes to prevent tax sale, could not compel surface owner to pay his share because there was "no personal liability"); *Robinson*,

---

that issue. But CPLC did not do so, and the statute of limitations based on any breach of fiduciary trust has also long since passed. *See McKean & Elk Land & Improvement Co. v. Hacker*, 10 Pa. C.C. 490, 494 (Elk Cty. Ct. of Common Pleas 1891).

[18] In its first summary judgment opinion, the district court correctly read Pennsylvania law as imposing "no duty—legal, contractual, equitable, or otherwise—obligating CPLC to pay the 1907 taxes." Doc. 166 at 35; *see also* Doc. 155 at 65-69 (R&R) (concluding the same). But the district court reversed itself on this issue in its subsequent summary judgment opinion. Doc. 182, 183, 184.

6 Watts at 285 (neither "is the owner, or any other, personally liable" for taxes on unseated lands).

The district court read this controlling language from *Herder Spring* as "dicta" because it related "directly to the facts of *Powell*." JA46. According to the district court, neither the surface owner nor the subsurface owner in *Powell* had any obligation to pay overdue taxes because those taxes had accrued while someone else owned the property. *Id.* But, this is untrue. As previously explained, Lantzy bought the surface from Flinn at a time when taxes were outstanding, *Powell*, 34 A. at 450-51, meaning Lantzy took the property "subject to whatever taxes had been levied prior" to his purchase of the surface. *See Miller*, 182 Pa. Super. at 247; *see also Robinson*, 6 Watts at 281. And yet, nothing prevented Lantzy from acquiring title to the entire property by purchasing it at the tax sale. As the *Herder Spring* Court recounted, this is because there was no duty on the landowner to pay taxes. 143 A.3d at 367.

The district court also thought the "no duty" language from *Herder Spring* was merely dicta because other Pennsylvania cases and a statute had referred to a duty to pay taxes. JA44-45, citing Act of June 6, 1887, P.L. 363, No. 248, § 1 (JA511); *Breisch v. Coxe*, 81 Pa. 336, 346 (Pa. 1876); *Mayor of Phila. v. Riddle*, 25 Pa. 259, 263 (Pa. 1855); *McCoy*, 7 Watts & Serg. at 386. But these cases merely used "duty" as shorthand. *See Russel v. Werntz*, 24 Pa. 337, 336 (Pa. 1855) (stating

both that land "was the debtor for taxes" and that it was warrant owner's "duty, as a good citizen, to pay the taxes"); *Hunter v. Cochran*, 3 Pa. 105, 107 (Pa. 1846) (per curiam) ("the charge of a tax upon unseated lands is no *charge* [that is, no duty] upon the person of the owner") (emphasis added);[19] *Hutchison v. Ash*, 74 Pa D. & C. 481, 488 (Ct of Common Pleas, Lycoming Cty. 1949) ("the land itself is responsible for the taxes *regardless of the question of ownership*") (emphasis added). After all, the land itself cannot pay taxes. It is a person that actually pays the taxes. These cases and this statute merely reflect reality.

Further, some of the language the district court quoted was in response to cries that selling land at a tax sale is inequitable. *See Appeal of Gault*, 33 Pa. at 97-98. It was not in response to any assertion that an owner has a duty to pay taxes. *See Strauch v. Shoemaker*, 1 Watts & Serg. 166, 176 (Pa. 1841) (owner is "bound" to pay taxes "upon every principle of *equality and justice*," but, notably, not saying there was a "legal duty" to pay) (emphasis added); *see id.* (noting that "vigilant owner has nothing to fear").

Under the district court's reasoning, a person could have a duty to pay taxes but face no personal liability, and an owner could have a duty to pay taxes but "no . . . personal responsibility." JA44. That is not the law. Duty and liability are

---

[19] Charge means "[a]n incumbrance, lien, or burden; an *obligation* or *duty*; a *liability*." Black's Law Dictionary, *charge* (1st ed. 1891) (emphasis added).

inextricably intertwined. "'Duty is only a word with which we state our conclusion that there is or is not to be liability.'" Black's Law Dictionary, *duty*, (11th ed. 2019), quoting William L. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 15 (1953). Pennsylvania law follows this same basic principle of law: where "there is no duty, there can be no liability." *Clement v. U.S. Pipe Line Co.*, 97 A. 1070, 1071-72 (Pa. 1916); *Foote v. Smullen & Barry*, 84 Pa. Super. 420, 423 (Pa. Super. 1925).

The district court should have followed *Herder Spring* and these principles of law. Had the court done so, it would have inevitably concluded that no personal responsibility and no duty are synonymous. So, if there is no personal responsibility, there is no duty and, therefore, no personal liability. One last time—in this context, the land alone—not the owner(s)—is liable. *See Herder Spring* 143 A.3d at 364; *Bannard*, 293 A.3d at 49; *Erwin*, 13 Serg. & Rawle at 154; *Sagamore Big Game Club*, 166 F. Supp. at 475.

## 2. The district court's ruling upends Pennsylvania law and the settled expectations of landowners.

The district court's ruling, if left standing, would do profound damage to Pennsylvania law, leaving chaos in its wake. That ruling eviscerates the concept of a "title wash." Recall, the district court determined that CPLC could not use an agent to acquire better title or a title adverse to the Proctor Trust at a tax sale prompted "by its own default." JA42-43. This determination, applicable to McCauley, Jr., as an agent for CPLC, would apply equally to CPLC as the principal. Restatement

(Second) of Agency, § 1. So, according to the district court (just as it stated in its certified question), CPLC also could not have purchased the entire property at the tax sale. This entirely undermines Pennsylvania law.

As the *Herder Spring* Court noted, "Pennsylvania law [has] a long history of accepting the concept of a tax sale reuniting severed estates of unseated property and perfecting previously defective titles." 143 A.3d at 368; *see Coxe v. Gibson*, 27 Pa. 160, 165 (Pa. 1856) ("there is nothing in reason or law to prevent a man who holds defective title from purchasing a better [one] at a treasurer's sale for taxes. It is a very common remedy for defective titles"). For an owner holding potentially defective title, the way to perfect title would be to *default* on the property's taxes. If a default is disqualifying, then there is no legal way to wash title. This cannot be correct. *See Sagamore Big Game Club*, 166 F. Supp. at 479, citing John Whitworth, *Tax Sale and Titles*, § 46 (1900) ("where one purchases lands at tax sales, and he has any doubt as to the sufficiency of the title, he can perfect it by purchase of the land *at a subsequent tax sale*") (emphasis added).

Besides being legally erroneous, the district court's determination results in practical problems. There is no notice in the public record indicating that when McCauley, Jr., purchased the Haines Warrant at the tax sale he was acting as CPLC's agent. The treasurer's deed simply notes that McCauley, Jr., purchased the property. JJA498. "No title examiner from the public record could acquire such knowledge as

to the relationship between McCauley and his employer." *Sagamore Big Game Club*, 166 F. Supp. at 479. Consequently, future purchasers, such as the Game Commission, would have no notice that they were purchasing only a half-interest in a property. *See id.* (subsequent purchaser was "entitled to rely upon the record title as it appear[ed]" in county records).

CPLC engaged in "a regime of systematic title washing," frequently using McCauley, Jr., to "buy the unified title to the land at the tax sale." *See Shale Gas Ownership, supra* at 112. There may be "hundreds of thousands of acres," title to which was washed, that are now in doubt because of the district court's erroneous reading of Pennsylvania law. *Id.*

To answer the district court's certified question, no, CPLC did not have a legal duty to pay taxes on the Haines Warrant. The taxes owed were chargeable to the land, not CPLC. This is because the land was unseated and was assessed as a whole, not separately. It ultimately does not matter why the land was assessed as a whole (whether because Proctor or the Proctor Trust did not report or because the Commissioners simply erred in their assessment). In either case, a challenge to this more than century-old assessment is time-barred. For this reason, the assessment and tax sale may not now be collaterally attacked. The district court erred when it allowed the Proctor Trust to do so. The district court should have held, as a matter

of law, that at the 1908 tax sale the entire property was sold to McCauley, Jr. This was the effect of the tax sale—a conveyance of the entire property, a title wash.

Crucially, for this unseated land, not separately assessed, CPLC had no duty to pay taxes. Pennsylvania law is clear on this point—the land alone was liable. Accordingly, the rule of *Powell*—that one cannot profit by his own wrong, *i.e.*, by not paying taxes—does not apply. Rather, the separate ownership of surface and subsurface were merged in McCauley, Jr., as the tax sale purchaser. For these reasons, the district court erred in awarding ownership of the Haines Warrant to the Proctor Trust. Title to the entire property belongs in the Game Commission.

The district court suggests that these issues of state law are novel. As we have detailed throughout, they are not. If, however, this Court agrees with the district court, JA42, this Court may certify these issues (even *sua sponte*) to the Pennsylvania Supreme Court. *See* Local Appellate Rule 110.1; 3d Cir. IOP § 10.9; Pa. Sup. Ct. IOP § 8; *see also U.S. v. Defreitas*, 29 F.4th 135, 141 (3d Cir. 2022) (explaining that when considering certification the relevant factors include whether the question is "material," of "importance," and the federal court "cannot predict how a state court would rule").

## CONCLUSION

For these reasons, the Court should reverse the judgment of the district court.

Alternatively, the Court should certify these controlling questions of state law for

decision by the Pennsylvania Supreme Court.

<div style="margin-left:40%">

Respectfully submitted,

JOSH SHAPIRO
Attorney General

By:  /s/ Michael J. Scarinci
_____

MICHAEL J. SCARINCI
Deputy Attorney General
Bar No. 323816 (Pa.)

J. BART DeLONE
Chief Deputy Attorney General
Appellate Litigation Section

</div>

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 857-2184
FAX:  (717) 705-2331

DATE: June 7, 2022

## CERTIFICATE OF COUNSEL

I, Michael J. Scarinci, Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That the following virus detection program – SYBARI ANTIGEN Version 8.00.1470 – was run on the file and no virus was detected.

4. That this brief contains 11,384 words within the meaning of Fed. R. App. Proc. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Michael J. Scarinci, Deputy Attorney General, do hereby certify that I have this day served the foregoing Brief For Appellants and Joint Appendix Volume I, via electronic service, on the following:

> Christopher R. Healy, Esq.
> Troutman Pepper Hamilton Sanders
> Two Logan Square
> 18th & Arch Streets
> Philadelphia, PA 19103
>
> Laura A. Lange
> 1670 Sturbridge Drive
> Sewickley, PA 15143
>
> Justin G. Weber
> Troutman Pepper
> 100 Market Street
> P.O. Box 1181
> Suite 200
> Harrisburg, PA 17108
> Attorneys for Appellees

Seven copies were also sent by first class mail to the Clerk of the United States Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Deputy Attorney General

DATE: June 7, 2022

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1587

_____

COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME
COMMISSION,

**Appellants**

v.

THOMAS E. PROCTOR HEIRS TRUST

_____

JOINT APPENDIX VOL. I

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
ENTERED DECEMBER 3, 2021


JOSH SHAPIRO
*Attorney General*

Office of Attorney General
15th Floor, Strawberry Square     BY:     MICHAEL J. SCARINCI
Harrisburg, PA 17120                              *Deputy Attorney General*
Phone: (717) 857-2184
FAX:   (717) 772-4526                            J. BART DELONE
                                                                *Chief Deputy Attorney General*
DATE: June 7, 2022                             *Appellate Litigation Section*

# JOINT APPENDIX
## INDEX

## VOLUME I of V

| Docket No. | Document Description | Page Numbers |
|---|---|---|
| 229 | Certification Order, dated Jan. 28, 2022 | JA1-3 |
| 3d Cir. 6-1 | Order granting permission to appeal, dated Mar. 24, 2022 | JA4-5 |
| 222 | District Court Memorandum Opinion, dated Dec. 3, 2021 | JA6-49 |
| 223 | District Court Order, dated Dec. 3, 2021 | JA50 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | : : : | CIVIL ACTION NO. 1:12-CV-1567 |
| | : | (Judge Conner) |
| Plaintiff | : : | |
| v. | : : | |
| THOMAS E. PROCTOR HEIRS TRUST, | : : : | |
| Defendant | : : | |

**ORDER**

AND NOW, this 28th day of January, 2022, upon consideration of the motion (Doc. 225) for certification of interlocutory appeal by plaintiff the Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), wherein the Game Commission requests immediate appellate review of the court's December 3, 2021 order and to stay proceedings during said appeal, (see id. at 1), and the parties' respective briefs in support of and opposition to said motion, and the court noting that interlocutory appeal is appropriate when the movant establishes that the relevant issue involves a "controlling question of law" over which there is "substantial ground for difference of opinion" and appeal of which "may materially advance the ultimate termination of the litigation,"[1] see 28 U.S.C. § 1292(b), and that

---

[1] The Trust does not dispute that the court's December 3, 2021 opinion and order contains a controlling question of law over which there is substantial ground for difference of opinion, and argues only that "the Game Commission cannot establish that certification will materially advance the ultimate termination of the litigation." (See Doc. 227 at 3-7).

**JA1**

the court should exercise its discretion to certify an interlocutory appeal only in

"exceptional cases," see Caterpillar Inc. v. Lewis, 519 U.S. 61, 74 (1996) (internal

quotation marks omitted); Vicky M. v. Ne. Educ. Intermediate Unit, No.

3:06-cv-1898, 2009 WL 4044711, at *4 (M.D. Pa. Nov. 20, 2009) (citing Link v.

Mercedes-Benz of N. Am., 550 F.2d 860, 863 (3d Cir. 1997)), and the court further

noting that there may be "substantial ground[s] for difference of opinion" when

there is no controlling precedent—or there is conflicting precedent—regarding the

relevant question of law, see In re Chocolate, 607 F. Supp. 2d at 705-06 (citations

omitted); Juice Entm't, LLC v. Live Nation Entm't, Inc., 353 F. Supp. 3d 309, 313

(D.N.J. 2018) (citation omitted), and that interlocutory appeal may be appropriate

when the issue is novel or highly complex, see In re Frascella Enters., No. 08-100,

2008 WL 4155676, at *3 (E.D. Pa. Sept. 10, 2008) (citation omitted), and the court

observing that in the matter sub judice, our December 3, 2021 order (Doc. 223) rests

in part upon the legal conclusion that the Central Pennsylvania Lumber Company

("CPLC") had a preexisting duty to pay taxes on its unseated surface estate, and

therefore could not use an agent (here, Calvin H. McCauley, Jr.) to acquire better

title to that land at a tax sale prompted by CPLC's default on such taxes, (see Doc.

222 at 34-44); that the court's conclusion on this issue constitutes a "controlling

question of law," see 28 U.S.C. § 1292(b); and that the Game Commission cites to

Pennsylvania state-court decisions that provide "substantial ground for difference

of opinion," see 28 U.S.C. § 1292(b); (see also Doc. 226 at 5-8; Doc. 228 at 2-5), and

the court further observing that we have ruled on the ownership of a single tract,

the bellwether Josiah Haines warrant, in our December 3, 2021 opinion and order,

**JA2**

but this litigation involves dozens of similar tracts that would each be subject to the same controlling legal question involving the preexisting duty to pay taxes on unseated lands, (see Docs. 89, 227-1), and therefore that resolution of this question "may materially advance the ultimate termination of the litigation," see 28 U.S.C. § 1292(b), and the court finding that the instant quiet title dispute qualifies as an "exceptional case," due to the scope of the court's December ruling, the number of other tracts that it would apply to, and resources that will be conserved if we refrain from taking this this case to conclusion before receiving an appellate court ruling on this common, threshold question, see Caterpillar Inc., 519 U.S. at 74, and the court thus concluding that interlocutory appeal is warranted in this matter, it is hereby ORDERED that:

1. The Game Commission's motion (Doc. 225) to certify an interlocutory appeal is GRANTED. Part IV.C of the memorandum and order of court (Docs. 222, 223) dated December 3, 2021 is CERTIFIED for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

2. The following question is further CERTIFIED pursuant to 28 U.S.C. § 1292(b):

> Under Pennsylvania law in effect at all times relevant to the instant quiet title dispute, did the owner of an unseated surface estate have a legal duty to pay taxes assessed on said surface estate, thereby preventing the owner—or the owner's agent— from acquiring better title to the land at a tax sale induced by the unseated surface owner's default?

3. Proceedings in this matter are STAYED pending appeal.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

JA3

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CCO-041

No. 22-8007

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,
Petitioner

v.

THOMAS E. PROCTOR HEIRS TRUST, under Declaration of Trust
dated October 28, 1980, which is recorded in Sullivan County in Book
1106, at page 879, its successors and assigns,
Respondent

(M.D. Pa. No. 1-12-cv-01567)

Present:  AMBRO, GREENAWAY Jr. and PHIPPS, <u>Circuit Judges</u>

1.  Petition for Permission to Appeal under 28 U.S.C. Section 1292(b) filed by
Petitioner Pennsylvania Game Commission

2.  Response filed by Respondent Thomas E Proctor Heirs Trust

Respectfully,
Clerk/lmr

_____ORDER_____
The foregoing motion is granted.

By the Court,

s/Joseph A. Greenaway, Jr.
Circuit Judge

Dated:  March 24, 2022
JK/cc:  All Counsel of Record

A True Copy:

Patricia S. Dodszuweit, Clerk

JA4    1 of 2

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## NOTICE

## GRANT OF PERMISSION FOR LEAVE TO APPEAL

The Court of Appeals has granted a petition for leave to appeal in this matter.

The $505.00 docketing and filing fee must be paid in the district court within 14 days after the entry of the order granting permission for leave to appeal, unless the petitioner is the United States government. Fed. R. App. P. 5. In addition, a cost bond must be filed if one is required under Fed. R. App. P. 7.

A notice of appeal does not need to be filed as a copy of the Court's order granting permission for leave to appeal which has been forwarded to the district court will serve as the notice of appeal.

The entry date of the order granting permission to appeal serves as the date of the filing of the notice of appeal for calculating time under the Federal Rules of Appellate Procedure. **Petitioner should notify the Court of Appeals in writing that the filing fee has been paid.**

Upon receipt of the notice from petitioner, the appeal will be opened on the general docket. All future filings regarding the appeal will be entered under the new docket number.

Very truly yours,

s/ Patricia S. Dodszuweit
Clerk

By: James King
Case Manager
267-299-4958

Cc:     Bradley C. Bechtel ,Esq.
Laura A. Lange, Esq.
William C. Martson, Esq.
Michael J. Scarinci, Esq.
Justin G. Weber, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF | : | CIVIL ACTION NO. 1:12-CV-1567 |
| PENNSYLVANIA, PENNSYLVANIA | : | |
| GAME COMMISSION, | : | (Judge Conner) |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS E. PROCTOR HEIRS | : | |
| TRUST, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff, Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), claims it owns both the surface and subsurface rights for numerous tracts of land in Sullivan and Bradford Counties in northeastern Pennsylvania. Defendant, Thomas E. Proctor Heirs Trust[1] ("Proctor Trust" or "the Trust"), disagrees, contending it holds superior title to the subsurface estates underlying these tracts. A lengthy and complex legal battle has ensued, culminating in a bench trial regarding subsurface ownership of the Josiah Haines warrant—a bellwether tract of land in LeRoy Township, Bradford County. As we explain in further detail herein, the court finds in favor of Proctor Trust.

---

[1] The Margaret O.F. Proctor Trust was also a named defendant in this action until April 13, 2021, when the court granted Proctor Trust's concurred-in motion to dismiss that entity. (See Docs. 212, 213).

JA6

## I.    <u>Procedural History</u>

The Game Commission initially filed this action in August 2012.  Following several rounds of Rule 12 motion practice, the Game Commission eventually filed the operative second amended complaint in December 2014 seeking to quiet title to 2,481 acres in Sullivan and Bradford Counties in northeastern Pennsylvania.  The Trust counterclaimed, also seeking to quiet title and adding claims for conversion and unjust enrichment.  The Game Commission subsequently filed a counterclaim for tortious interference.  This protracted procedural history is outlined in a February 2019 report and recommendation from Magistrate Judge Susan E. Schwab, familiarity with which is presumed.  (<u>See</u> Doc. 183 at 2 (citing Doc. 155 at 1-10)).

Following a period of discovery, both parties moved for partial summary judgment, seeking to quiet title to the subsurface estate of a single tract, the bellwether 410-acre Josiah Haines warrant.  The court denied summary judgment based on material factual disputes regarding two issues: (1) whether the scope of the 1907 assessment leading to the 1908 tax sale of the Josiah Haines warrant included the subsurface estate, and (2) whether Calvin H. McCauley, Jr.,[2] who purchased the Josiah Haines warrant at the 1908 tax sale, was acting as an agent of the Central Pennsylvania Lumber Company ("CPLC").  The court convened a one-day bench trial in April 2021 to determine ownership of the subsurface estate of the

_____

[2] We refer to Calvin H. McCauley, Jr., as "McCauley" throughout this opinion. We note, however, that several items in evidence also refer to his father, Calvin H. McCauley.  Where necessary, we use the appropriate suffix to differentiate between father and son.

Josiah Haines warrant. After trial, the parties submitted proposed findings of fact and conclusions of law. We now resolve outstanding evidentiary objections and set forth our findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). See Fed. R. Civ. P. 52(a).

## II.   Outstanding Evidentiary Objections[3]

During the April 2021 bench trial, the court admitted Joint Exhibits 2 through 29 without objection. (See 4/27/21 Tr. 9:13-20, 10:15-16; Joint Exs. 2-29). Plaintiff's Exhibits 3 through 35 were admitted without objection. (See 4/27/21 Tr. 133:22-135:5). Defense Exhibits 39, 40, and 42 were not admitted. (See id. at 115:18-116:15). In addition to the objections raised in its pretrial brief, the Game Commission reserved an objection to Joint Exhibits 30, 31, and 32 on grounds of relevance, and possibly authenticity and hearsay, depending on their use at trial. (See id. at 9:23-10:14). We consider the remaining evidentiary objections seriatim.

---

[3] The court's resolution of evidentiary objections is based on the parties' pretrial exhibit list and briefing as well as argument during the April 2021 bench trial. (See Docs. 204, 206, 214, 218). The factual narrative in Section III represents the court's findings of fact as derived from the record. Citations thereto include the transcript of the bench trial convened on April 27, 2021, ("4/27/21 Tr. [page:line]"), as well as stipulated facts, (Doc. 205 ¶ __), and exhibits introduced by both parties, ("Joint Ex. __," "Pl. Ex. __," and "Def. Ex. __").

## A.      Proctor Trust's Objections

Proctor Trust contends several pages of the parties' first joint exhibit, as well as two of the Game Commission's exhibits, contain inadmissible expert legal conclusions.  (See Doc. 206 at 1-3; Joint Ex. 1 at 1-6; Pl. Exs. 1, 2).

Admissibility of expert testimony is governed by Federal Rule of Evidence 702.  See FED. R. EVID. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).  The Third Circuit Court of Appeals has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).  For expert testimony to "fit," it must be "sufficiently tied to the facts of the case, so that it 'fits' the dispute and will assist the trier of fact."  UGI Sunbury, LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation marks omitted).

According to Rule 704, an expert's opinion "is not objectionable just because it embraces an ultimate issue."  See FED. R. EVID. 704.  But an opinion on the ultimate issue is not admissible if the opinion "would merely tell the [factfinder] what result to reach."  See id. advisory committee's notes to 1971 amendment.  Rule 704 must also "be read in conjunction with Rule 702, which requires opinion evidence to be helpful to the jury."  See Collie v. Wal-Mart Stores E., L.P., No. 1:16-CV-227, 2017 WL 2264351, at *1 (M.D. Pa. May 24, 2017) (Conner, C.J.).  Our court of appeals further cautions that experts may not "testify as to the governing law of the case."  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).  They also may not provide opinions "about the ultimate legal conclusion."  Patrick

v. Moorman, 536 F. App'x 255, 258 (3d Cir. 2013) (nonprecedential) (citing

Berckeley, 455 F.3d at 217; United States v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)).

Allowing an expert to so testify effectively usurps the court's role.  Berckeley, 455

F.3d at 217.

### 1.  *Wilkinson Report*

The Game Commission obtained a declaration and title report from J.C.

Wilkinson, III, an attorney with experience in "oil and natural gas title issues in

Pennsylvania."  (See Pl. Ex. 1 at 2).  Wilkinson provides an expert opinion on the

scope of the 1908 tax sale to McCauley and the ownership of the subsurface estate of

the Josiah Haines warrant.  (See id. at 3-7).  The Trust continues to object to the

Wilkinson report, arguing it contains "legal opinion testimony."  (See Doc. 206 at 1-

4).

In a February 2019 report and recommendation, Magistrate Judge Susan E.

Schwab partially granted Proctor Trust's motion to strike the Wilkinson report and

recommended striking portions of that evidence, reasoning that such testimony is

"not helpful to the court or factfinder."  (See Doc. 155 at 11-17 & nn.8-9).  In our

April 2020 opinion, we expressed "complete agreement with Judge Schwab's

analysis and conclusions" on the Wilkinson report and adopted them as our own.

(See Doc. 187 at 7 n.5).  We continue to agree that the conclusions set forth in the

Wilkinson report regarding the legal effect of the 1908 tax sale and ownership of the

disputed subsurface rights impermissibly usurp our role in this quiet title action.

See Berckeley, 455 F.3d at 217.  To reiterate Judge Schwab, we will not consider

Wilkinson's discussion of the "governing law" as it pertains to the Pennsylvania

Supreme Court's opinion in <u>Herder Spring Hunting Club v. Keller,</u> 143 A.3d 358, 364 (Pa. 2016). We also will not consider Wilkinson's legal conclusions (1) that the Proctor Trusts do not have an interest in the subsurface estate; (2) that the Commonwealth has title to the subsurface estate; (3) that 100% of both the surface estate and the subsurface estate is vested in the Commonwealth; (4) that the 1908 tax sale resulted in a "Title Wash" that extinguished the prior reservation of oil, gas, and mineral rights; and (5) that the 1920 deed from the CPLC to the Commonwealth does not contain clear language of reservation in favor of CPLC. (<u>See</u> Doc. 155 at 16). We will not strike the other portions of the report. (<u>See id.</u> at 16-17).

### 2.    *Percheron Title Abstract*

The parties submitted a joint exhibit comprised of several hundred pages that begins with a six-page abstract by Percheron Title. (<u>See</u> Joint Ex. 1 at 1-6). The other pages consist of, *inter alia*, maps, deeds, and unseated land books. (<u>See id.</u> at 7-615). The Trust objects to only the first six pages of the exhibit for the same reason it objects to the Wilkinson report, arguing it contains inadmissible legal conclusions. (<u>See</u> Doc. 206 at 2-3). We agree with the Trust, as these pages also contain conclusions about the effect of the 1908 tax sale and whether it effected a title wash on the subsurface estate—a dispute that is at the heart of this quiet title action. Percheron Title's rendering of an opinion on this matter usurps the court's

role.  See Berckeley, 455 F.3d at 217.  We will not consider the first six pages of the parties' first joint exhibit.  (See Joint Ex. 1 at 1-6).

### 3.  *Sullivan County Title Report*

The Game Commission submitted an exhibit related to the Commonwealth's purchase of numerous land tracts, including the Josiah Haines warrant, from CPLC.  (See Pl. Ex. 2 at 1).  The Trust summarily contends "substantial portions" of this exhibit are legal conclusions from the Game Commission's title examiner, and the other portions are not relevant to ownership of the Josiah Haines subsurface estate.  (See Doc. 206 at 3 n.2).  The Trust does not, however, provide excerpts or even pagination for the portions it considers "legal conclusions" from this 100-page exhibit.  (See id.)  We "decline to root through the record" and make the Trust's argument for it, see Zimmermann v. NLRB, 749 F. App'x 148, 150 (3d Cir. 2019) (nonprecedential) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)), and therefore will deny the Trust's objection.  We will consider the exhibit to the extent it contains relevant information about either the 1907 assessment or McCauley's status as an agent of CPLC.

### B.  Game Commission's Collateral Estoppel Arguments

The Game Commission contends that Proctor Trust is collaterally estopped from relitigating the issues currently before the undersigned due to two state-level cases involving the Trust as a party, one of which also involves the Game Commission.  (See Doc. 214 at 1-3).  The doctrine of collateral estoppel dictates that "a question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the

JA12

same parties or their privies." Montana v. United States, 440 U.S. 147, 153 (1979). Collateral estoppel specifically bars relitigation of an issue that was conclusively determined in a prior adjudication and that was essential to the original judgment. Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999); Venuto v. Witco Corp., 117 F.3d 754, 758 (3d Cir. 1997). Collateral estoppel promotes fairness and certainty, while preventing wasteful expenditure of resources on issues already resolved through adversarial proceedings. See Allen v. McCurry, 449 U.S. 90, 94 (1980); Montana, 440 U.S. at 153–54; Witkowski, 173 F.3d at 198-99.

A federal court sitting in diversity in Pennsylvania must apply Pennsylvania law with respect to issue preclusion. See Witkowski, 173 F.3d at 199. Pennsylvania courts apply a four-part test derived from Section 27 of the Restatement (Second) of Judgments to determine whether collateral estoppel bars a potential claim. Witkowski, 173 F.3d at 199 (citing Pa. State Univ. v. County of Centre, 615 A.2d 303, 306 (Pa. 1992)). Relevant here, Pennsylvania courts have explained that when the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments," collateral estoppel may not be warranted. See Off. of Disciplinary Couns. v. Kiesewetter, 889 A.2d 47, 52 (Pa. 2005) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330 (1979)).

We reject the Game Commission's collateral estoppel arguments related to Keta Gas & Oil Co. v. Proctor, No. 1975 MDA 2018, 2019 WL 6652174 (Pa. Super. Ct. Dec. 6, 2019), as well as Commonwealth v. Thomas E. Proctor Heirs Tr., No. 493 M.D. 2017, 2020 WL 256984 (Pa. Commw. Ct. Jan. 16, 2020). The Keta decision affirmed a trial court's decision on summary judgment where the trial court found

no genuine issues of material fact for trial on, *inter alia*, whether certain subsurface reservations had been reported.  See <u>Keta</u>, 2019 WL 6652174, at *3.  This court, however, already concluded in April 2020 that Proctor Trust has "proffered competent evidence that Union Tanning and CPLC reported their unseated surface interest to Bradford County Commissioners."  (<u>See</u> Doc. 183 at 27).  We thus do not consider the <u>Keta</u> decision preclusive because, unlike the trial court, we did not and do not consider the Trust's evidence speculative.  Cf. <u>Keta</u>, 2019 WL 6652174, at *5.  Nor do we consider the 2021 Commonwealth Court opinion preclusive, as the Pennsylvania Supreme Court has vacated that decision and remanded the case for further proceedings.  <u>See</u> <u>Pennsylvania Game Comm'n v. Thomas E. Proctor Heirs Tr.</u>, No. 12 MAP 2021, 2021 WL 5346728, at *1 (Pa. Nov. 17, 2021); (<u>see also</u> Doc. 221).  These opinions are "inconsistent with" our previous summary judgment opinion providing the applicable law for trial, and preclusive effect is not warranted.  <u>See</u> <u>Kieswetter</u>, 889 A.2d at 52.

### C.    Game Commission's Objections

#### 1.    *Relevance Objections*

"Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, and the fact is of consequence in determining the action."  FED. R. EVID. 401.  Evidence is relevant unless it has "*no* tendency to prove [a consequential] fact."  <u>Spain v. Gallegos</u>, 26 F.3d 439, 452 (3d Cir. 1994) (citation omitted).  Relevance is a low bar.  <u>See</u> <u>Forrest v. Parry</u>, 930 F.3d 93, 114 (3d Cir. 2019).

**JA14**

The Game Commission asserts a general relevance objection to all of the Trust's exhibits, claiming "these misperceived factual disputes are irrelevant and immaterial as a matter of law." (See Doc. 214 at 8). The Game Commission has further lodged objections to nearly all of the 53 exhibits from the Trust on the parties' final joint exhibit list. (See Doc. 204; Doc. 214 at 9-37). We consider these objections in several groupings depending on the substance of the evidence offered, its purpose, the objection, and our ruling. If we do not rule on a particular evidentiary item, we have not considered it in our analysis.

### a.  General Relevance

We overrule the Game Commission's general objection for the reasons stated in our summary judgment opinion, which sets forth the factual disputes to be resolved at trial. As noted in that opinion, disputes regarding the scope of the 1907 assessment of the Josiah Haines warrant, as well as McCauley's status as an agent of CPLC, are both relevant and material to determining the current legal owner of the subsurface estate. (See Doc. 183 at 23-43). The Game Commission's objection is preserved for appellate review. (See 4/27/21 Tr. 26:19-27:2).

### b.  Exhibits Offered in Relation to CPLC's Reporting Practices

The Trust has offered over a dozen exhibits in relation to the issue of whether Union Tanning Company ("Union Tanning") or CPLC properly reported their surface interest in the Josiah Haines warrant pursuant to the Act of 1806, P.L. 644, 4 Sm. L. 346, § 1, repealed and replaced by 72 PA. STAT. AND CONS. STAT. ANN. § 5020-409. (See Def. Exs. 2-9, 44-47, 49-51). The Game Commission argues these

exhibits are irrelevant and immaterial. (<u>See</u> Doc. 214 at 13-37).[4]  As explained in our summary judgment opinion, evidence concerning Union Tanning's and CPLC's reporting practices are relevant to the instant dispute. (<u>See</u> Doc. 183 at 29-31).  We will summarize each documentary exhibit offered by the Trust, and the Game Commission's objection, in turn.

Exhibits 1, 2, 3, 8, and 47 are excerpts from land assessment books within Bradford County, covering a range of years from 1895 to 1930. (<u>See</u> Def. Exs. 1-3, 8, 47).  Exhibits 1 and 8 provide records from Leroy Township; Exhibit 2 from Barclay Township; and Exhibit 3 from Overton Township. (<u>See</u> Def. Ex. 1-3).  Exhibit 47 contains records from each of these townships. (<u>See</u> Def. Ex. 47).  Exhibit 50 is a recapitulation statement from the county commissioners to the Barclay Township assessors in 1894, instructing assessors to return a list of, <i>inter alia</i>, "all property taxable by law." (<u>See</u> Def. Ex. 50 at 2).  The Game Commission objects to Exhibits 2 and 3 because the Josiah Haines warrant is not located within those townships, to Exhibit 8 because it concerns seated land, to Exhibit 47 because it contains information after the tax sale occurred in 1908, and to Exhibit 50 because it does not explain the 1908 tax sale. (<u>See</u> Doc. 214 at 13, 16, 32, 34).

We will overrule the objection to these exhibits.  When land was still assessed as seated and unseated in Pennsylvania, county land assessors were responsible for

[4] Although the Game Commission initially objected to Exhibit 51 from the Trust, (<u>see</u> Doc. 214 at 34), it withdrew this objection during trial, (<u>see</u> 4/27/21 Tr. 118:16-19).  Exhibit 51 is a demonstrative exhibit which contains magnifications of certain pages from the parties' joint exhibits. (<u>See</u> Def. Ex. 51).  We will admit this exhibit to the extent it aids in reading these notations.

"travers[ing] the county" to determine whether land was seated or unseated and for reporting such distinctions to the county commissioners for taxation purposes. <u>Herder Spring Hunting Club v. Keller</u>, 143 A.3d 358, 364 (Pa. 2016); <u>see</u> <u>McCall v. Lorimer</u>, 4 Watts 351, 353 (Pa. 1835).  The Trust has offered these exhibits to demonstrate reporting practices and payment at the county level.  (<u>See</u> 4/27/21 Tr. 30:14-32:11).  We consider reporting practices within Bradford County, of both seated and unseated lands, and the recapitulation statements used to assess property, to be relevant to our resolution of this matter.  We also do not consider Exhibit 47 outside the relevant time period because we consider tax-payment activity occurring on the Josiah Haines warrant in 1909 and 1910 to be relevant to our analysis.  (<u>See also</u> Doc. 183 at 28, 32-34).

We do not, however, consider Exhibits 4, 5, 6, 7, 9, or 49 relevant to the instant dispute.  (<u>See</u> Def. Exs. 4-7, 9, 49).  Exhibit 4 is a Pennsylvania Supreme Court paper book from a state court case in 1907 involving CPLC.  (<u>See</u> Def. Ex. 4 at 1, 2).  The testimony to which the Trust refers relates to Lycoming County rather than Bradford County and does not reference the Josiah Haines warrant.  (<u>See</u> <u>id.</u> at 49-59).  So too for Exhibits 5 and 6, which are letters from Proctor's estate to the Lycoming County treasurers, and the assessment books for McIntyre Township in Lycoming County, respectively.  (<u>See</u> Def. Exs. 5-6).  Nor do we consider Exhibit 7, which depicts the Commonwealth's gas and oil development in 2007, to be relevant to our analysis.  (<u>See</u> Def. Ex. 7).  We also will not consider Exhibit 9, which is comprised of several news articles from the 1890s and early 1900s regarding planned or ongoing coal operations during that time period, on tracts of land

formerly owned by Proctor and Hill. (<u>See</u> Def. Ex. 9 at 1, 7, 10). The Trust has not proffered competent evidence that any coal mining occurred on the Josiah Haines warrant during the relevant period. Finally, Exhibit 49 is a map of the "Schrader Lands." (<u>See</u> Def. Ex. 49 at 1). The parties do not dispute that Schrader Mining & Manufacturing owned the Josiah Haines warrant prior to Proctor and Hill, and we do not consider this map relevant to our analysis. (<u>See</u> Doc. 205 ¶¶ 3, 4).

Exhibits 44, 45, and 46 are sworn declarations from three individuals who are custodians of different recordkeeping entities in the Commonwealth. Exhibit 44 is from the Bradford County Historical Society; Exhibit 45 is from the office of the Recorder and Register of Deeds for Bradford County; and Exhibit 46 is from the Pennsylvania State Archives. (<u>See</u> Def. Ex. 44 ¶¶ 3, 4; Def. Ex. 45 ¶¶ 3, 5; Def. Ex. 46 ¶¶ 3, 5). Each exhibit attests to the same fact, *viz.*—that the entity "does not possess any notices to the Bradford County Board of Commissioners" from the 1890s through the 1920s. (<u>See</u> Def. Ex. 44 ¶ 5; Def. Ex. 45 ¶ 6; Def. Ex. 46 ¶ 6). The Game Commission objects that these declarations are irrelevant. We disagree. As noted in our summary judgment opinion, legal ownership of the Josiah Haines subsurface estate depends partially on whether certain interests were reported to the county commissioners in Bradford County. (<u>See</u> Doc. 183 at 29-31). This information is relevant to whether such records still exist or were retained by the entities that originally received them over a century ago.

### c.    Exhibits Offered in Relation to McCauley

The Trust has offered over 30 exhibits in relation to McCauley and whether he was acting as an agent for CPLC when he purchased the Josiah Haines warrant at a tax sale in June 1908.  The Game Commission argues these exhibits are irrelevant and immaterial.  (See Doc. 214 at 13-37).  As noted above, we consider McCauley's relationship to CPLC to be highly relevant and material to resolving this quiet title dispute.  (See Doc. 183 at 23-43).

Exhibits 10, 11, 21, 23, 25, and 26 are documents from two court cases that originated in the Potter County Court of Common Pleas.  (See Def. Exs. 10, 11, 21, 23, 25, 26).  Exhibits 12, 13, and 14 are CPLC's corporate documentation from its inception in 1903.  (See Def. Exs. 12, 13, 14).  Exhibits 15, 16, and 17 are letters to McCauley in 1904 and 1905.  (See Def. Exs. 15, 16, 17).  Exhibits 18, 19, 20, and 22 are Boyd's Directory excerpts from 1906 through 1909 that contain listings for CPLC and for McCauley.  (See Def. Exs. 18, 19, 20, 22).  Exhibit 24 is a page from the United States Census in 1910 listing McCauley as a "lawyer" for a "lumber co." (See Def. Ex. 24).  Exhibits 27 and 28 are copies of a notarized declaration by McCauley in 1914, stating that he was acting in trust for CPLC and using CPLC funds when he purchased six properties in Elk County from the county treasurer, and that his name on the deeds "is used only in trust for" CPLC.  (See Def. Exs. 27, 28).  Exhibit 29 consists of several deeds whereby McCauley quitclaims dozens of parcels of land (consisting of thousands of acres) to CPLC for $1.00.  (See Def. Ex. 29).  Exhibits 30 and 31 are letters from 1916 on CPLC "Legal Department" letterhead from McCauley.  (See Def. Exs. 30, 31).  Exhibit 32 contains two

newspaper articles that mention McCauley's positions within CPLC in 1913 and
1917.  (See Def. Ex. 32).  Exhibit 48 consists of two news articles from *The
Williamsport Sun* in 1907 and 1908.  (See Def. Ex. 48).  One refers to "Calvin H.
McCauley," who in 1908 was admitted to the Lycoming County bar and appointed
"assistant general solicitor" for CPLC.  (See id. at 1, 2).[5]  The other names a "Calvin
H. McCauley, Jr., of the Central Pennsylvania Lumber company," as a visitor to
Ridgway, Pennsylvania in 1907.  (See id. at 3, 4).

    The Game Commission objects to all these documents on the basis of
relevance, arguing that they are not probative of McCauley's status as CPLC's
agent.[6]  We overrule these objections, noting that an agency relationship does not
require direct evidence "if it can be reasonably inferred from the circumstances of
the case."  Scott v. Purcell, 415 A.2d 56, 61 n.8 (Pa. 1980) (citing Yezbak v. Croce, 88

___

[5] The Game Commission argues it would be improper to consider this article
to pertain to McCauley, Jr., when the suffix "Jr." is not included and he had a father
of the same name who also held a leadership position in CPLC.  (See Doc. 214 at 37;
4/27/21 Tr. 131:22-133:5).  However, the Trust proffered other evidence indicating
McCauley, Sr., only ever held the position of "general solicitor" within the company.
(See Def. Ex. 53; 4/27/21 Tr. 136:24-137:21).  We agree with the Trust on this point.  It
would be fanciful to infer that McCauley, Sr., who was appointed general solicitor
when CPLC was formed in 1903, (see Def. Ex. 53 at 1, 2), and was further mentioned
as its general solicitor in December 1907, (see id. at 3, 5), was demoted to *assistant*
general solicitor less than two months later in February 1908, (see Def. Ex. 48 at 1,
2).  We find that defense Exhibit 48 refers to McCauley, Jr., and not his father.  We
will also overrule the Game Commission's relevance objections to defense Exhibit
53.  (See Doc. 214 at 36-37).  This exhibit contains articles regarding McCauley, Sr.,
that rebut the inference the Game Commission would have us draw from the lack of
a suffix in defense Exhibit 48.

[6] The Game Commission also considers Exhibits 10 and 11 irrelevant
because, *inter alia*, they "do not mention McCauley, Jr."  (See Doc. 214 at 18-19).
This statement is incorrect—he is listed as an attorney of record for CPLC during
the appeal.  (See Def. Ex. 11 at 2).

A.2d 80, 82 (Pa. 1952)).  Each of these documents demonstrates McCauley's association with CPLC in the years surrounding the tax sale in 1908 and are circumstantial evidence of his agency status.  We thus consider this evidence relevant to McCauley's relationship with CPLC.

We will sustain, however, the Game Commission's objections to some of the evidence adduced by the Trust on relevancy grounds.  Exhibit 33 is a collection of letters between Proctor's heirs and McCauley as well as others, and Exhibit 34 is a map referenced in some of the correspondence.  (See Def. Exs. 33, 34).  Exhibit 35 consists of more correspondence referring to coal leases between 1913 and 1921.  (See Def. Ex. 35).  McCauley is mentioned but is neither an author nor recipient of any letter in this exhibit.  (See id. at 11).  Most of the letters in Exhibit 33 are handwritten and illegible, as are several in Exhibit 35.  (See Def. Ex. 33 at 1-16, 18-22, 30; Def. Ex. 35 at 1-6, 16).  The remaining letters, while typed and therefore legible, reference mineral rights in tracts other than the Josiah Haines warrant.  (See e.g., Def. Ex. 33 at 24).

At trial, counsel for the Trust noted that the John Barron tract, referenced in Exhibit 33, was also subject to the 1908 tax sale, and argued this material is relevant to highlight the ongoing communications between McCauley and the Proctor heirs following the tax sale, as well as evidence that Proctor's heirs had active coal leases following CPLC's deed to the Game Commission.  (See 4/27/21 Tr. 63:11-67:3).  We make no determination whether this information is relevant to *other* tracts, but the Trust does not direct us to any letter where the Josiah Haines warrant is mentioned.  Furthermore, the maps in Exhibit 34 indicate that the area in which

coal was mined did not cover the Josiah Haines warrant.  (See Def. Ex. 34 at 9).  We will not consider Exhibits 33 through 35 as they are not relevant to our resolution of the instant dispute regarding the bellwether tract.

We will also not consider Exhibits 36, 37, 38, or 43 to the extent they contain legal opinions about the effect of the 1908 tax sale.  Two of these exhibits are 1931 letters from the Game Commission's title examiner John E. Potter, one is a response to Potter from A.F. Jones of CPLC, and one is a title examination excerpt regarding certain tracts of land in Lycoming County.  (See Def. Exs. 36, 37, 38, 43).  The letters contain Potter's beliefs about the effect of a tax sale on tracts of land.  (See Def. Ex. 36 at 3-4; Def. Ex. 37 at 11-12; Def. Ex. 38 at 2).  The title examination excerpt is likewise the examiner's belief about a purchase McCauley made.  (See Def. Ex. 43 at 8).  These opinions are not relevant to our determination of McCauley's agency status.

> ## 2.  *Authenticity Objections*

All admissible evidence must be authenticated.  FED. R. EVID. 901(a).  Similar to relevance, the standard for authentication is "slight."  United States v. Turner, 718 F.3d 226, 232 (3d Cir. 2013) (citation omitted).  An evidentiary item is authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is."  Id. at 232 (quoting FED. R. EVID. 901(a)).  Once the proponent makes a *prima facie* showing of authenticity, the evidence goes to the factfinder.  Id. (citation omitted).  The proponent can use circumstantial evidence, including the context in which the evidence was obtained and its contents, to authenticate evidence.  Id. at 232-33.

**JA22**

For ancient documents, Rule 901 provides an exemplar method for authentication if the proponent can adduce evidence that the ancient document "is in a condition that creates no suspicion about its authenticity; was in a place where, if authentic, it would likely be; and is at least 20 years old when offered." See FED. R. EVID. 901(b)(8).  In deciding authenticity, the court may also consider the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item."  FED R. EVID. 901(b)(4).

The Game Commission objects to the authenticity of a series of defense exhibits comprised of CPLC's ledger books and letters interwoven within the books that concern McCauley.  (See Doc. 214 at 10-13).  These ledger books and the letters within them are in the possession of nonparty Lauri Sekerak, who testified about her acquisition of the items.  (See Joint Ex. 30).  Sekerak, who worked as an abstractor in Pennsylvania, testified that she came into possession of the ledger books around 2005.  (See Joint Ex. 30, Sekerak Dep. 7:12-8:5, 11:5-8).  When Sekerak learned that a Warren County law firm was dissolving, she offered to take the ledger books from the firm's library after learning they would otherwise be thrown away. (See id. at 8:6-10:19).  Proctor Trust proffered additional evidence in pretrial briefing to explain why the ledger books were located in a law firm Warren County, noting CPLC's headquarters moved to Sheffield, in Warren County, until it closed in 1941.  (See Docs. 206-1, 206-2).

The Proctor Trust produced the original CPLC ledger books during the April 2021 bench trial for examination, and the court inspected the books containing the letters at issue.  (See 4/27/21 Tr. 82:3-83:25).  The ledger books are organized by map

number into seven volumes.  (See Sekerak Dep. 7:22-8:8:5).  They contain maps for CPLC tracts and corresponding ledger information for the tracts from the early twentieth century.  (See id. at 13:21-14:21).  Relevant here, many tract pages contain letters that have been affixed on or between a particular tract's map and its ledger entries.  (See id. at 17:5-18:17).  Some of these letters, offered by the Trust into evidence, are dated between 1904 and 1916 and are either written by, or addressed to, "Calvin H. McCauley, Jr."  (See Def. Exs. 15, 16, 17, 30, 31).  Each letter had been affixed onto certain pages of the ledger books.  (See Sekerak Dep. 17:5-18 (Def. Ex. 15), 20:1-10 (Def. Ex. 16), 23:16-25 (Def. Ex. 17), 27:8-18 (Def. Ex. 30), 30:23-31:16 (Def. Ex. 31)).  One additional exhibit is an entry from the ledger book regarding the Josiah Haines warrant.  (See Def. Ex. 41).  The court confirmed during trial that this exhibit was also contained within the CPLC ledger books submitted for examination.  (See 4/27/21 Tr. 115:18-22).

During her deposition, Sekerak testified that each of the letter exhibits were located in the ledger books on the same page as lots or tracts mentioned in the letter.  Exhibit 15 is a 1904 letter to McCauley regarding a Lot 146 in Hamilton Township and was affixed in the CPLC ledger book on the page for Tract 146 in Hamilton Township, and the ledger page references the letter itself.  (See Sekerak Dep. 18:13-19:1).  Exhibit 16 is a 1905 letter to McCauley regarding the Alexander McMullen warrant and was affixed to the ledger's plat page for the Alexander McMullen warrant.  (See id. at 21:8-25).  Exhibit 17 is a 1905 letter to McCauley on CPLC letterhead regarding "warrant #5105" and is affixed to the ledger page on "tract 5105" in Forest County.  (See id. at 25:12-25).  Exhibit 30 is a 1916 letter from

McCauley regarding a Lot 578 in Warren County and is affixed on a ledger page regarding a "tract of land 578" in Warren County.  (See id. at 28:25-29:6).  Finally, Exhibit 31 is a 1916 letter from McCauley regarding "Warrant 4737" in Ulysses Township and is affixed on a ledger page regarding "tract 4737" in Ulysses Township.  (See id. at 32:13-17).

Based on Sekerak's deposition testimony, as well as the court's careful examination of the ledger books and the letters contained therein, we will overrule the Game Commission's authenticity objection.  Both the ledger books and the letters within them contain "distinctive characteristics" that support the Trust's claim that they are, in fact, CPLC ledgers as well as letters to and from McCauley during his tenure with CPLC.  See FED. R. EVID. 901(b)(4).  The letters were also located in a place where, if authentic, such documents would be.[7]  Each letter was carefully affixed and preserved within CPLC ledger books, and the ledger books were located in the same county in Pennsylvania that CPLC was headquartered until its closure.  (See Docs. 206-1, 206-2).  Finally, the ledger books and letters are over a century old.  The court's inspection of the ledger books and letters within them created no suspicion about their age or the circumstances in which they were located.  In sum, we find that the Trust has provided *prima facie* evidence to

---

[7] The Game Commission observes that the letters were "glued into" the ledger books and argues they should be considered with suspicion.  (See Doc. 214 at 15).  We disagree.  Neither the ledger books nor the letters were in a condition that creates suspicion about their authenticity.  Sekerak attested that each letter references a tract of land and is affixed to the ledger page matching that same tract. (See Sekerak Dep. 15:14-32:25).

JA25

authenticate Exhibits 15, 16, 17, 30, 31, and 41, and we will not exclude them on authenticity grounds.

### 3. *Hearsay Objections*

Hearsay is a "statement other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Hearsay is inadmissible unless an exception enumerated in the Federal Rules of Evidence applies. <u>Agere Sys., Inc. v. Advanced Env't Tech. Corp.</u>, 602 F.3d 204, 232 (3d Cir. 2010).

The Game Commission objects to several exhibits as hearsay because they are letters, newspaper articles, or other writings. (<u>See</u> Doc. 214 at 9-10). The Game Commission alludes to "double hearsay" in its briefing, but provides no further argument as to what statements within these documents it considers further hearsay, and we again decline to make the Game Commission's argument for it. <u>See</u> <u>Zimmermann</u>, 749 F. App'x at 150 (citation omitted). The Trust responds that (1) all of the challenged exhibits qualify as ancient documents and are therefore excepted from the hearsay rule, and (2) the exhibits further qualify under other hearsay exceptions. (<u>See</u> Doc. 206 at 8-9).

We agree with the Trust. Exhibits 15, 16, 17, 30, 31, and 41 are the authenticated CPLC ledger book pages and letters affixed to them. They are ancient documents and are excepted from the hearsay rule. <u>See</u> FED. R. EVID. 803(16); <u>Langbord v. U.S. Dep't of Treasury</u>, 832 F.3d 170, 190 (3d Cir. 2016).

The Game Commission's remaining hearsay objections similarly fail. Exhibit 12 is the First Annual Report of CPLC from 1903; it is also excepted as an ancient

document. See FED. R. EVID. 803(16). Exhibits 18, 19, 20, and 22 are excerpts from *Boyd's Directory* in 1906 through 1909. (See Def. Ex. 18-20, 22). These exhibits qualify as ancient documents, and also qualify as "directories" because they are "compilations that are generally relied on by the public." See FED. R. EVID. 803(16), 803(17); see also United States v. Woods, 321 F.3d 361, 364 (3d Cir. 2003) (explaining rationale behind "directories" exception). Exhibit 27 is a notarized declaration of trust from 1914 signed by McCauley. (See Def. Ex. 27). This document is self-authenticating as an acknowledged document, see FED. R. EVID. 902(8), and further qualifies as an ancient document, see FED. R. EVID. 803(17). Exhibits 32, 48, and 53 are various news articles from the early twentieth century. (See Def. Ex. 32, 48, 53). These documents are self-authenticating as newspapers or periodicals, see FED. R. EVID. 902(6), and qualify as ancient documents, see FED. R. EVID. 803(17). We will not exclude these exhibits on the grounds of hearsay.

## III.  Findings of Fact

### A.  CPLC Reported Its Surface Estate in the Josiah Haines Warrant Prior to 1907

The Commonwealth of Pennsylvania warranted a tract of land to Josiah Haines in 1793.[8] (See Doc. 205 ¶ 1). The land encompassing the Josiah Haines warrant is located in what is now LeRoy Township, Bradford County. (See id. ¶¶ 1, 3). In 1893, then-owner Schrader Mining & Manufacturing Company conveyed the Josiah Haines warrant, along with other tracts, to Thomas E. Proctor and Jonathan

---

[8] See Herder Spring, 143 A.3d at 360 n.3 (describing the warrant process by which land was conveyed in Pennsylvania).

A. Hill. (See id. ¶¶ 4, 5; Joint Ex. 3). The next year, Proctor and Hill and their wives conveyed the surface estate of the Josiah Haines warrant, along with other tracts, to Union Tanning. (See Doc. 205 ¶ 6; Joint Ex. 4). The 1894 deed to Union Tanning expressly "reserved" the subsurface rights to minerals, oil, gas, coal, and petroleum (hereinafter "mineral rights" or "subsurface estate") to the tracts contained in the deed.[9] (See Joint Ex. 4 at 13; Doc. 205 ¶¶ 6, 7; Doc. 220 ¶ 13). In the 1894 deed, Proctor and Hill also retained the land of several warrants less those warrants' "bark rights." (See Joint Ex. 4 at 2; Doc. 220 ¶ 14). The warrants retained by Proctor and Hill in the 1894 deed were the Henry Beck, John Graff, Thomas Dundas, and James Biddle warrants. (See Doc. 220 ¶ 14). Proctor died the same year and the defendant, Proctor Trust, is his successor in interest to the Josiah Haines warrant. (See Doc. 205 ¶¶ 8-10).

LeRoy Township assessment records from 1896 through 1903 reflect Union Tanning's ownership in the Josiah Haines warrant. (See Def. Ex. 1). In 1896, the Josiah Haines warrant is assessed to "U.T. Co." (See id. at 3). In 1898, the Josiah Haines warrant is included under "unseated lands ass[']ed to the Union Tanning Company." (See id. at 7). LeRoy Township assessment records from this period also reflect the lands retained by Proctor in the 1894 deed. (See Def. Ex. 1 at 8).

---

[9] As noted in our summary judgment opinion, it is more accurate to say Proctor and Hill "excepted" the mineral rights from their conveyance to Union Tanning, rather than that they "reserved" them. (See Doc. 183 at 3 n.3 (citing Lauderbach-Zerby Co. v. Lewis, 129 A. 83, 84 (Pa. 1925))).

Namely, the Beck, Graff, Dundas, and Biddle warrants continued to be assessed for taxes to Proctor and Hill.  (See id. at 8, 10, 11, 12, 13).

In 1903, Union Tanning conveyed its surface ownership interest in the Josiah Haines warrant to CPLC, excepting the rights to certain tree bark and conveying the property "subject to" all prior exceptions and reservations.  (See Doc. 205 ¶¶ 11-12; Joint Ex. 5).  From 1894 through 1902, Union Tanning paid taxes on the Josiah Haines warrant, which was assessed as unseated in LeRoy Township.  (See Joint Ex. 8 at 10, 14; Joint Ex. 9 at 2, 6, 10, 14, 18; Joint Ex. 10 at 2, 5).  From 1903 through 1906, CPLC paid taxes on the same warrant.  (See Joint Ex. 10 at 8, 11, 14; Joint Ex. 11 at 2; see also Joint Ex. 11 at 1 ("C P L Co means Central Pennsylvania Lumber Co.")).  Taxes assessed against the Josiah Haines warrant for 1907 were not paid. (See Doc. 205 ¶ 13; Joint Ex. 12 at 3).[10]

As the LeRoy Township assessment records attest, tax officials were aware of Union Tanning's surface interest created by the 1894 deed.  Starting in 1894, tax assessments on the Josiah Haines warrant were levied against, and paid by, Union Tanning.  (See Def. Ex. 1 at 7).  Meanwhile, the county commissioners continued to assess taxes on the lands that had been "retained" in the 1894 deed against Proctor

---

[10] For tax years 1895 and 1896, the Bradford County unseated land assessment books inadvertently referred to the 410-acre Josiah Haines warrant as the "Joseph Haines" warrant.  (See Joint Ex. 8 at 14; Joint Ex. 9 at 2).  That error was corrected in 1897, (see Joint Ex. 9 at 6), and the entries remained accurate through 1901, (see id. at 10, 14, 18; Joint Ex. 10 at 2).  Beginning in 1902 and continuing through 1906, the tract is again mislabeled as the "Joseph Haines" or "Joseph Hines" warrant in the unseated assessment books.  (See Joint Ex. 10 at 5, 8, 11, 14; Joint Ex. 11 at 2).  For tax years 1907 and 1908, the name is once more corrected to "Josiah Haines."  (See Joint Ex. 11 at 5, 9).

and Hill.  (See Def. Ex. 1 at 8, 10, 11, 12, 13).  After Union Tanning conveyed its

surface interest in the Josiah Haines warrant to CPLC in 1903, CPLC was then

assessed, and paid, taxes on the warrant from 1903 to 1906.  (See Joint Ex. 10 at 8,

11, 14; Joint Ex. 11 at 2).  The evidence of record therefore demonstrates that both

Union Tanning and CPLC reported their surface ownership interests in the Josiah

Haines warrant to county commissioners.  (See Doc. 220 ¶ 33).

### B.    Calvin H. McCauley, Jr., Had a Long-Time Association with CPLC

On June 8, 1908, the Josiah Haines warrant was sold to Calvin H. McCauley,

Jr., to recover the unpaid 1907 taxes.  (See Doc. 205 ¶¶ 15-16; Joint Ex. 11 at 5).  In

December 1910, McCauley and his wife quitclaimed all interest in numerous

properties, including the Josiah Haines warrant, to CPLC for $1.00.  (See Doc. 205 ¶

16).  In 1920, CPLC conveyed its interest in the warrant, along with other

properties, to the Game Commission.  (Id. ¶¶ 17-18).

At CPLC's formation in 1903, corporate documentation listed McCauley as

the company's treasurer.  (See Def. Ex. 13 at 2; Def. Ex. 14 at 1).  CPLC's first annual

report lists McCauley as its real estate agent.  (See Def. Ex. 12 at 3).  In 1904 and

1905 correspondence contained in CPLC's ledger books, McCauley is addressed as

"R.E. Agt., C.P.L. Company."  (See Def. Ex. 15 at 1; Def. Ex. 16 at 1).  Internal

correspondence from CPLC's "Land and Timber" superintendent dated December

1905 is addressed to McCauley as a "real estate agent" and is stamped with a date of

receipt by "Central Penna Lum. Co. Real Estate Dept."  (See Def. Ex. 17 at 1).  The

CPLC ledger book, which contains the company's bark-peeling records on the

Josiah Haines warrant as well as its own internal record of "land sales," makes no

mention of McCauley's purported ownership of the tract; instead, it only lists the 1920 sale to the Commonwealth.  (See Def. Ex. 41 at 1).  Finally, an excerpt from the Game Commission's title abstract contains a schedule of taxes for the Josiah Haines warrant.  (See Pl. Ex. 2 at 40-42).  Its listing for 1907 associates McCauley with CPLC, listing both McCauley and CPLC as the warrant's "owner" in 1907 and in 1908, two and three years before McCauley quitclaimed the property back to CPLC. (See id. at 42).

Several public documents confirm McCauley's association with CPLC as well.  For example, *Boyd's Directory* entries from 1906 through 1909 list McCauley as a real estate agent, assistant general solicitor, or attorney at the same address as CPLC.  (See Def. Exs. 18, 19, 20, 22).  The change in McCauley's title from attorney to assistant general solicitor in the 1908 *Boyd's* listing is supported by the February 1908 news article noting his appointment as "assistant general solicitor for the Central Pennsylvania Lumber Company."  (See Def. Ex. 48 at 1).  McCauley also appeared as an attorney for CPLC, and as a notary public for CPLC's president, in several state court proceedings from 1908 through 1910.  (See Def. Ex. 11 at 2; Def. Ex. 21 at 7; Def. Ex. 23 at 2; Def. Ex. 25 at 1; Def. Ex. 26 at 1, 6).  The 1910 United States census lists McCauley's occupation as "lawyer" for a "lumber co."  (See Def. Ex. 24 at 1).

Other actions by McCauley demonstrate his affiliation with CPLC.  From 1904 to 1916, McCauley purchased at tax sales more than 100 properties that were previously owned by CPLC and later quitclaimed those tracts back to CPLC, all in consideration for $1.00.  (See Def. Ex. 29 at 1, 4, 12).  The same 1910 sale at which

McCauley quitclaimed the Josiah Haines warrant included 44 additional tracts. (See id. at 8-11). In 1914, McCauley executed a notarized declaration stating he was acting in trust for CPLC when he purchased six properties in Elk County from the county treasurer using funds provided by CPLC. (See Def. Ex. 27 at 2).

After he quitclaimed the Josiah Haines warrant (and other tracts) to CPLC in 1910, McCauley continued to be associated with CPLC for several years. For example, news articles in 1913 and 1917 note McCauley was elected to CPLC's Board of Directors. (See Def. Ex. 32 at 2, 6). The CPLC ledger books also contain correspondence on McCauley's personalized CPLC letterhead to an engineer in 1916. (See Def. Ex. 30, 31). We do not hesitate to find that McCauley had a long and well-documented employment with CPLC.

## IV.   Conclusions of Law

The plaintiff in a quiet title action must recover on the strength of its own title, not the weakness of the defendant's title. See Herder Spring, 143 A.3d at 372 (citing Albert v. Lehigh Coal & Navigation Co., 246 A.2d 840, 843 (Pa. 1968)). The plaintiff has the burden to prove title by a preponderance of the evidence. See Montgomery County v. MERSCORP Inc., 795 F.3d 372, 374 n.2 (3d Cir. 2015) (citing Moore v. Dep't of Env't Res., 566 A.2d 905, 907 (Pa. Commw. Ct. 1989)).

### A.   CPLC Complied with the Act of 1806

Under Pennsylvania law, "there may be three separate estates in land: the surface, the right of support, and the subsurface mineral rights." United States v. 3,218.9 Acres of Land, More or Less, Situated in Warren Cnty., 619 F.2d 288, 291 (3d Cir. 1980) (citing Pa. Bank & Tr. Co. v. Dickey, 335 A.2d 483, 485 (Pa. Super. Ct.

1975); Smith v. Glen Alden Coal Co., 32 A.2d 227, 234 (Pa. 1943)).  Thus, a single tract of land can be "severed and owned by different persons."  3,218.9 Acres of Land, 619 F.2d at 291.  Prior to 1947, Pennsylvania's real property taxing practices varied depending on whether land was noticeably occupied or developed ("seated") or wild and undeveloped ("unseated").  Herder Spring, 143 A.3d at 363-64.  Although unseated land was considered "wild," it could still be "severed into surface and subsurface estates."  Id. at 364 (citation omitted).

Pennsylvania distinguished between seated and unseated land for tax-collection purposes.  See id. at 363.  County land assessors determined whether land was seated or unseated and then reported that determination to the county commissioners for appropriate taxation.  Id. at 364; see McCall, 4 Watts at 353.  Owners of land designated as seated could be held personally liable for the taxes assessed on their plot.  Herder Spring, 143 A.3d at 364.  If land was deemed unseated, taxes were "imposed on the land itself," and owners were not held personally liable if they failed to pay the taxes owed.  Id.; Northumberland County v. Phila. & Reading Coal & Iron Co., 131 F.2d 562, 565-66 (3d Cir. 1942).

In the early 1800s, many unseated landowners failed to pay the taxes due on their land.  See Herder Spring, 143 A.3d at 354.  Instead of trying to impose personal liability for unpaid taxes on these unseated lands, Pennsylvania enacted statutes whereby the unseated land could simply be sold to pay the delinquent taxes.  Id. at 365.  We review the Act of 1804 and the Act of 1806 as relevant to the case at bar.

The Act of 1804 constitutes the origin of tax-sale "title-washing."  See id. at

366.  According to Section 5:

> [S]ales of unseated land, for taxes that are now due …
> shall be in law and equity valid and effectual, to all intents
> and purposes, to vest in the purchaser or purchasers of
> lands sold as aforesaid, all the estate and interest therein,
> that the real owner or owners thereof had at the time of
> such sale, although the land may not have been taxed or
> sold in the name of the real owner.

Id. at 366 (quoting Act of 1804, April 3, P.L. 517, 4 Sm. L. 201, § 5).  This allowed a

tax sale to "extinguish[] all previous titles" to the land that was assessed and sold

for delinquent taxes.  See id. at 366 (quoting Reinboth v. Zerbe Run Improvement

Co., 29 Pa. 139, 145 (Pa. 1858)).  When unseated land was severed into surface and

subsurface estates, those separate estates "could be separately assessed, taxed, and,

if necessary, sold at tax sale."  Id. at 364 (citing F. H. Rockwell & Co. v. Warren

County, 77 A. 665, 666 (Pa. 1910)).

The Act of 1806 imposed a reporting requirement in connection with

unseated land, stating "it shall be the duty of every holder of unseated lands" to

provide the county commissioners with a signed statement describing the tract of

land and "the name of the person or persons to whom the original title from the

commonwealth passed, and the nature, number, and date of such original title."  Id.

at 368 (quoting Act of March 28, 1806 ("Act of 1806"), P.L. 644, 4 Sm. L. 346, § 1,

repealed and replaced by 72 PA. STAT. AND CONS. STAT. ANN. § 5020-409).  For those

transfers occurring after the law's passage, a person "becoming a holder of

unseated land" was required to "furnish a like statement, together with the date of

the conveyance to such holder, and the name of the grantor, with in one year."  See

*id.*  Failure to comply with this reporting requirement resulted in a penalty equal to "four times the amount of tax" owed on the land.  See *id.* at 368.  The Act of 1806 obligated then-current unseated landowners to provide the commissioners with information about their property.  See *id.*  The Act of 1806 also required subsequent owners of unseated land to provide information about newly acquired property interests.  See *id.*  To state the obvious, the statutory purpose was "to allow the commissioners to impose an appropriate tax."  *Id.* at 369.  Owners were also responsible for reporting a severance of the original warrant or a division due to such severance, because "assessors would treat unseated lands 'entirely in reference to the original warrants, when not otherwise directed by the owners.'"  *Id.* at 370 (quoting Hutchinson v. Kline, 49 A. 312 (Pa. 1901) (*per curiam*)).  In other words, unseated land, while severable, was "assessed and taxed as a whole" unless owners informed the commissioners differently.  *Id.*  If the owners *did* report a severance, assessors could then separately assess and tax the subsurface estate if it had value.  See *id.* at 368.

    We have already found as a matter of fact that CPLC reported its interest in the surface estate of the Josiah Haines warrant.  We conclude as a matter of law that CPLC complied with the Act of 1806 by "inform[ing] the commissioners of the land owned to allow the commissioners to impose an appropriate tax."  See Herder Spring, 143 A.3d at 369.  According to the statute, one who is "becoming a holder of unseated land" must report his interest.  Herder Spring, 143 A.3d at 368 (citation omitted).  In Herder Spring, the record contained "no evidence" that the previous surface or subsurface owner reported their respective unseated interest to county

commissioners following severance of the warrant at issue. See id. at 360. Under such circumstances, the court concluded, the warrant must have been assessed as a whole (and sold as a whole) because county officials had never been directed otherwise. Id. at 360, 372, 375. In stark contrast, the tax assessment records in this matter are competent evidence establishing CPLC's compliance with the Act of 1806. Cf. Herder Spring, 143 A.3d at 360. Thus, CPLC's compliance with the reporting requirements of the Act of 1806 meant that the commissioners of Bradford County were "otherwise directed" to assess the surface and subsurface estates of the Josiah Haines warrant separately. See Herder Spring, 143 A.3d at 370 (quoting Hutchinson, 49 A. 312). This critical deviation from the facts of Herder Spring forecloses the argument that the 1908 tax sale at issue must have included the whole warrant.

The Game Commission contends that there is "no evidence establishing that the severance was ever reported to Bradford County Commissioners." (See Doc. 219 ¶ 20). As we stated in our summary judgment opinion, this argument is merely semantics; reporting a surface estate for separate taxation and reporting a "severance" is a distinction without a difference. (See Doc. 183 at 30). The assessment books make clear that Union Tanning and CPLC were assessed taxes on the Josiah Haines warrant and paid those taxes. The Game Commission still offers no alternative explanation as to how Union Tanning and CPLC were named in the unseated assessment books and paid assessed taxes if those entities had not reported their ownership interests to Bradford County officials. The Trust has provided declarations from various records custodians confirming that the initial

correspondence that served as notice to the County Commissioners cannot be located in various archives.  (See Def. Exs. 44, 45, 46).

The assessment books and the notations contained within them are likely the only remaining public records of any notification to county commissioners.  (See 4/27/21 Tr. 50:10-51:20).  Although the Game Commission underscores the absence of tax levies on the Josiah Haines subsurface estate during Union Tanning's and CPLC's ownership of the surface estate, this fact has very limited evidentiary value. In Herder Spring, the state supreme court observed that subsurface estates were not taxed unless they were determined to have distinct and cognizable tax value; if they "had no value," they were not subject to levy.  See Herder Spring, 143 A.3d at 368.  Furthermore, the Trust correctly points out that the assessment books contain no indication that either Union Tanning or CPLC was ever assessed a four-fold penalty for failing to report.  (See Doc. 220 ¶ 33); Herder Spring, 143 A.3d at 368. Finally, we have received no evidence that Union Tanning or CPLC improperly reported owning *more* than the surface estate.  We conclude that Union Tanning and CPLC properly reported their interest in the surface estate of the Josiah Haines warrant, thus complying with the Act of 1806.

To be clear, however, we do not find as a matter of law that only the surface estate was assessed in 1907 or offered for sale by the treasurer in 1908.  The record is unclear on the parameters of the 1907 assessment and the 1908 sale.  It is conceivable that the Proctor heirs also defaulted, or the treasurer erroneously offered the entire warrant at the 1908 tax sale.  Our conclusion on this issue merely serves to reinforce the distinction between the facts of this case and those in Herder

Spring.  Nevertheless, as noted in our summary judgment opinion: "Even if we could definitively conclude that the county treasurer properly offered the entire Josiah Haines warrant at the 1908 tax sale, what was *offered* for sale is not dispositive as to what interest this tax sale effectively conveyed."  (See Doc. 183 at 31).  As we conclude below, CPLC's compliance with the Act of 1806, combined with McCauley's status as an agent of CPLC, as well as CPLC's breach of its duty to pay 1907 taxes on the Josiah Haines warrant, rendered McCauley's 1908 purchase a mere redemption.

## B.    McCauley Acted as CPLC's Agent During the 1908 Tax Sale

The existence of a principal-agent relationship is a question for the factfinder.  See Walton v. Johnson, 66 A.3d 782, 787 (Pa. Super. Ct. 2013) (citing Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co., 602 A.2d 1348, 1351 (Pa. Super. Ct. 1992)).  Such a relationship "results from the consent of one [] that another may act on his behalf."  Lincoln Ave. Indus. Park v. Norley, 677 A.2d 1219, 1222 (Pa. Super. Ct. 1996) (citing Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1970)).  The agency relationship "requires no special formalities."  McIlwain v. Saber Healthcare Grp., Inc., 208 A.3d 478, 485 (Pa. Super. Ct. 2019).  Nor must it be in writing.  See Falconer v. Mazess, 168 A.2d 558, 560 (Pa. 1961).  An agency relationship's existence need not be proven by direct evidence "if it can be reasonably inferred from the circumstances of the case."  See Scott v. Purcell, 415 A.2d 56, 61 n.8 (Pa. 1980) (citing Yezbak v. Croce, 88 A.2d 80, 82 (Pa. 1952)).

We find that McCauley acted as an agent of CPLC in the 1908 tax sale of the Josiah Haines warrant.  See Lincoln Ave., 677 A.2d at 1222 (citing Smalich, 269 A.2d

**JA38**

at 480). The evidence offered by the Trust allows us to "reasonably infer" an agency relationship from the unique circumstances of this case, where the individuals with personal knowledge of an agency relationship agency are no longer living. See Scott, 415 A.2d at 61 n.8 (citation omitted).

Principally, we emphasize an undisputed fact: after McCauley purchased the Josiah Haines warrant at a June 1908 tax sale, CPLC—*not McCauley*—paid taxes on the Josiah Haines warrant in 1908 and 1909. (See Joint Ex. 11 at 9; Def. Ex. 47 at 2). Other record evidence originating with CPLC confirms this conclusion, including CPLC's corporate documentation naming McCauley in its leadership, CPLC's ledger books that conspicuously lack any record of the purported sale to McCauley, and CPLC internal correspondence to and from McCauley while he worked for the company. (See Def. Exs. 12-17, 30-32, 41). We further note that public documents, including *Boyd's Directory* excerpts, court filings, newspaper articles, and McCauley's own notarized declaration reinforce our conclusion. (See Def. Exs. 11, 18-23, 25-27, 48). In much the same way McCauley declared he was acting "in trust for" CPLC when he made tax purchases in Elk County, we conclude he was acting on behalf of CPLC when purchasing the Josiah Haines warrant in Bradford County. (See Def. Ex. 27 at 2).

### C. Because CPLC Breached Its Duty to Pay 1907 Taxes, McCauley's Purchased as CPLC's Agent Effected Only a Redemption

It is uncontested that in 1907, CPLC did not pay the assessed taxes on the Josiah Haines warrant, thereby causing the property to be sold by the Bradford County treasurer at the 1908 tax sale. (See Doc. 205 ¶¶ 13, 15). Default occurred in

1907, the very same year that CPLC records indicate the company completed its bark-peeling activities on the tract. (See Def. Ex. 41 at 1). In June 1908, McCauley purchased the Josiah Haines warrant for $49.36, an amount equal to the delinquent taxes for 1907. (See Doc. 205 ¶ 16; Joint Ex. 2 at 72).

We held in our summary judgment opinion that CPLC had a duty to pay taxes on its surface interest in the unseated Josiah Haines warrant in 1907. (See Doc. 183 at 31-43). We restate the bulk of our previous legal analysis herein, as it undergirds our current findings.

Pennsylvania law instructs that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest[.]" Powell v. Lantzy, 34 A. 450, 451 (Pa. 1896) (citing Chambers v. Wilson, 2 Watts 495 (Pa. 1834); Coxe v. Wolcott, 27 Pa. 154 (1856)). This rule "rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty." Id. Instead, such a purchase "operates as a payment only," i.e., a redemption. Id. (citation omitted). Application of this rule is limited to cases where the purchaser had some preexisting duty—arising by law, contract, or equity—to pay the taxes. Id.

There is no case precedent which considers whether, under the foregoing facts, an agent who purchases at a tax sale induced by his principal's default takes good title to the entire property or simply redeems his principal's prior interest. For example, in Powell, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and through no fault of, the tax-sale purchaser who

JA40

currently owned the surface estate.  <u>See</u> <u>Powell</u>, 34 A. at 451, 452.  Neither the surface nor the subsurface owner had a legal duty to pay the overdue taxes, which had accrued on the land prior to severance during ownership by a different individual.  <u>Id.</u>  In <u>Hutchinson</u>, taxes on unseated lands went unpaid in 1890 and 1891, before any involvement or ownership by the eventual 1892 tax-sale purchaser.  <u>Hutchinson</u>, 49 A. at 317.  In <u>Sagamore</u>, delinquent taxes from 1892 induced the 1894 tax sale that divested Proctor of the interest he purchased in 1893.  <u>Sagamore</u>, 166 F. Supp. at 468-69, 476.  And in <u>Herder Spring</u>, a *bona fide* third party bought the entire warrant from the county, which the county had acquired in fee simple at a tax sale after the prior surface and subsurface owners failed to report their separate interests or pay taxes thereon.  <u>Herder Spring</u>, 143 A.3d at 360-61.

   <u>Reinboth</u> also presents materially different circumstances.  There, the 1840 tax-sale purchaser, Christopher Geiger, held claim to the subject property based on prior conveyances, but there were other putative owners who claimed title to portions of that land.  <u>Reinboth</u>, 29 Pa. at 140, 144-45.  The property went through two tax sales, one in 1824 and another in 1840.  <u>Id.</u> at 144-45.  The 1824 tax-sale buyer was an unrelated third party who purchased in good faith, and in 1829, Geiger directed his attorney to purchase the property from the third-party buyer.  <u>Id.</u>  Geiger's attorney then sought a treasurer's deed for the tract at the 1840 tax sale to eliminate any doubts as to superiority of Geiger's title.  <u>See</u> <u>id.</u> at 142, 145.  <u>Reinboth</u> is clearly distinguishable because the first tax-sale purchaser was an independent third party.

A final case requiring consideration is <u>Gibson</u>, the decision quoted by <u>Powell</u> for the proposition that "there [i]s nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale." <u>Powell</u>, 34 A. at 451 (quoting <u>Gibson</u>, 27 Pa. at 160, 165). In <u>Gibson</u>, William A. Williams bought the subject property at a tax sale in 1850 for unpaid 1848 and 1849 taxes. <u>Gibson</u>, 27 Pa. at 160. Williams made the tax-sale purchase at the direction of Eli Felt, who had privately purchased the same land in August 1848 and conveyed it to the defendants early the following year. <u>Id.</u> at 162. Felt directed the tax-sale purchase to "confirm and strengthen" his own title, which he had already transferred to new buyers. <u>Id.</u> The Pennsylvania Supreme Court held Felt was not prohibited from perfecting, at a treasurer's sale, his 1848 title, which he may have deemed "suspicious" and "defective" due to possible fraud by its grantor. <u>Id.</u> at 165. But again, <u>Gibson</u> is materially different because the unpaid taxes at least partially accrued when Felt was not the owner, and because the tax-sale purchase was intended to cure any title defects caused by potential fraud of a prior owner.

Finding no case on point, we revert to the original question raised by <u>Powell</u>: whether CPLC owed any duty to pay the 1907 taxes such that McCauley's purchase—since he was an agent of CPLC—acted merely as a redemption. This issue is purely a matter of state law, and we believe it has ramifications for other pending and future real property disputes in the Commonwealth. In the absence of controlling precedent, it is our task to predict how Pennsylvania courts would rule if confronted with this issue. After careful consideration, we conclude that CPLC owed a legal duty to pay taxes on its unseated surface estate; hence, CPLC could

not use an agent to "acquire a better title, or a title adverse to that of other parties in interest," at a tax sale prompted by its own default.  Powell, 34 A. at 451.

It is beyond peradventure that unseated landowners faced no *personal liability* for failing to pay taxes assessed on unseated land.  Pennsylvania's highest court has repeatedly affirmed this legal principle for nearly 200 years.  As early as 1822, the Pennsylvania Supreme Court acknowledged that "taxes on unseated lands[] have never . . . been considered a charge on the person of the owner."  Burd v. Ramsay, 9 Serg. & Rawle 109, 114 (Pa. 1822).  In 1841, the court explained that "the land itself, and not the owner of it, is debtor for the public charge," and is looked to for any overdue payment.  Strauch v. Shoemaker, 1 Watts & Serg. 166, 175 (Pa. 1841) (quoting Fager v. Campbell, 5 Watts 287, 288 (Pa. 1836)).  Fifty-five years later, the Powell court reiterated that when taxes were assessed on unseated land, "there was no personal responsibility on the owner therefor.  The land alone was liable."  Powell, 34 A. at 451 (citing Hunter v. Cochran, 3 Pa. 105 (1846) (*per curiam*); Russel v. Werntz, 24 Pa. 337 (1855); Logan v. Washington County, 29 Pa. 373 (1857)).  In 1972, the Bannard court explained that, as to unseated land, "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes."  Bannard, 293 A.2d at 49.  Herder Spring recently reaffirmed this premise, stating that "tax on unseated land was the liability of the land rather than the owners."  Herder Spring, 143 A.3d at 375 (citations omitted).

Personal liability, however, is quite different than a duty to pay taxes.  Personal liability is a potential *consequence* for breaching a duty, such as failing to

pay taxes on seated land.  See id. at 364 (citation omitted).  Simply because the Commonwealth imposed no personal liability or "personal responsibility" (as it was sometimes referred to) on unseated landowners for failure to pay assessed taxes does not mean that those owners had no duty to pay taxes in the first place.

To the contrary, courts in the Commonwealth have long recognized an unseated landowner's duty to pay taxes.  In Herder Spring, the Pennsylvania Supreme Court reaffirmed that, while the tax-sale regime for unseated land may have appeared "harsh and severe" for landowners, "[a] vigilant owner has nothing to fear.  All he has to do is to pay his taxes, and *this he is bound to do upon every principle of equality and justice*."  Herder Spring, 143 A.3d at 366 (emphasis added) (quoting Strauch, 1 Watts & Serg. at 176).  The Herder Spring court likewise quoted M'Coy v. Michew, 7 Watts & Serg. 386 (Pa. 1844), for similar reasoning: "If there be hardship, it is one which can easily be avoided by performing the *duty* which the law imposes upon [the owner], to return the land and *pay his taxes*."  Id. at 369 (emphasis added) (alteration in original) (quoting M'Coy, 7 Watts & Serg. at 391).  And in Breisch v. Coxe, another case involving taxation of unseated land, the court explicitly stated that "*the payment of taxes is a duty*, and a failure to perform it is the fault of the *owner*."  Breisch v. Coxe, 81 Pa. 336, 346 (1876) (emphasis added); see also Mayor of Phila. v. Riddle, 25 Pa. 259, 263 (1855) (noting that "it is an owner's duty to pay taxes" and failure to do so results in tax sale of owner's land).

JA44

The legal duty of owners to pay taxes on unseated land, which was firmly established in the common law, was subsequently codified by statute.  In 1887, Pennsylvania's General Assembly passed the Act of June 6, 1887, which mandates:

> That after June first, [1888], *all taxes levied upon unseated lands*, within the counties of this Commonwealth, *shall be paid by the owner or owners of such unseated lands* within the year for which the same are levied; and in case of the refusal or failure of any person or persons, companies or bodies corporate, owner or owners of such unseated lands to pay the taxes so levied within the year for which the same are levied and collectible, then interest at the rate of six per centum, per annum, is to be charged upon the amount of said taxes, or any part thereof, remaining due and unpaid from and after the first day of the year following that for which said taxes were levied until the same has been paid in full, *or the land sold as now provided by law for the sale of unseated lands*: Provided, No interest shall be charged upon taxes levied for the years [1886] and [1887].

Act of June 6, 1887, P.L. 363, No. 248, § 1 (codified at 72 PA. STAT. AND CONS. STAT. ANN. § 5781) (emphasis added).  The plain language of this statute unambiguously obligates unseated landowners to pay assessed taxes within a year of levy.  Id.

We acknowledge that, at several points in the Herder Spring decision, the court uses language—albeit in *dicta*—which could be read to infer that there was no duty to pay taxes on unseated land.  Nevertheless, when put in proper context, we do not believe that such remarks were meant to contradict longstanding legislation or state supreme court precedent.

For instance, the Herder Spring court states that "[t]he owner of unseated land . . . was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original

**JA45**

warrant had been issued." <u>Herder Spring</u>, 143 A.3d at 364.  However, this statement is followed by multiple citations to state supreme court decisions indicating that there was no personal *liability* for taxes on unseated land.  <u>See</u> <u>id.</u> (citing <u>Strauch</u>, 1 Watts & Serg. at 175; <u>Bannard</u>, 293 A.2d at 49).  As noted by a prominent treatise on tax titles, the idea of taxes being "imposed on" or "against" the land, or that the land alone was liable for taxes, "means no more than that taxes assessed upon a specific parcel of real estate can only be collected by a process having for its object the condemnation and sale of the land."  HENRY CAMPBELL BLACK, A TREATISE ON THE LAW OF TAX TITLES: THEIR CREATION, INCIDENTS, EVIDENCE, AND LEGAL CRITERIA § 167 (2d ed. 1893).  Later in the opinion, the <u>Herder Spring</u> court notes that the <u>Powell</u> decision "explained the duty, or lack thereof, of landowners to pay taxes[.]"  <u>Herder Spring</u>, 143 A.3d at 367.  Although this language appears broad at first blush, it relates directly to the facts of <u>Powell</u>, where neither the surface nor the subsurface owner had any obligation to pay overdue taxes that had accrued on the property when owned in whole by a different individual.  <u>Id.</u> (quoting <u>Powell</u>, 34 A. at 451).

In sum, we read this *dicta* within its context and find that it does not represent a reversal of precedent or an abrogation of the Act of 1887.[11]  Had the <u>Herder Spring</u> court intended such drastic outcomes, it would have made its

---

[11] This is especially true when, in the same opinion, the court explicitly states that unseated landowners were bound to pay their taxes "upon every principle of equity and justice," <u>id.</u> at 366 (quoting <u>Strauch</u>, 1 Watts & Serg. at 176), and could avoid the loss of their land at tax sales by performing the "duty" imposed by the law on unseated landowners: "to return the land and pay the taxes," <u>id.</u> at 369 (quoting <u>McCoy</u>, 7 Watts & Serg. at 391).

**JA46**

holdings clear and explicit. Instead, these statements simply affirm the noncontroversial axiom that there was no personal liability on unseated landowners who failed to pay taxes.

We find unpersuasive the Game Commission's arguments against the existence of a legal duty to pay taxes on unseated land, as reiterated in its bench trial memorandum. (See Doc. 219 at 17-25). The Game Commission argues that we have misinterpreted the Powell case. (See id. at 17-21). It bears repeating that, in Powell, the surface owner bought the entire property at a tax sale induced by default of a *prior owner* who had failed to pay taxes assessed on the tract as a whole. Powell, 34 A. at 451, 452. And in Herder Spring, the buyer was a *bona fide* third party who purchased the entire warrant because none of the prior surface or subsurface owners had reported their separate interest to county commissioners or paid the taxes owed, thus causing a tax sale of the entire property. Herder Spring, 143 A.3d at 360-61. Neither tax-sale buyer was under *any* obligation to pay the overdue taxes that caused the treasurer's sales in those cases, so the Powell rule did not apply. The Game Commission's repeated reliance on the outcome in Powell and Herder Spring, therefore, is misplaced because the facts of the case at bar are entirely different.

Furthermore, the fact that CPLC had no duty to pay taxes on the subsurface estate it did not own does not render the Powell rule irrelevant. In Powell, the tax-sale purchaser had no other option to protect his surface interest except to buy the entire property at the tax sale. See Powell, 34 A. at 452 ("Lantzy was in a position in which he was obliged to pay a claim which he did not personally owe, and which

**JA47**

was, in part, a charge upon the land of another, from whom he could not require repayment, or to buy or lose his title."). That is simply not the situation here. All CPLC had to do to protect its surface interest was pay its taxes. If Bradford County incorrectly assessed the entire warrant in 1907, rather than separate estates, CPLC could have challenged that assessment prior to the tax sale or following the sale during the statutory redemption period. See Herder Spring, 143 A.3d at 366. What CPLC could not do is utilize its own default to gain a better title at a tax sale, *i.e.*, "build up or acquire a title founded upon [its] own neglect of duty." Powell, 34 A. at 451. We therefore conclude, as we did in our summary judgment opinion, that CPLC as an unseated landowner had a legal duty to pay taxes assessed on its land.

In the matter *sub judice*, CPLC was the undisputed surface owner of the Josiah Haines warrant prior to the 1908 tax sale. (See Doc. 205 ¶ 11). Thus, CPLC had an affirmative duty to pay taxes assessed on its interest in the surface estate, and breached its duty by failing to pay those taxes in 1907. (See id. ¶ 13). We reiterate that CPLC could not use an agent to "acquire a better title, or a title adverse to that of other parties in interest," at a tax sale prompted by its own default. See Powell, 34 A. at 451. McCauley was acting as CPLC's agent at the 1908 tax sale, and therefore the rule set forth in Powell applies here. CPLC's purchase through McCauley effectuated nothing more than a redemption of its surface interest. See id. A redemption operates to "set aside or annul" the tax sale, leaving the title "precisely as though the sale had not been made." Yocum v. Zahner, 29 A. 778, 779 (Pa. 1894). Since McCauley's purchase acted as a redemption, it left the title as it stood before the sale was made. See id. at 779. Thus, Proctor's subsurface

interest in the Josiah Haines warrant was not extinguished at the tax sale, and the Proctor Trust continues to hold its interest in the subsurface estate.

**V.**     **Conclusion**

We find in favor of Proctor Trust on the issue of ownership of the subsurface estate of the Josiah Haines warrant.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     December 3, 2021

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,** | : : : : | **CIVIL ACTION NO. 1:12-CV-1567** |
| | : | **(Judge Conner)** |
| **Plaintiff** | : : | |
| **v.** | : : | |
| **THOMAS E. PROCTOR HEIRS TRUST,** | : : : | |
| **Defendant** | : : | |

## <u>ORDER</u>

AND NOW, this 3rd day of December, 2021, after convening a bench trial in this matter, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Judgment is ENTERED in favor of defendant Thomas E. Proctor Heirs Trust on the issue of subsurface ownership in the bellwether Josiah Haines warrant only.

2. The court will schedule, by separate order, a telephone conference with counsel to address remaining matters in the above litigation.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

**JA50**

## CERTIFICATE OF SERVICE

I, Michael J. Scarinci, Deputy Attorney General, do hereby certify that I have

this day served the foregoing Brief For Appellants and Joint Appendix Volume I,

via electronic service, on the following:

> Christopher R. Healy, Esq.
> Troutman Pepper Hamilton Sanders
> Two Logan Square
> 18th & Arch Streets
> Philadelphia, PA 19103
>
> Laura A. Lange
> 1670 Sturbridge Drive
> Sewickley, PA 15143
>
> Justin G. Weber
> Troutman Pepper
> 100 Market Street
> P.O. Box 1181
> Suite 200
> Harrisburg, PA 17108
> Attorneys for Appellees

Seven copies were also sent by first class mail to the Clerk of the United States

Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Deputy Attorney General

DATE: June 7, 2022