IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

**No. 22-1587**

**COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,**

**Appellants**

**v.**

**THOMAS E. PROCTOR HEIRS TRUST**

# PETITION FOR PANEL REHEARING AND REHEARING EN BANC

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
ENTERED DECEMBER 3, 2021

DAVID W. SUNDAY, JR.
*Attorney General*

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 857-2184
FAX: (717) 772-4526

BY: MICHAEL J. SCARINCI
*Senior Deputy Attorney General*

DANIEL B. MULLEN
*Chief Deputy Attorney General*
*Appellate Litigation Section*

DATE: September 14, 2026

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

RULE 35.1 STATEMENT .......... 1

INTRODUCTION .......... 2

BACKGROUND .......... 3

REASONS FOR GRANTING THE PETITION .......... 7

I. THE COMMISSION IS AN ARM OF THE STATE UNDER *GALETTE* AND THIS COURT'S PRECEDENT .......... 7

A. The Legislature Structured the Commission as Part of the Commonwealth. .......... 9

B. The Practical Reality of Funding is that the Monies in the Game Fund are State Funds. .......... 16

C. The Similarities Between the Commission and the Pennsylvania Liquor Control Board Warrant the Same Result. .......... 18

II. Even if the Commission is Not an Arm of the State, the Commonwealth is the Real Party in Interest per *Galette*. .......... 22

CONCLUSION .......... 24

CERTIFICATE OF COUNSEL .......... 25

CERTIFICATE OF SERVICE .......... 26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Arneson v. Wolf*,
117 A.3d 374 (Pa. Cmwlth. 2015) ....................16

*Bannard v. N.Y. State Nat. Gas Corp.*,
172 A.2d 306 (Pa. 1961) ....................20

*Bradley v. West Chester Univ.*,
880 F.3d 643 (3d Cir. 2018).................... passim

*Brey v. PLCB*,
381 A.2d 228 (Pa. Cmwlth. 1978) ....................20

*Christy v. Pennsylvania Turnpike Commission*,
54 F.3d 1140 (3d Cir. 1995).................... 13, 14

*Cooper v. SEPTA*,
548 F.3d 296 (3d Cir. 2008)....................13

*EF Operating Corp v. American Bldgs*.,
993 F.2d 1046 (3d Cir. 1993)....................23

*Fitchik v. N.J. Rail Operations, Inc.*,
873 F.2d 655 (3d Cir. 1989)....................7

*Galette v. New Jersey Transit Corporation*,
607 U.S. 509 (2026) .................... passim

*Geer v. Connecticut*,
161 U.S. 519 (1896) ....................9

*Herder Spring Hunting Club v. Keller*,
143 A.3d 358 (Pa. 2016) ....................3

*Holland v. Game Comm'n*,
2011 WL 10819503 (Pa. Cmwlth. 2011)....................20

*Hopkins v. Clemson*,
221 U.S. 636 (1911) ..........23

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ..........9

*Krulac v. Pa. Game Comm'n*,
702 A.2d 621 (3d Cir. 1997) ..........16

*Maliandi v. Montclair State University*,
845 F.3d 77 (3d Cir. 2016) ..........17

*Marquis v. PLCB*,
2025 WL 2784232 (E.D. Pa. 2025) ..........20

*Merchs' Warehouse Co. v. Gelder*,
36 A.2d 444 (Pa. 1944) ..........20

*Moor v. Alameda Cty.*,
411 U.S. 693 (1973) ..........2

*Nilsen v. Univ. of Washington*,
__ F.4th __, 2026 WL 2348451 (Aug. 13, 2026; 9th Cir.) ..........8

*Pa. Game Comm'n v. Int'l Dev. Corp.*,
276 A.3d 1215 (Pa. Cmwlth. 2022) .......... 16, 22

*Patterson v. Pennsylvania Liquor Control Board*, 915 F.3d 945 (3d Cir. 2019)
.......... passim

*Powell v. Lantzy*,
34 A.450 (Pa. 1896) ..........5

*Ramada Inns, Inc. v. Rosemount Mem. Park Ass'n*,
598 F.2d 1303 (3d Cir. 1979) ..........23

*Regents of the Univ. of Cal. v. Doe*,
519 U.S. 425 (1997) ..........8

*Roe v. Game Comm'n*,
147 A.3d 1244 (Pa. Cmwlth. 2016) ..........20

*State Highway Commission of Wyoming v. Utah Const. Co.*,
278 U.S. 194 (1929) .......... 23

*Synthes USA HQ, Inc. v. Commonwealth*,
289 A.3d 846 (Pa. 2023) .......... 14

*U.S. v. Cotton*,
535 U.S. 625 (2002) .......... 23

*Venesky v. Ridge*,
789 A.2d 862 (Pa. Cmwlth. 2002) .......... 21

**Statutes**

2 Pa.C.S. § 101 .......... 15

4 Pa.C.S. § 1403 .......... 11

16 Pa.C.S. § 14302 .......... 12

16 Pa.C.S. § 14320 .......... 12

16 Pa.C.S. § 3202 .......... 13

16 Pa.C.S. § 5505-A .......... 13

16 U.S.C. § 669 .......... 10

34 Pa.C.S. § 103 .......... 2, 9, 15, 20

34 Pa.C.S. § 2102 .......... 22

34 Pa.C.S. § 2709 .......... 19

34 Pa.C.S. § 301 .......... 9, 20, 21

34 Pa.C.S. § 322 .......... passim

34 Pa.C.S. § 324 .......... 10

34 Pa.C.S. § 521 .......... 16, 17, 19

34 Pa.C.S. § 522 .......... 17

34 Pa.C.S. § 701 .......... 21

34 Pa.C.S. § 706 .......... 15, 23
34 Pa.C.S. § 708 .......... 10, 20
34 Pa.C.S. § 725 .......... 19
34 Pa.C.S. § 901 .......... 21
34 Pa.CS. § 521 .......... 19
42 Pa.C.S. § 8522 .......... 20
47 P.S. § 2-201 .......... 20, 21
47 P.S. § 2-202 .......... 21
47 P.S. § 2-207 .......... 19, 21, 22
47 P.S. § 2-208 .......... 22
47 P.S. § 744-907 .......... 19
47 P.S.§ 8-802 .......... 19
53 Pa.C.S. § 5505 .......... 13
62 Pa.C.S. § 1724 .......... 16
71 P.S. § 1340.301 .......... 11
71 P.S. § 61 .......... 20, 22
71 P.S. § 631.1 .......... 17
71 P.S. § 634 .......... 17, 19
71 P.S. § 732-102 .......... 14, 15
71 P.S. § 732-204 .......... 12, 13, 14
71 P.S. § 732-303 .......... 14, 15
71 P.S. § 732-403 .......... 14, 15
71 P.S. § 8102-C .......... 21

72 P.S. § 1798.1-E ........ 11, 20

72 P.S. § 5020-204 ........ 10

72 P.S. § 7204 ........ 11, 20

72 P.S. § 8102-C.2 ........ 11, 12

74 Pa.C.S. § 1711 ........ 9, 13

75 Pa.C.S. § 9004 ........ 11

Law of July 12, 2026, P.L. 265, No. 21 ........ 11

**Other Authorities**

House Bill 1300, Section 11 (2023-24) ........ 17, 19

House Bill 2690 of 2026 ........ 19

Senator Dush, Adjustment to Payment in Lieu of Taxes, Co-Sponsorship Memo to SB225 (2023-24) ........ 11

**Rules**

FRAP 40 ........ 3, 10, 12

**Regulations**

61 Pa.Code § 32.23 ........ 21

**Constitutional Provisions**

Pa. Const., Art. VI, § 7 ........ 21

## RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of this Court and the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court, *i.e.*, the panel's decision is contrary to *Galette v. New Jersey Transit Corporation*, 607 U.S. 509 (2026), and *Patterson v. Pennsylvania Liquor Control Board*, 915 F.3d 945 (3d Cir. 2019).

This case also raises a question of exceptional importance: a state agency's status as an arm of the state, which implicates both the jurisdiction of the federal courts under the diversity statute and States' rights to immunity pursuant to the Eleventh Amendment.

# INTRODUCTION

The Pennsylvania Game Commission commenced this action in the district court against Thomas E. Proctors Heirs Trust seeking to quiet title to the subsurface rights under State Game Lands in northcentral Pennsylvania. The suit was brought solely under state law, so jurisdiction was based on diversity of citizenship—the Trust being based in Massachusetts and the Commission in Pennsylvania. But there was no jurisdiction because the Commission is an "arm of state" and, thus, cannot be a citizen for purposes of diversity jurisdiction. *See e.g. Moor v. Alameda Cty.*, 411 U.S. 693, 717 (1973). No one realized this mistake until the panel, *sua sponte*, raised the issue of jurisdiction, after the merits of ownership had been briefed and argued to this Court, and the Pennsylvania Supreme Court had ruled on this Court's certified question of state law.

The panel, however, determined that the Commission—a state agency having no separate corporate existence apart from the Commonwealth, is subject to significant oversight and control by the Commonwealth, takes title to land in the name of the Commonwealth, and whose very purpose is to "protect, propagate, manage and preserve the game or wildlife of this Commonwealth" in its "*sovereign* capacity"—is *not* an arm of the Commonwealth but an independent citizen. *See* 34 Pa.C.S. §§ 103(a), 322(a). That ruling is inconsistent with both the High Court's

decision in *Galette* and several of this Court's decisions, most notably, *Patterson*, which held that the Pennsylvania Liquor Control Board is "an arm of the state."

At the very least, panel rehearing is warranted because the panel misapprehended several critical factors based on its misreading of state law. Properly understood, state law demonstrates that the Commission is an arm of the state. *See* FRAP 40(b)(1)(A).

**BACKGROUND**

Because the underlying merits are relevant only as background to the jurisdictional issue, a brief recitation of the merits is provided.

This case concerns the effect of a 1908 tax sale of an unseated 410-acre tract of land in what is now LeRoy Township, Bradford County, known as the Josiah Haines Warrant. JA167-68.[1] At the time of that sale, ownership of the land was split, with the Central Pennsylvania Lumber Company ("CPLC") owning the surface and the heirs of Thomas E. Proctor (who died in 1894), and Jonathan Hill owning the subsurface.[2] JA167-68, JA170, JA372. Because no one paid the taxes on the Haines

[1] The law, then, distinguished between seated and unseated land. Seated land was "property that had been developed with residential structures, had personal property upon it that could be levied upon for the tax due, or was producing regular profit through cultivation, lumbering, or mining." Unseated land was considered "wild." *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 363 (Pa. 2016).

[2] CPLC was a subsidiary of U.S. Leather, of which Proctor was the first president. JA170.

Warrant in 1907, the land was exposed for sale. JA343, JA452. Bradford County sold the Haines Warrant at a public sale on June 8, 1908, to Calvin H. McCauley, Jr., who, the district court would later find, was an agent of CPLC. JA38.

More than two years later, after the period when the prior owners could have redeemed or bought back the Haines Warrant, 72 P.S. § 6091, JA507-08, McCauley, Jr., and his wife sold it, along with several other tracts of land, back to CPLC for stated consideration of $1.00 JA168, JA499-502. A decade later, CPLC conveyed more than 7,000 acres, including the Haines Warrant, "*to the Commonwealth*." JA169, JA389-94.

In 2012, the Commission commenced an action against the Proctor Trust, seeking to quiet title to the subsurface rights of six warrants, consisting of over 2,000 acres. JA75-91. The Proctor Trust counterclaimed for title to the subsurface of these warrants and dozens of others, including the Haines Warrant. JA106-07. The Commission invoked diversity jurisdiction, alleging that it exists under the laws of the Commonwealth, while the Trust is a citizen of Massachusetts. JA83.

The matter proceeded to trial solely on the Haines Warrant. The Trust claimed it a "bellwether" for the rest of the litigation. JA6. The issue that divided the parties was the significance of McCauley, Jr.'s purchase at the tax sale. The Commission maintained that his purchase effected a "title wash," meaning he acquired both the surface and subsurface estates at the sale. The Trust, however, claimed that his

purchase effected only a "redemption" of CPLC's interest in the surface estate (not the subsurface) because he was an agent of CPLC, and CPLC could not "acquire a better title" by defaulting on the taxes. *See Powell v. Lantzy*, 34 A.450, 451 (Pa. 1896). The Commission responded that, for unseated land, the owner did not have a duty to pay taxes; rather "the land alone was liable." *Id.*; *see Herder Spring*, 143 A.3d at 360.

The district court ruled in favor of the Trust on ownership to the subsurface estate of the Haines Warrant. JA50. At the Commission's request, the district court certified to this Court the issue of an unseated landowner's duty to pay taxes, and this Court granted the Commission's petition for permission to appeal. JA1-5.

Following briefing and argument before this Court, it held the appeal *c.a.v.* pending disposition of a state court case raising a similar issue. ECF No.59. However, at the parties' joint request, the Court vacated its stay and certified the duty question to the Pennsylvania Supreme Court. ECF No.62.

After additional briefing and argument before the Pennsylvania Supreme Court, it determined that the sale to CPLC, through McCauley, Jr., resulted in only a redemption, not a wash. "Harmoniz[ing] seemingly incongruent" case law, that court concluded that unseated "landowners had an obligation to the state to pay the taxes levied." ECF No.66 at 23.

On return to this Court, the panel *sua sponte* questioned the basis for federal jurisdiction, pointing out that a State is not a citizen for purposes of diversity. ECF No.68. The panel requested the parties address in supplemental briefing whether the Commission is an arm of the state. *Id.* After the parties complied, the High Court clarified the proper framework for answering that question in *Galette*. The panel, applying *Galette* “for the first time,” ruled that the Commission is an independent citizen of the Commonwealth. ECF No. Doc.88.

## REASONS FOR GRANTING THE PETITION

### I. THE COMMISSION IS AN ARM OF THE STATE UNDER *GALETTE* AND THIS COURT'S PRECEDENT.

Prior to the High Court's decision in *Galette*, this Court's "arm-of-the-state" analysis (for both diversity and Eleventh Amendment immunity) focused on the *Fitchik* factors. *See Fitchik v. N.J. Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989). That test employed three factors with numerous subfactors. *See Bradley v. West Chester Univ.*, 880 F.3d 643, 654-58 (3d Cir. 2018). Those three factors are as follows:

1. Funding: will the money to pay any judgment against the entity come from the state treasury?
2. Status under state law: is the entity treated as an arm of the state under state statutes and case law?
3. Autonomy: does the entity retain significant autonomy from state control?

*Patterson*, 915 F.3d at 950.

This Court regarded those factors as "co-equal," *id.*, but that changed with *Galette*. Now, the "predominant" factors are whether (1) "the State structured the entity as a legally separate entity" that is (2) "liable for its own judgments." *Galette*, 607 U.S. at 523-24. Although the "degree of control the State exerts under the entity" pursuant to the autonomy factor remains relevant, a court should consider this factor with "caution." *Galette*, 607 U.S. at 526; ECF No.88 at 12-13.

Despite the change in emphasis, the panel concluded that "[t]he *Fithchik* factors and their various subfactors will continue to guide [the Court's] arm-of-the-state analysis, and [that the Court's] precedents assessing those factors remain authoritative." ECF No.88 at 13. But, as explained below, the panel's analysis was not faithful either to *Galette* or this Court's precedents.

In undertaking this analysis, a court must look to state law. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997). This is because the very definition of a sovereign is the ability to "structure its [own] government" and, so, the "States maintain the power to 'structure themselves as they wish.'" *Galette*, 607 U.S. at 536. Consequently, a court should examine "explicit statutory indications" and "case law from the state courts." *Bradley*, 880 F.3d at 655; *see Galette*, 607 U.S. at 528-29 (examining New Jersey law). It is the State's intent, reflected in the plain language of its laws, that controls. *See Galette*, 607 U.S. at 536; *Regents of the Univ. of Cal.*, 519 U.S. at 429 n.5; *Nilsen v. Univ. of Washington*, __ F.4th __, 2026 WL 2348451, *4 (9th Cir. Aug. 13, 2026) (asking, "did the State intend to create an entity that was part of itself or legally independent?").

In light of *Galette's* emphasis on (1) the structure of the entity, and (2) its liability for its own judgments, the Commission's analysis will begin with those two factors in that order.

**A. The Legislature Structured the Commission as Part of the Commonwealth.**

The panel rightly recognized that with the Commission, the Commonwealth did not create a "separate legal personality" because there is no "statutory language explicitly stating the same." *Patterson*, 915 F.3d at 953; *see* 34 Pa.C.S. §§ 103(a), 301(a) (creating the Commission as an "independent agency *of the Commonwealth*"); *cf.* 74 Pa.C.S. § 1711(a) (creating metropolitan transportation authorities as "a separate body corporate and politic"); *Galette*, 607 U.S. at 528-29 (New Jersy law described NJ Transit as "'a body corporate and politic with corporate succession"); *Bradley*, 880 F.3d at 657, 600 (finding that the Pennsylvania State System of Higher Education is an "arm of the state" even though it is separately incorporated). This "separate legal personality" is a "key marker" the Commission lacks. *Galette*, 607 U.S. at 520.

But it is more than just an absence of language. From "earliest traditions"—Ancient Rome, Ancient Greece, and English common law—the sovereign has had control over wildlife. *Geer v. Connecticut*, 161 U.S. 519, 602-03 (1896). It is no different in Pennsylvania. *See Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("the States have broad trustee and police powers over wild animals within their jurisdictions"). The Commonwealth "vested" the "ownership, jurisdiction over and control of game or wildlife in the commission as an independent agency of the Commonwealth." 34 Pa.C.S. § 103. And the Commission regulates wildlife "in its

*sovereign* capacity." *Id.* These are explicit statutory provisions recognizing the Commission as part of the Commonwealth. The panel overlooked the significance of these provisions that demonstrate the Commonwealth's intent. FRAP 40(b)(1)(A). The panel did not even *mention* these provisions.

Another statutory provision explicitly recognizes the sovereignty of the Commission. Through the Commission, the Commonwealth "assents to the provisions of the Federal Wildlife Restoration Act (16 U.S.C. § 669 et seq.)." Under that federal law, "the Secretary of the Interior is authorized to cooperate with the *states* through their respective . . . wildlife agencies." 34 Pa.C.S. § 324.

Relative to other subfactors that bear on the structure of the Commission, the panel misapprehended other state laws. The Commission does not possess "typical corporate powers." *Galette*, 607 U.S. at 529.

Most critically, the Commission is not subject to "state taxation." ECF No.88 at 25-26 (Heading: "Immunity from *State* Taxation"; discussing property assessments "*to the Commonwealth*"). The payments the Commission makes in "lieu of taxes on all lands, waters, or buildings" are to localities, not the State. 34 Pa.C.S. § 708; *see also* 72 P.S. § 5020-204(a)(7) (exempting public property from various local taxes). "For land owned by the . . . Commission, real property" acquired by it as forest preserves or reserves is subject to a $9 per acre payment for the benefit of the county, school district, or township where that property is located. 72 P.S. §

1798.1-E(a), (b)(2.1). Until recently, this payment was subsidized by the State Gaming Fund, *i.e.*, State tax dollars from gambling revenue. *See* former 72 P.S. § 1798.1-E(f); *see also* Law of July 12, 2026, P.L. 265, No. 21, § 25 (ending subsidy); 4 Pa.C.S. § 1403 (gambling fund).

Moreover, the Department of Conservation and Natural Resources also makes payments in lieu of taxes on land it has acquired as forest preserves or reserves. 72 P.S. § 1798.1-E(b)(1). And DCNR is "an administrative department within the executive branch of the government of this Commonwealth." 71 P.S. § 1340.301. Thus, these payments do not show any intent of the Commonwealth to "structure" the Commission (or DCNR) as separate from the State. *See Galette*, 607 U.S. at 536. Rather, these payments are designed to keep property taxes—the primary source for school funding—down in rural areas, where DCNR and the Commission manage a significant amount of Commonwealth-owned land. Senator Dush, Adjustment to Payment in Lieu of Taxes, Co-Sponsorship Memo to SB225 (2023-24) (referring to these lands as "state-owned").[3]

Like other State entities, the Commission is exempt from paying State taxes. For example, the Commission does not pay sales tax, 72 P.S. § 7204(12), the realty transfer tax, 72 P.S. § 8102-C.2, or the liquid fuels tax, 75 Pa.C.S. § 9004(e)(4).

---

[3] Available at https://www.palegis.us/senate/co-sponsorship/memo?memoID=39039&document=SB225

Citing a district court case, the panel concluded that an express exemption from taxation points against an entity being an arm of the state because such an exemption would be "utterly superfluous." ECF No.88 at 25-26. But even if that proposition, despite the lack of controlling authority, is true as a general matter, Pennsylvania law explicitly exempts "the Commonwealth or any of [its] instrumentalities" from taxation. *See e.g.* 72 P.S. § 8102-C.2. Thus, the Pennsylvania Legislature does not consider these express provisions to be superfluous. Again, the State's intent controls. *See Galette*, 607 U.S. at 536.

The panel also misapprehended the Commission's ability to sue and be sued. FRAP 40(b)(1). The panel determined that the Commission has "an *unrestricted* power to sue and be sued." ECF No.88 at 24. Not so. The Commission generally needs authorization from the Office of Attorney General to either initiate litigation or represent itself when it is sued. 71 P.S. § 732-204(c).

The Commission's authority is limited to enforcing the Wildlife Code. 34 Pa.C.S. § 322(a). Commission Enforcement Officers issue citations or make arrests, but it is the local district attorney who typically prosecutes and does so "in the name of the Commonwealth." 16 Pa.C.S. §§ 14302, 14320(b). The Wildlife Code does not use the language, "sue or be sued."[4] When the Legislature uses this broader

---

[4] This lawsuit was brought in the name of the "Commonwealth of Pennsylvania, Pennsylvania Game Commission." JA81.

language, it is typically reserved for authorities or political subdivisions, which are not ordinarily an "arm of the state." *See* 16 Pa.C.S. § 3202(2) (counties); 16 Pa.C.S. § 5505-A(b)(2) (sports and exhibition authorities); 53 Pa.C.S. § 5505(d)(2) (parking authorities); 74 Pa.C.S. § 1711(a)(2) (metropolitan transit authorities); *Cooper v. SEPTA*, 548 F.3d 296, 307 (3d Cir. 2008) ("sue and be sued" in enabling legislation weighed against Eleventh Amendment immunity for SEPTA); *cf. Patterson*, 915 F.3d at 954 (Liquor Code does not give the Liquor Control Board the power to sue or be sued as a separate entity from the Commonwealth).

On this subfactor, the panel misapprehended the significance of the Commonwealth Attorneys Act and this Court's own decision in *Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140, 1150 (3d Cir. 1995). ECF No.88 at 24-25. The panel noted that, under that Act, the Attorney General is required to represent an independent agency, such as the Game Commission (as the Attorney General has done here),[5] unless he determines "it is more efficient or otherwise is in the best interest of the Commonwealth, [to] authorize the General Counsel or the counsel for an independent agency to" represent the agency "*in his stead*." 71 P.S. § 732-204(c). An "independent agency" may request for its counsel to represent the agency and only if the Attorney General denies that request, the agency may

[5] The Commonwealth Attorneys Act defines both an "executive agency" and an "independent agency" as a "Commonwealth agency." 71 P.S. § 732-102.

intervene as of right, with the agency counsel representing the agency, and the Attorney General representing the Commonwealth. 71 P.S. § 732-403; *see Synthes USA HQ, Inc. v. Commonwealth*, 289 A.3d 846, 861-62 (Pa. 2023). The panel's comment that the Commission had an "unrestricted" power to sue and be sued was a profound misstatement of Pennsylvania law.

The panel then turned to its decision in *Christy* and concluded that because the Pennsylvania "Turnpike Commission is likewise subject to the Act but is not considered an arm of Pennsylvania, [71] P.S. § 732-102; *see Christy*, 54 F.3d at 1150, this subfactor counsels that the Game Commission is not either." ECF No.88 at 25. But in *Christy*, this Court never discussed the Attorney General's representation of the Turnpike Commission in litigation; rather, this Court discussed the Attorney General's review for "form and legality of each contract and rule or regulation the [Turnpike] Commission" proposes. *Christy*, 54 F.3d at 1150.[6] Moreover, in *Bradley*, this Court concluded that the Pennsylvania State System of Higher Education (PASSHE) is an arm of the state even though it may intervene in litigation and have the Office of General Counsel represent it, rather than the Attorney General. *See* 71 P.S. § 732-303(b). Indeed, every agency, whether

[6] The Commission's contracts and proposed regulations are likewise subject to the Attorney General's review. 71 P.S. § 732-204(b), (f); *Bradley*, 880 F.3d at 657 (review by the Attorney General of PASSHE's contracts and regulations favored finding PASSHE as an arm of the state).

classified as an "executive agency" or an "independent agency" under the Act, has the right to intervene on its own behalf but only after the Attorney General has initially refused to take action. *Id.* §§ 732-102 (definitions), 732-303, 732-403. Thus, that the Commission has this same right is no proof the Commonwealth intended it to be independent of the State.

The panel's erroneous analysis of these subfactors—immunity from state taxation and the ability to sue and be sued—were critical, tipping the scale in favor of its finding that the Commission is not an arm of the state. ECF No.88 at 26. Moreover, the panel overlooked the Commonwealth's explicit identification of the Commission as "sovereign." 34 Pa.C.S. § 103(a). And, the panel gave insufficient weight to the fact that the land the Commission acquires and uses must be "taken in the name of the Commonwealth," as was done with the Haines Warrant. 34 Pa.C.S. § 706; JA169, JA389-94. This was a pivotal factor in *Galette* the panel mistakenly discounted. *See Galette*, 607 U.S. at 530 (NJ Transit "hold[s] property in its own name"). Had the panel properly analyzed *Galette*'s first predominant factor, it would have concluded that the Commission is an arm of the state.[7]

[7] In analyzing this factor, the panel also considered the "overall treatment" of the Commission "under state law," which correlates to *Fitchik*'s "status-under-state-law factor." ECF No.88 at 12. The panel misapprehended or overlooked state law relative to this subfactor. Although the Commission is an "independent agency," that simply means that it is "not subject to the policy supervision and control of the Governor." 2 Pa.C.S. § 101. The Commission is "located squarely within the (continued….)

**B. The Practical Reality of Funding is that the Monies in the Game Fund are State Funds.**

For this factor, the "focus" is on whether "the entity is liable for its own judgments or whether the State is formally liable," *i.e.*, "whether 'any judgment' against the entity must be satisfied out of the state treasury." *Galette*, 607 U.S. at 525. The panel recognized, "the relevant statutory provisions do not expressly impose or disclaim such obligations." ECF No.88 at 15. So then the panel looked to "the practical realities of state funding," even though the High Court stated the focus should be on a State's "formal responsibility"—meaning what state law says—not "practical realities." *Galette*, 607 U.S. at 533-34.

But even the panel's examination of practical realities was mistaken. The practical reality is that even though the Commission has a separate fund apart from general appropriations, 34 Pa.C.S. § 521, judgments against it are covered by insurance. Like other agencies, the Commission participates in the Employee

---

executive department." *Arneson v. Wolf*, 117 A.3d 374, 393 (Pa. Cmwlth. 2015), *aff'd* 124 A.3d 1225 (Pa. 2015). The Legislature still exercises significant control over the Commission. *See infra* at 21. Further, the panel overlooked that disputes over title to land claimed by the Commission are heard in the Board of Property, which has "exclusive original jurisdiction over any claims involving title to land occupied or claimed by the *Commonwealth*." *Krulac v. Pa. Game Comm'n*, 702 A.2d 621, 623 (3d Cir. 1997); 71 P.S. § 337; *see Pa. Game Comm'n v. Int'l Dev. Corp.*, 276 A.3d 1215 (Pa. Cmwlth. 2022). Similarly, because the Commission is a "Commonwealth agency," disputes over its contracts are adjudicated in the Board of Claims. 62 Pa.C.S. § 1724.

Liability Self Insurance Program, paying premiums to the Department of General Services, another Commonwealth agency. 71 P.S. §§ 631.1, 634. ELSIP covers "all State employees, including members of boards and commissions, while engaged in the performance of their duties." 71 P.S. § 634(b).

Moreover, the notion that the Game Fund does not belong to the Commonwealth is mistaken. As described earlier, the Legislature has previously authorized revenue generated from gambling to offset the Commission's payment in lieu of taxes. *See supra* at 10. The Legislature has also previously proposed taking $150 million from the Game Fund for the Clean Streams Fund. *See* House Bill 1300, Section 11 (2023-24); *Patterson*, 915 F.3d at 955 (state law required Liquor Control Board to transfer profits from sale of liquor to Department of Health). Although that proposal did not pass, it was due to political opposition, not lack of legislative authority. Both actions demonstrate the conjugal nature of state money.

Moreover, the Game Fund is subject to significant state control. The Game Fund is in a restricted account within the State Treasury, subject to oversight by the Legislature, approval by the Governor, audit by the Auditor General, and appropriation controls by the State Treasurer. *See* 34 Pa.C.S. §§ 521, 522.

But even if the funding factor cuts against the Commission, the other factors weigh in favor of the Commission. The same was true in *Maliandi v. Montclair State University*, 845 F.3d 77, 87-88 (3d Cir. 2016) (Montclair State University), *Bradley*,

880 F.3d at 654-55 (PASSHE), and *Patterson*, 915 F.3d at 951 (Pennsylvania Liquor Control Board), and yet this Court held these were state entities. Although these cases pre-date *Galette*, they still "remain authoritative." ECF No.88 at 13.

### C. The Similarities Between the Commission and the Pennsylvania Liquor Control Board Warrant the Same Result.

The panel's decision here cannot be reconciled with its decision holding that the Pennsylvania Liquor Control Board is an arm of the state. *See Patterson*, 915 F.3d at 955-56. On all factors, these two entities share many similarities. Particularly, the State retains significant control over both entities, and yet this Court reached conflicting conclusions on that factor. *See id.* at 955. Because of the "multifaceted" nature of the arm-of-the-state analysis, which "can become hopelessly checkered," *see Bradley*, 880 F.3d at 656, rather than describe *Patterson*, the Commission presents a comparative chart of the two entities below:

| | **Pa. Liquor Control Bd.** | **Pa. Game Commission** |
|---|---|---|
| *Separately Incorporated?* | No. | No. |
| *Separate funding apart from General Fund?* | Yes, State Store Funds. 47 P.S.§ 8-802. | Yes, Game Fund. 34 Pa.CS. § 521. |
| *The State has a legal obligation to pay a money judgment against the agency?* | No. | No, the Commonwealth is not formally liable. |
| *Agency has money to pay adverse judgment?* | Yes, through State Store Funds, 47 P.S. § 744-907, but Board is also covered under Employee Liability Self-Insurance Program (ELSIP). 71 P.S. § 634(b). | Yes, through Game Fund, 34 Pa.C.S. § 521, but Commission is also covered under ELSIP. 71 P.S. § 634(b). |
| *Agency can raise its own revenues without State involvement?* | Yes, with many caveats. 47 P.S. § 2-207. | Yes, as to rights-of-way, easements, and licenses, 34 Pa.C.S. § 725, but no as to license fees, which are set by the Legislature, 34 Pa.C.S. §§ 2709, 2904; *cf.* House Bill 2690 of 2026 (proposing to give Commission the authority to establish license fees). |
| *Can the State transfer money from these agencies separate funds into the General Fund or other state funds?* | Yes. 47 P.S.§ 8-802(f), (h). | Yes. House Bill 1300 (2023) (proposing to transfer money from the Game Fund to the Clean Streams Fund). |

| | | |
|---|---|---|
| *Is the State immune from the agencies' debts?* | No express disclaimer. | No express disclaimer. |
| *Arm of the State for sovereign immunity purposes?* | Yes. 42 Pa.C.S. § 8522(b)(7); *Merchs' Warehouse Co. v. Gelder*, 36 A.2d 444, 448 (Pa. 1944); *Brey v. PLCB*, 381 A.2d 228, 229 (Pa. Cmwlth. 1978); *Marquis v. PLCB*, 2025 WL 2784232, *2 (E.D. Pa. 2025). | Yes. 42 Pa.C.S. § 8522; *Bannard v. N.Y. State Nat. Gas Corp.*, 172 A.2d 306, 313 (Pa. 1961); *Roe v. Game Comm'n*, 147 A.3d 1244, 1252 (Pa. Cmwlth. 2016); *Holland v. Game Comm'n*, 2011 WL 10819503 (Pa. Cmwlth. 2011). |
| *Independent administrative board or agency?* | Yes. 47 P.S. § 2-201. | Yes. 34 Pa.C.S. §§ 103, 301; 71 P.S. § 61. |
| *Can sue and be sued in its own name?* | No, nothing express in the Liquor Code. | Yes, but Wildlife Code expressly limits it to enforcing wildlife laws. 34 Pa.C.S. § 322(a). |
| *Subject to state taxation?* | No. No statutory indication that Board is immune from state taxation, but it does not pay tax on revenues, property, or bonds. | No, the Commission does not pay taxes to the Commonwealth. Section 708 is a payment in lieu of taxes that the Commission pays to counties, schools, and townships, *not the Commonwealth*. 34 Pa.C.S. § 708; 72 P.S. § 1798.1-E(b)(2.1). The Commission is immune from many state taxes. 72 P.S. § 7204(12); 71 P.S. |

| | | |
|---|---|---|
| | | § 8102-C; 61 Pa.Code § 32.23(a)(1). |
| *State control over entity (subfactors follow)?* | Yes, State has substantial control. | Yes, State has substantial control. |
| *Appointment power?* | 3 board members appointed by Governor with advice and consent by 2/3 of the Senate. | 9 commissioners appointed by Governor with advice and consent of majority of the Senate. |
| *Qualifications on members?* | Yes, e.g., age limit. 47 P.S. § 2-202. | Yes, e.g. geographical qualification. 34 Pa.C.S. § 301. |
| *Term limits?* | Yes, 47 P.S. § 2-201. | Yes, 34 Pa.C.S. § 301(c). |
| *Removal power?* | Yes, removal at will by the Governor. Pa. Const., Art. VI, § 7. | Yes, removal at will by the Governor. *Venesky v. Ridge*, 789 A.2d 862, 865-66 (Pa. Cmwlth. 2002), *aff'd* 809 A.2d 899. |
| *Exercises police powers?* | Yes, e.g. controls "the manufacture, possession, sale, consumption, importation, use, storage, transportation and delivery of liquor, alcohol and malt or brewed beverages." 47 P.S. § 2-207(b)(1). | Yes, e.g. regulates game and wildlife; possesses eminent domain, and power to arrest. 34 Pa.C.S. §§ 322(a), 701(a), 901(a)(1), (17). |

| | | |
|---|---|---|
| *Part of the Executive Department?* | No. | Yes. 71 P.S. § 61. |
| *State "prescribes general powers" of the entity?* | Yes, 47 P.S. § 2-207. | Yes, 34 Pa.C.S. § 322. |
| *State "prescribes the types of regulations" the entity may create?* | Yes, 47 P.S. § 2-208. | Yes, 34 Pa.C.S. § 2102. |

As the Liquor Control Board and the Commission share so many factors/subfactors in common, the result should be the same: both are state entities.

## II. Even if the Commission is Not an Arm of the State, the Commonwealth is the Real Party in Interest per *Galette*.

"Even if an entity is not an arm of the State . . . a State's sovereign immunity may still require dismissal of the action if the State is the real party in interest in that particular case." *Galette*, 607 U.S. at 527. "Although the arm-of-the-State and the real-party-in-interest doctrines are related, they can provide separate bases for dismissal." *Id.* Rehearing is warranted because the panel failed to account for the latter basis, which by itself requires dismissal.

Here, the Commonwealth is the real party in interest. The dispute is over title to subsurface rights, which is real property. *See Pa. Game Comm'n v. Int'l Dev. Corp.*, 276 A.3d 1215 (Pa. Cmwlth. 2022). Again, the Commission takes title to real

property in the name of the Commonwealth, as it did with respect to the land at issue here. JA389; 34 Pa.C.S. § 706. Because a "remedy" in favor of the Trust would run "directly against" the Commonwealth—not the Commission—the Commonwealth is the real party in interest and its sovereign immunity requires dismissal. *See Galette*, 607 U.S. at 528, citing *Hopkins v. Clemson*, 221 U.S. 636 (1911); *State Highway Commission of Wyoming v. Utah Const. Co.*, 278 U.S. 194, 199-200 (1929).[8]

---

[8] Although the Commonwealth did not explicitly raise this issue in its supplemental letter brief, because it concerns the subject matter jurisdiction of this Court, the issue can be raised at any time. *See U.S. v. Cotton*, 535 U.S. 625, 630 (2002); *EF Operating Corp v. American Bldgs.*, 993 F.2d 1046, 1048 (3d Cir. 1993); *Ramada Inns, Inc. v. Rosemount Mem. Park Ass'n*, 598 F.2d 1303, 1306 (3d Cir. 1979).

## CONCLUSION

For these reasons, the Court should grant panel rehearing or rehearing en banc.

Respectfully submitted,

DAVID W. SUNDAY, JR.
Attorney General

By: /s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Senior Deputy Attorney General
Bar No. 323816 (Pa.)

DANIEL B. MULLEN
Chief Deputy Attorney General
Appellate Litigation Section

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 857-2184
FAX: (717) 705-2331

DATE: September 14, 2026

**CERTIFICATE OF COUNSEL**

I, Michael J. Scarinci, Senior Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That a virus detection program was run on the file and no virus was detected.

4. That this brief contains 5,000 words within the meaning of Fed. R. App. Proc. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Senior Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Michael J. Scarinci, Deputy Attorney General, do hereby certify that I have this day served the foregoing Motion for Panel Rehearing or Rehearing En Banc via electronic service on all registered users.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Senior Deputy Attorney General

DATE: September 14, 2026

# U.S. COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 22-1587

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA GAME COMMISSION,
Appellant

v.

THOMAS E. PROCTOR HEIRS TRUST,
under Declaration of Trust dated October 28, 1980,
which is recorded in Sullivan County in Book 1106,
at page 879, its successors and assigns

---

Appeal from the U.S. District Court, M.D. Pa.
Judge Christopher C. Conner, No. 1:12-cv-01567

Before: KRAUSE, PHIPPS, and ROTH, *Circuit Judges*
Submitted Sep. 22, 2025; Decided Jul. 31, 2026

---

OPINION OF THE COURT

KRAUSE, *Circuit Judge.*[1] In *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), the Supreme Court clarified the proper framework for determining whether a state-created entity is an "arm of the state"—a status that carries significant consequences for federal jurisdiction. One, at issue in *Galette*, is that the entity then qualifies for sovereign immunity, but another is that the entity is disqualified from state "citizenship" for purposes of diversity jurisdiction. This appeal arises in the latter context and requires us, for the first time, to consider how *Galette* affects the framework we have historically applied and, in so doing, we answer the question percolating in our district courts as to whether Appellant, the Pennsylvania Game Commission, is an "arm" or a citizen of the Commonwealth of Pennsylvania.

Because we conclude, under an updated arm-of-the-state analysis, that the Game Commission is a citizen, the Game Commission properly invoked diversity jurisdiction and we must reach the merits of this quiet title action. From that point, the merits are resolved by the Pennsylvania Supreme Court's answer to our certification petition on a controlling question of state law: The Thomas E. Proctor Heirs Trust retains an ownership interest in the subsurface estate of the tract of land

---

[1] This matter was originally heard on January 11, 2023, before Judges Jordan, Phipps, and Roth, who certified a question of state law to the Pennsylvania Supreme Court pursuant to 3d Cir. L.A.R. Misc. 110. While that matter was pending, Judge Kent A. Jordan retired, and the panel was reconstituted to include Judge Cheryl Ann Krause.

at issue, so we will affirm the District Court's judgment in favor of the Trust.

## I. BACKGROUND

This appeal concerns the ownership rights to a single tract of land, the Josiah Haines warrant, presenting "bellwether" claims as to District Court litigation involving thousands of acres of land with valuable oil and gas deposits in northeastern Pennsylvania. *Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, No. 1:12-cv-1567, 2021 WL 5759030, at *1 (M.D. Pa. Dec. 3, 2021). Bradford County sold the Josiah Haines warrant at a public tax sale in 1908, and we are tasked with determining the effect of that sale.

Title to the Josiah Haines warrant and its subsurface resources passed through several hands before the 1908 tax sale. In 1894, one year after Thomas E. Proctor, the Trust's predecessor, obtained title to the Josiah Haines warrant, Proctor, Jonathan A. Hill, and their wives conveyed its surface estate to the Union Tanning Company, while reserving the subsurface estate—i.e., "all the minerals, coal, oil, gas, or petroleum"—to themselves and their heirs.[2] App. 313; 360-74.

---

[2] Bradford County classified the Josiah Haines warrant as "unseated land." App. 169, 561. Prior to 1947, Pennsylvania distinguished between seated land—which contained residential structures or valuable personal property, or produced a regular profit through cultivation, lumbering, or mining—and unseated land—which was any "wild" land that

The Union Tanning Company paid taxes on the surface estate until 1903, when it conveyed the Josiah Haines warrant, subject to all prior exceptions and reservations, to its affiliate, the Central Pennsylvania Lumber Company (CPLC).

The controversy underlying this appeal arose when CPLC failed to pay taxes on the surface estate in 1907 and, because of that tax default, Bradford County sold the Josiah Haines warrant at a public tax sale in 1908. The purchaser at the tax sale was Calvin H. McCauley, Jr., who had close ties to the defaulting party; he had served as CPLC's treasurer, real estate agent, and assistant general solicitor since its inception in 1903. Although McCauley nominally owned the Josiah Haines warrant, CPLC continued to pay taxes on the surface estate in the following years. And in 1910, McCauley and his wife quitclaimed the land back to CPLC for just $1.00.

Ten years later, CPLC conveyed various tracts of land, including the Josiah Haines warrant, to the Pennsylvania Game Commission subject to the Trust's prior reservations of its subsurface rights in the 1894 and 1903 deeds. The Game Commission and the Trust now seek to quiet title and obtain a

---

did not qualify as seated. *Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 335 A.3d 1108, 1110 (Pa. 2025) (quoting *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 364 (Pa. 2016)). Both seated and unseated land "could be severed into surface and subsurface estates, which could be separately assessed, taxed, and, if necessary, sold at tax sale." *Id.* at 1111 n.3 (quoting *Keller*, 143 A.3d at 364).

declaration that they are the respective owners of the oil, gas, and mineral rights associated with the subsurface estate of the Josiah Haines warrant.

The Game Commission invoked the District Court's diversity jurisdiction to resolve this state-law question of property ownership in federal court.[3] Following discovery and multiple motions for summary judgment, the District Court ordered the parties to proceed to trial, noting that material disputes of fact existed as to whether Bradford County assessed the Josiah Haines warrant as seated or unseated land in 1907 and whether McCauley was acting as CPLC's agent when he purchased the warrant at the 1908 tax sale.

Those factual disputes were resolved through a one-day bench trial where the District Court reviewed over one hundred exhibits and subsequently entered judgment in favor of the Trust. It determined that "CPLC had an affirmative duty to pay taxes assessed on its interest in the surface estate, and breached its duty by failing to pay those taxes in 1907," and that "McCauley was acting as CPLC's agent at the 1908 tax sale," so under Pennsylvania law, CPLC could not use its agent to acquire a better title at the tax sale. *Pa. Game Comm'n*, 2021 WL 5759030, at *18. Therefore, "McCauley's purchase acted

[3] The parties' quiet title claims involve the Josiah Haines warrant and various nearby tracts of land, but this appeal focuses on the former. We do not opine on the parties' quiet title claims as to any other tracts of land.

as a redemption" of CPLC's surface interest, leaving the Trust's subsurface interest untouched. *Id.*

At the Game Commission's request and pursuant to 28 U.S.C. § 1292(b), the District Court certified a portion of its post-trial judgment order for interlocutory appeal, specifying the single question of controlling law that is now before us for review:

> Under Pennsylvania law in effect at all times relevant to the instant quiet title dispute, did the owner of an unseated surface estate have a legal duty to pay taxes assessed on said surface estate, thereby preventing the owner—or the owner's agent—from acquiring better title to the land at a tax sale induced by the unseated surface owner's default?

App. 3. Meanwhile, the Commonwealth Court of Pennsylvania was considering a case involving the same parties and raising similar issues, so after hearing oral argument, we initially held this appeal *c.a.v.* to allow the Pennsylvania courts to resolve the issues of state law in the first instance. But because the state court case was at a substantially earlier stage of litigation and the Commonwealth Court had stayed its proceedings pending our resolution of the Game Commission's request to certify the controlling legal question to the Pennsylvania Supreme Court, we vacated our hold and

granted that certification request.[4] The Pennsylvania Supreme Court accepted the certification and, in a thorough and carefully crafted opinion, held that Pennsylvania's title wash doctrine did not apply to the 1908 tax sale. *See Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 335 A.3d 1108, 1110 (Pa. 2025). That is, it "determine[d] that the 1908 tax sale did not constitute a title wash but, rather, acted as a mere redemption of taxes owed and, as such, did not divest the subsurface owners of their interest in the [Josiah] Haines Warrant." *Id.*

As we were poised to finally decide the issue, we identified an open question regarding the propriety of diversity jurisdiction and obtained supplemental briefing. At that point, the Game Commission, which had alleged in its complaint that it has Pennsylvania citizenship as "an independent state commission of the Commonwealth of Pennsylvania," App. 83, changed its mind after receiving the Pennsylvania Supreme

---

[4] We modified the certified question to the Pennsylvania Supreme Court as follows:

> [W]hether, on the record provided here, a 1908 tax sale of an unseated parcel of land, induced by the surface owner's failure to pay taxes on the estate, and made to an agent of the defaulting surface owner, constitutes a title wash, thereby divesting the subsurface owner of his interest in the estate.

*Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, No. 22-1587, 2023 WL 8224102, at *1 (3d Cir. Oct. 11, 2023).

Court's adverse opinion concerning the title wash doctrine and asserted that it is an arm, not a citizen, of the Commonwealth. The Trust, of course, maintained that the Game Commission is a citizen and that the Pennsylvania Supreme Court's decision controls. We now proceed to address both our jurisdiction and the answer to the controlling question of Pennsylvania law, ultimately concluding that the Game Commission's Hail Mary argument cannot win the day.

## II. JURISDICTION AND STANDARD OF REVIEW

Having concluded that the Trust and the Game Commission are citizens of different states and the amount-in-controversy requirement is satisfied, the District Court properly exercised jurisdiction under 28 U.S.C. § 1332, and we accept jurisdiction pursuant to 28 U.S.C. § 1292(b).[5] We exercise plenary review over issues of subject matter jurisdiction, reviewing legal

---

[5] In this interlocutory appeal, "we may address any issue fairly included within the [District Court's] certified order because it is the order that is appealable, and not the controlling question identified by the district court." *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 344 (3d Cir. 2021) (citation modified). Here, the certified order encompasses only "Part IV.C of the memorandum and order" of the District Court "dated December 3, 2021." App. 3. Therefore, although our review is not limited to the controlling question of law articulated by the District Court, we "may not reach beyond the certified order" to consider the District Court's factual findings or "other orders made in the case." *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996).

conclusions de novo and factual findings for clear error. *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345 (3d Cir. 2013). The Pennsylvania Supreme Court's opinion on the certified question of state property law "constitutes precedent that we are bound to follow." *Wirth v. Aetna U.S. Healthcare*, 469 F.3d 305, 311 (3d Cir. 2006).

## III. DISCUSSION

Before addressing the merits of the District Court's certified question, we must confirm that the Game Commission properly invoked the District Court's subject matter jurisdiction. The Game Commission's complaint asserts that the District Court had jurisdiction based on the diversity of the parties under 28 U.S.C. § 1332, which extends federal courts' limited subject matter jurisdiction to civil disputes between "citizens of different States." *Id.* § 1332(a)(1). But we have a "continuing obligation to assess subject matter jurisdiction *sua sponte* at all stages of the proceeding, even when parties do not raise the issue," *Peace Church Risk Retention Grp. v. Johnson Controls Fire Prot. LP*, 49 F.4th 866, 869 (3d Cir. 2022), and the citizenship status of the Game Commission is reasonably in question. We therefore consider the question of jurisdiction before turning to the merits.

### A. Subject Matter Jurisdiction

Before *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), we had developed a rather elaborate arm-of-the-state test using the so-called *Fitchik* factors, *see Fitchik v. N.J.*

*Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) (en banc), and several subfactors we articulated over time, *see Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83-84 (3d Cir. 2016), to structure our analysis, *see, e.g.*, *Patterson v. Pa. Liquor Control Bd.*, 915 F.3d 945, 951-55 (3d Cir. 2019) (outlining and applying the multifactor test). Given the variation among the Courts of Appeals and state supreme courts, however, the Supreme Court took up the issue and has now provided valuable guidance. We will briefly review the lessons of *Galette* and then apply them to the Game Commission.

*1. Guidance from the Supreme Court in* Galette

In *Galette*, the Supreme Court resolved a disagreement between two state supreme courts as to whether the New Jersey Transit Corporation (NJ Transit) is an arm of New Jersey. It first explored the features of NJ Transit, noting that New Jersey "structured the entity as a body corporate and politic with corporate succession," located within the Department of Transportation but "independent of any supervision or control by the department." *Galette*, 607 U.S. at 516 (citation modified). New Jersey also gave NJ Transit "significant authority," including, among others, the powers to "sue and be sued; enter into contracts; acquire or deal in and with real or personal property; raise funds . . . ; adopt rules and regulations as necessary; and exercise eminent domain powers." *Id.* (citing N.J. Stat. §§ 27:25-5, 27:25-13). But New Jersey tempered that authority by empowering its Governor to veto any action

taken by NJ Transit's board of directors, and the state expressly disclaimed any liability for NJ Transit's debts or liabilities in the entity's organic statute. *See id.* at 516-17 (citing N.J. Stat. §§ 27:25-4(f), 27:25-17).

The Court then chronicled its arm-of-the-state precedents and discerned that those cases "have consistently, and predominantly, examined whether the State structured the entity as a legally separate entity liable for its own judgments." *Id.* at 523-24. While those precedents "also suggest[ed] that courts may consider the degree of control the State exerts over the entity," the Court warned that we "should do so with caution" because "ultimate control of every state-created entity resides with the State" and "gauging actual control" based on various factors "can be a perilous inquiry." *Id.* at 526 (citation modified). It applied those considerations to NJ Transit, emphasizing the entity's corporate structure and "typical corporate powers," as well as New Jersey's lack of formal liability for the entity's debts or liabilities. *Id.* at 529. And based on those two primary considerations—legal separation and source of liability funding—the Court determined that NJ Transit "is a legally separate corporation and is responsible for its own judgments," and observed that New Jersey's "substantial amount of control over NJ Transit," did not "meaningfully affect" the conclusion that it is not an arm of the state. *Id.* at 530.

Prior to *Galette*, our arm-of-the-state test centered on the three factors we adopted in *Fitchik v. N.J. Transit Rail*

*Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) (en banc); namely, "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Patterson*, 915 F.3d at 950 (quoting *Karns v. Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018)). We previously treated these three factors as "co-equal," *id.* (citation modified), but the Supreme Court's analysis in *Galette* has since modified our approach by placing nearly all the weight on the first two factors and treating the autonomy factor as a distant third of limited relevance, *see* 607 U.S. at 523-25.

While *Galette* altered the weight assigned to the three *Fitchik* factors, the substance of those factors remains largely intact. The "predominant[]" considerations identified in *Galette* map onto our first two *Fitchik* factors: Whether an entity is "liable for its own judgments" is covered by the funding factor, and whether an entity is "legally separate" is addressed by the status-under-state-law factor. *Id.* at 523-24. And it is apparent from the Court's analysis of NJ Transit that, when it comes to identifying whether an entity "is a legally separate corporation . . . responsible for its own judgments," *id.* at 530, the same subfactors we have historically looked at remain pertinent, *see Maliandi*, 845 F.3d at 86, 91.

Going forward, then, to determine whether an entity is an arm of the state, our analysis will predominantly focus on (1) whether the entity is "liable for its own judgments," and (2) whether the state "structured the entity as a legally separate

entity." *Galette*, 607 U.S. at 524. We may consider "with caution" the degree of control exercised by the state over the entity, but we will assign that consideration low probative value and bear in mind that the Supreme Court "has never once found a corporation that was liable for its own judgments to be an arm of the State, even when the State had significant control over the entity." *Id.* at 526. The *Fitchik* factors and their various subfactors will continue to guide our arm-of-the-state analysis, and our precedents assessing those factors remain authoritative. But at the balancing stage, consistent with *Galette*, we will no longer treat the entity's degree of autonomy as co-equal with the predominant considerations.

*2. Application of the Updated Arm-of-the-State Test to the Game Commission*

It is well established that "a State is not a 'citizen' for purposes of . . . diversity jurisdiction," nor are its constituent entities that are "simply 'the arm or *alter ego* of the State.'" *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973) (emphasis added) (citing *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894)). The test to determine whether an entity is an arm of the state for diversity purposes "parallels" our Eleventh Amendment sovereign-immunity analysis, *Blake v. Kline*, 612 F.2d 718, 726 (3d Cir. 1979); *see also Galette*, 607 U.S. at 521 (citing *Moor*, 411 U.S. at 717-19)).[6] So, we

[6] Unlike sovereign immunity, however, the diversity of citizenship required for federal courts to exercise subject

will apply our updated arm-of-the-state test, as refined by the Supreme Court's guidance in *Galette*, to determine whether the Game Commission is an arm of Pennsylvania—i.e., whether it is structured as "a legally separate entity liable for its own judgments."[7] 607 U.S. at 524.

a. *Galette*'s First Predominant Consideration: Liability for Judgments Against the Entity

The first predominant consideration addresses "whether the entity is liable for its own judgments"—specifically, whether "any judgment against the entity must be satisfied out of the state treasury." *Id.* at 525 (citation modified). As discussed below, we look to "(1) a state's legal obligation to pay a money judgment entered against the entity; (2) whether the agency has money to satisfy the judgment; and (3) whether there are specific statutory provisions that immunize the state from

---

matter jurisdiction "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002).

[7] Our inquiry is informed by reference to the characteristics of analogous Pennsylvania entities that have been the subjects of similar arm-of-the-state analyses. *See, e.g.*, *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1150 (3d Cir. 1995) (holding that the Turnpike Commission is not an arm of the state); *Gerr v. Emrick*, 283 F.2d 293, 297-98 (3d Cir. 1960) (same); *Pa. Hum. Rels. Comm'n v. USAir, Inc.*, 615 F. Supp. 75, 78 (W.D. Pa. 1985) (holding that the Pennsylvania Human Relations Commission (PHRC) is an arm of the state).

liability for money judgments." *Patterson*, 915 F.3d at 951 (citing *Fitchik*, 873 F.2d at 659).

*i. The Commonwealth's Legal Obligation to Pay a Money Judgment Against the Game Commission*

We focus our analysis of the Commonwealth's obligation to bear judgments against an entity on its "*formal* legal liability." *Galette*, 607 U.S. at 525 (emphasis added). If it were apparent from the face of Pennsylvania's statutory provisions that the Commonwealth "is formally liable for judgments against" the Game Commission, such that the Game Commission's liabilities would "necessarily undermine the State's ability to make choices about how to allocate the State fisc," the Game Commission would be "more likely to be an arm of the State." *Id.* Here, unlike in *Galette*, the relevant statutory provisions do not expressly impose or disclaim such obligations. *Compare* 607 U.S. at 529-30 ("New Jersey law provides that '[n]o debt or liability of the corporation shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State.'" (quoting N.J. Stat. § 27:25-17)), *with* 34 Pa. Cons. Stat. § 301 *et seq.* (lacking any similar language). Therefore, we must look beyond the Commonwealth's formal assumption of liabilities and consider "the practical realities of state funding." *Galette*, 607 U.S. at 534.

The Supreme Court cautioned against "[h]inging an entity's arm-of-the-State status to [such] practical realities," in part, because NJ Transit's state funding oscillated from year to year,

risking "arbitrary distinctions." *Id.* In contrast, this is not a situation where we must "decide how much [state] funding is enough" to prove financial entanglement with the state, *id.*, because the Game Commission "receives no General Fund money from the state's annual budget," *Frequently Asked Questions*, Pa. Game Comm'n, https://www.pa.gov/agencies/pgc/about-us/frequently-asked-questions [https://perma.cc/4224-NQK2] (last visited Apr. 30, 2026); *see also Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017).

Rather than relying on appropriations from the General Fund, the Game Commission has the exclusive right to expend money from a "separate fund," known as the Game Fund, "for any contingent, incidental or other expenses of any kind or description reasonably necessary in carrying on the work of the commission." 34 Pa. Cons. Stat. § 521(a); *see id.* § 522. Money in the Game Fund primarily consists of revenues from hunting and furtaking licenses, *see* 34 Pa. Cons. Stat. § 2709, proceeds from the sale of mineral leases and similar grants to use its lands, *see id.* §§ 725, 727, and federal wildlife restoration funds, *see id.* § 324. The fact that independently generated money in the Game Fund is intended to cover the Game Commission's expenses suggests that "[Pennsylvania] is under no obligation to pay [the Game Commission's] debts or reimburse [the Game Commission] for judgments that it pays," and any state appropriation to the Game Commission because of an adverse judgment "will be entirely the result of discretionary action by the state." *Fitchik*, 873 F.2d at 661

(citation modified); *cf. Galette*, 607 U.S. at 525 ("In contrast to formal legal liability, an entity's . . . expectation that the State would cover its judgments if needed, has less relevance.").

We confronted a similar situation in *Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140 (3d Cir. 1995), where the Turnpike Commission's organic statute likewise lacked express language about the Commonwealth's legal obligation to pay its judgments. There, we remarked: "That four of the five established sources of the Commission's funding are not state-derived is, we think, even in the absence of additional information, some support for the conclusion that the Commission is not the alter ego of Pennsylvania." *Christy*, 54 F.3d at 1145. That support is even stronger here, where none of the Game Commission's funding derives from the General Fund.

Although the Game Commission is subject to performance audits and must submit annual estimates of its expenditures to the Governor for approval, *see* 34 Pa. Cons. Stat. § 522, that sort of "state regulation of the Commission's funding" is "only significant to the funding analysis where such control indicates state ownership of the funds," *Christy*, 54 F.3d at 1145-46; *see also Galette*, 607 U.S. at 526 (noting that "[c]ontrol is not especially probative"). And because the Commonwealth's oversight of the Game Commission's expenditures from the Game Fund—which "shall be used solely" by the Game Commission, 34 Pa. Cons. Stat. § 521(a); *see id.* § 522(a)—does not show "a financial interest on the part of Pennsylvania

that would be directly and adversely affected by the diminution of the Commission's funds," that oversight "falls short of indicating state ownership of the funds," *Christy*, 54 F.3d at 1146.[8]

*ii. The Game Commission's Ability to Satisfy a Judgment Against It*

Next, we consider "whether the entity has money to pay an adverse judgment, and whether the entity has sources of funding aside from state appropriations that could satisfy the judgment." *Patterson*, 915 F.3d at 951-52 (citation modified). Although this subfactor does not address "whether the State would be formally obligated to pay the entity's judgments," *Galette*, 607 U.S. at 534, it informs our determination of whether an entity will bear its own judgments where, as here, its organic statute is silent as to formal liability.

As discussed above, "all moneys in the Game Fund are . . . appropriated to the [Game Commission]," 34 Pa. Cons. Stat. § 522(a), and those funds are substantial, *see*

---

[8] *See also Galette v. New Jersey Transit Corp.*, 607 U.S. 509, 530 (2026) (determining that the State's "substantial amount of control over" the entity—including gubernatorial veto authority—"does not change the overall conclusion" that the entity is not an arm of the state); *Fitchik*, 873 F.2d at 660 (explaining that the Governor's ability to influence the entity's revenue-raising efforts by exercising veto power over its operations did not indicate state ownership of the entity's money).

Pennsylvania Office of the Budget, *2025-26 Governor's Executive Budget* (2025), at E21-2; *cf. Vanderklok*, 868 F.3d at 205 n.16. The Game Commission also "need not 'request funds from the state coffers in order to meet shortfalls caused by adverse judgments,'" *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 819 (3d Cir. 1991) (en banc) (quoting *Fitchik*, 873 F.2d at 661), because it can cover any shortfall by raising certain fees or by decreasing its expenses, 34 Pa. Cons. Stat. §§ 725, 2904(c).

These facts suffice to show that the Game Commission could independently pay a judgment against it. *See Christy*, 54 F.3d at 1146-47 (noting that the Turnpike Commission's ability to increase revenue through toll rates or decrease expenses demonstrated its ability to satisfy a judgment against it).[9]

*iii. The Commonwealth's Immunization from the Game Commission's Debts and Liabilities*

When analyzing the final funding subfactor, we ask "whether the state has immunized itself from the entity's debts." *Patterson*, 915 F.3d at 952; *see Galette*, 607 U.S.

[9] *See also Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 305 (3d Cir. 2008) (observing that a transportation agency could raise fares to satisfy a judgment); *Fitchik*, 873 F.2d at 661 (same); *cf. USAir*, 615 F. Supp. at 77 ("The PHRC is entirely dependent on Commonwealth for its funding because the PHRA makes no provision for the collection of fines.").

at 530 (highlighting that, under New Jersey law, "[n]o debt or liability of [NJ Transit] shall be deemed or construed to create or constitute a debt . . . of the State" (quoting N.J. Stat. § 27:25-17)). The Game Code provides that "any contingent, incidental or other expenses of any kind or description reasonably necessary in carrying on the work of the [Game Commission]" should be paid from the Game Fund. 34 Pa. Cons. Stat. § 521. Although there is no statutory provision, as there was in *Galette*, *see* 607 U.S. at 529-30, expressly immunizing the Commonwealth from responsibility for the Game Commission's debts and liabilities, we have previously rejected the argument "that the absence of a blanket disclaimer is significant," *Christy*, 54 F.3d at 1147. So, in the absence of such an express disclaimer of liability or an indication that the Commonwealth is under any affirmative obligation to pay for judgments against the Game Commission, *see* Section II.A.2.a.i, this subfactor carries little weight.

* * *

In sum, because the Game Commission is "responsible for its own judgments," with payment coming from the Game Fund rather than the state treasury, the first predominant consideration indicates that the Game Commission is not an arm of the state. *Galette*, 607 U.S. at 530.

b. <u>*Galette*'s Second Predominant Consideration: Separate Legal Status of the Entity</u>

The second predominant consideration requires us to determine whether Pennsylvania structured the Game Commission "as part of itself or as legally independent." *Galette*, 607 U.S. at 525; *see Fitchik*, 873 F.2d at 662. Four subfactors guide our analysis: "(1) how the law treats the agency generally; (2) whether the agency is separately incorporated; (3) whether the agency can sue and be sued in its own right; (4) and whether it is immune from state taxation." *Patterson*, 915 F.3d at 953; *see also Galette*, 607 U.S. at 528-30 (considering several of these subfactors).

*i. Overall Treatment Under Pennsylvania Law*

First, we look to Pennsylvania's statutes and opinions from its state courts to assess the Game Commission's general treatment under state law. Pennsylvania statutes define the Game Commission as an "independent administrative commission," 34 Pa. Cons. Stat. § 301(a), or an "independent agency," 71 P.S. § 732-102, that is "not subject to the policy supervision and control of the Governor," 2 Pa. Cons. Stat. § 101. The Game Commission possesses "the hallmarks of separate legal personhood," *Galette*, 607 U.S. at 530, including the powers to sue in its own name, 34 Pa. Cons. Stat. § 322(a); enter contracts, 34 Pa. Cons. Stat. §§ 302(f), 323; acquire property for its own use, albeit not in its own name, 34 Pa. Cons. Stat. §§ 701, 706; collect licensing fees, 34 Pa. Cons. Stat. § 2709; and raise proceeds from the sale of rights and

natural resources under its purview, 34 Pa. Cons. Stat. § 727; *see also Galette*, 607 U.S. at 529 (citing NJ Transit's power to sue and be sued, make contracts, acquire property, set and collect fares, and raise funds as evidence of its legal separateness); *Christy*, 54 F.3d at 1148 (noting that the powers to sue and enter contracts are "traits not at all characteristic of an arm of the state").

No doubt, some statutory provisions give inconsistent signals about the Game Commission's status by granting it attributes of sovereignty. For example, the Game Commission may exercise eminent domain when acquiring property, employ personnel to exercise law enforcement powers, and enact regulations to ensure proper use of its lands. *See* 34 Pa. Cons. Stat. §§ 303(a), 322(c)(10), 701, 901. But the Supreme Court explained that a state's decision to delegate to an entity "substantial plenary public powers, such as the power to operate a police force, exercise eminent domain power, and promulgate regulations," is not the concern of the arm-of-the-state test. *Galette*, 607 U.S. at 532 (citation modified). We focus "not on whether the entity serves public functions, but rather on whether the State has chosen to serve those public functions through its own apparatus or through that of a legally separate entity." *Id.* And we have already recognized that such attributes of sovereignty are not particularly salient, as they were also true of the Turnpike Commission, *see Christy*, 54 F.3d at 1148; 74 Pa. Cons. Stat. § 8107, where we still concluded "[o]n balance" that the second predominant consideration "weigh[ed] slightly in favor

of the conclusion that the [Turnpike] Commission is *not* an arm of the Commonwealth of Pennsylvania," *Christy*, 54 F.3d at 1148.

While Pennsylvania's statutory provisions favor the conclusion that the Game Commission is not structured as an arm of the state, we are cognizant that several Pennsylvania state courts, including its Supreme Court, have concluded that the Game Commission is entitled to sovereign immunity. *See, e.g.*, *Bannard v. N.Y. State Nat. Gas Corp.*, 172 A.2d 306, 313 (Pa. 1961); *Roe v. Pa. Game Comm'n*, 147 A.3d 1244, 1252 (Pa. Commw. Ct. 2016); *Holland v. Pa. Game Comm'n*, No. 4 M.D. 2011, 2011 WL 10819503, at *2 (Pa. Commw. Ct. Sept. 14, 2011).

Nevertheless, the United States Supreme Court has relied heavily on whether the State imbued the entity "with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt," *Galette*, 607 U.S. at 524, and here, the Game Commission "has all the hallmarks of separate legal personhood, . . . which all indicate that it is not an arm of the State," *id.* at 530. We therefore conclude that this subfactor weighs in favor of concluding that the Game Commission is not an arm of the state.

*ii. Separate Corporate Existence*

The Supreme Court has emphasized that an entity's corporate form, though "not dispositive," *Galette*, 607 U.S. at 530, is "particularly salient" evidence that a state created it

as a legally separate entity, *id.* at 524. Indeed, the Court suggested that, when a state chooses to establish an entity as a corporation, we "should presume that the corporation . . . is no longer part of the State itself." *Id.* at 524-25. But we acknowledge an entity as separately incorporated only "when there is statutory language explicitly stating the same," *Patterson*, 915 F.3d at 953, and there is no explicit statutory provision stating that the Game Commission is separately incorporated. Thus, this subfactor favors a determination that the Game Commission is an arm of the state.

*iii. Ability to Sue and Be Sued*

An entity is less likely to be an arm of the state if it can sue and be sued in its own name. *See Maliandi*, 835 F.3d at 94; *see also Galette*, 607 U.S. at 529-31 (discussing the import of NJ Transit's sue-and-be-sued authority). The Game Code provides that the Game Commission has explicit authority "to enforce, by proper actions and proceedings, the laws of this Commonwealth relating thereto." 34 Pa. Cons. Stat. § 322(a). Like the Turnpike Commission, the Game Commission has an unrestricted power to sue and be sued that is "not at all characteristic of an arm of the state." *Christy*, 54 F.3d at 1148; *see* 74 Pa. Cons. Stat. § 8107(a)(3).[10]

[10] *Cf. USAir*, 615 F. Supp. at 77 (holding that the PHRC is an arm of the state, in part because its "power to sue is limited to filing 'petitions in court' to secure enforcement of its orders" (quoting 43 Pa. C.S. § 960)).

True, the Game Commission is subject to the Commonwealth Attorneys Act, *see* 71 P.S. § 732-101 *et seq.*, which requires the Attorney General to represent independent agencies, including the Game Commission, unless "it is more efficient or otherwise is in the best interest of the Commonwealth" to "authorize the General Counsel or the counsel for an independent agency to initiate, conduct or defend any particular litigation or category of litigation in his stead," 71 P.S. § 732-204(c). Yet the option to be represented by the Attorney General is not dispositive of this subfactor because the Game Commission may request authorization for its agency counsel to represent the entity instead and, if such a request is denied, to intervene as a matter of right on behalf of the Game Commission. *Id.* § 732-403. Because the Turnpike Commission is likewise subject to the Act but is not considered an arm of Pennsylvania, *id.* § 732-102; *see Christy*, 54 F.3d at 1150, this subfactor counsels that the Game Commission is not either.

*iv. Immunity from State Taxation*

We have also held that an entity's immunity from state taxation weighs in favor of determining that it is an arm of the state. *See Maliandi*, 845 F.3d at 95; *Christy*, 54 F.3d at 1148. But an explicit statutory provision exempting the entity from taxation points in the other direction because, "[h]ad the state legislature regarded the [entity] as the Commonwealth itself[,] it would have been utterly superfluous to give an express tax exemption." *Darby v. L. G. De Felice & Son, Inc.*, 94 F. Supp.

535, 537 (E.D. Pa. 1950) (recognizing that the Turnpike Commission's statutory tax exemption was a "very important" attribute supporting diversity jurisdiction). While the Supreme Court did not address NJ Transit's tax status in *Galette*, the Court noted that its "discussion [was] not intended to exhaust all considerations that may be relevant to the arm-of-the-State analysis, and instead focuse[d] on the considerations most pertinent" to that entity. 607 U.S. at 527 n.5. So at least where, as here, the entity is not separately incorporated and we cannot "presume" that it "is no longer part of the State itself," we will continue to analyze this subfactor. *Id.* at 524-25.

Here, the Game Commission is not immune from state taxes in the traditional sense, as the Game Code expressly requires it to "make payments in lieu of taxes" on its property. 34 Pa. Cons. Stat. § 708. Although these payments in lieu of taxes might impose a lower financial burden on the Game Commission than ordinary property taxes, the express statutory requirement that it pay some form of property assessment to the Commonwealth strongly suggests that the General Assembly did not "regard[] the Commission as the Commonwealth itself." *Darby*, 94 F. Supp. at 537. So, this subfactor also points toward a determination that the Game Commission is not an arm of the state.

* * *

Our analysis of the second predominant consideration involves countervailing considerations. On the one hand, the Game Commission's entitlement to sovereign immunity in

several Pennsylvania courts and its lack of a separate corporate existence somewhat favor the conclusion that the entity is an arm of the state. On the other hand, the Game Commission's "traditional corporate powers," *Galette*, 607 U.S. at 524, including its ability to sue and be sued, and its express lack of complete immunity from state taxation strongly suggest it is an independent citizen of the Commonwealth. On balance, the moderate leaning of the first subfactor and conclusive nature of the third and fourth subfactors, contrasted with the second, which we know is "not dispositive," *id.* at 530, weigh against the conclusion that the Game Commission is an arm of Pennsylvania.

c. <u>*Galette*'s Subordinate Consideration: Degree of State Control Over the Entity</u>

While our arm-of-the-state analysis focuses "predominantly" on "whether the State structured the entity as a legally separate entity liable for its own judgments," *Galette*, 607 U.S. at 523-24, we may also, cautiously and to a lesser extent, consider what was formerly the third *Fitchik* factor: "the degree of control the State exerts over the entity," *id.* at 526. Here, the Game Commission's autonomy from "oversight and control exerted by a State's governor and legislature," *Maliandi*, 845 F.3d at 96, does not "meaningfully affect" its status or "change the overall conclusion" because it also points towards independence, *Galette*, 607 U.S. at 530.

The Game Commission is defined as an independent agency "not subject to the policy supervision and control of the

Governor." 2 Pa. Cons. Stat. § 101; *cf. Galette*, 607 U.S. at 530 (observing that NJ Transit is statutorily "independent of any supervision or control" of the transportation department, but its actions are subject to a gubernatorial veto). Although all nine of its members are appointed by the Governor, with the advice and consent of the Senate, and must meet certain statutory qualifications, the Director of the Commission is selected by and serves "at the pleasure of" its members. 34 Pa. Cons. Stat. §§ 301, 302(a); *see also Galette*, 607 U.S. at 530 (noting that the Governor can appoint and remove NJ Transit's board members); 74 Pa. Cons. Stat. § 8105(b), (e) (stating that the Turnpike Commission's members are appointed by the Governor, with the advice and consent of the Senate, but its Chairman is elected by the members).

The Game Commission also has "the power and duty to take all actions necessary for the administration and enforcement of this title," 34 Pa. Cons. Stat. § 322(b), including the power to "enact and enforce regulations," *id.* § 322(c)(10); *see also Galette*, 607 U.S. at 516 (stating that NJ Transit can "adopt rules and regulations as necessary"); 74 Pa. Cons. Stat. § 8107(a)(5) (authorizing the Turnpike Commission to enact "rules and regulations for its own governance"). And the Director exercises "sole control" over the administration of Game Commission property, with no obligation to obtain prior approval from the Governor or legislature. 34 Pa. Cons. Stat. § 721(a); *see* 74 Pa. Cons. Stat. § 8105(f) (explaining that actions by the Turnpike Commission are taken "solely" upon approval of its members).

What oversight the Governor and General Assembly exercise is largely constrained to the Game Commission's financial matters. For example, the Game Commission must submit legislative performance audits every three years, submit an annual report on its budget to a legislative committee, and obtain approval from the Governor of its estimated expenditures from the Game Fund before those funds are paid out. *See* 34 Pa. Cons. Stat. § 522(b)-(c); *see also* 74 Pa. Cons. Stat. §§ 8121, 8204 (requiring the Turnpike Commission to submit annual revenue reports to the General Assembly and to undergo performance audits). Such financial oversight does not negate financial independence. *See supra* Section III.A.2.a.i.

Moreover, unlike the Turnpike Commission, the Game Commission is not required to adhere to a legislatively devised code of conduct, *see* 74 Pa. Cons. Stat. § 8204(a), or to provide a supervisory executive department with an opportunity to review and approve its contracts or agreements prior to execution, *see id.* § 8120(b). Instead, it may enact and administer its own regulations, execute contracts and leases, acquire and develop its property, and issue licenses with a high degree of autonomy. Although the Commonwealth Attorneys Act authorizes the Attorney General to "review for form and legality" all the Game Commission's contracts, that review is limited to determining whether the contract is in improper form, not statutorily authorized, or unconstitutional. 71 P.S. § 732-204(f). And the Game Commission is free to disagree

with the Attorney General and appeal his determination to the Commonwealth Court. *Id.*

Thus, the autonomy of the Game Commission, though minimally probative, weighs in favor of independence.

* * *

Under our updated arm-of-the-state test, the Game Commission is not an arm of Pennsylvania because Pennsylvania law "structured [it] as a legally separate entity liable for its own judgments," and its degree of autonomy only further supports that conclusion. *Galette*, 607 U.S. at 524. Although the Game Commission is entitled to sovereign immunity in Pennsylvania courts, is not formally incorporated, and lacks express liability for its own judgments, its legal and financial independence demonstrates that it is properly understood as a citizen of Pennsylvania for purposes of diversity jurisdiction. And as the Trust and the Game Commission are "citizens of different States," the District Court properly exercised diversity jurisdiction under 28 U.S.C. § 1332. We therefore proceed to the merits of the appeal.

**B. Ownership of the Josiah Haines Warrant**

The Pennsylvania Supreme Court granted our petition for certification and answered the certified question of state law—i.e., whether the 1908 tax sale divested the Trust of its interest in the subsurface estate—in the negative, *see Pa. Game Comm'n v. Thomas E. Proctor Heirs Tr.*, 335 A.3d 1108

(Pa. 2025), and its central holdings govern our resolution of this interlocutory appeal, *see Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 925 (3d Cir. 2015).[11]

The Pennsylvania Supreme Court determined that "the 1908 tax sale did not constitute a title wash but, rather, acted as a mere redemption of taxes owed and, as such, did not divest the subsurface owners of their interest in the [Josiah] Haines Warrant." *Pa. Game Comm'n*, 335 A.3d at 1110.[12] The Court began its analysis by explaining the process of title washing under Pennsylvania law, "whereby the sale of unseated land at a tax sale extinguished all prior titles in the property and granted the tax sale purchaser exclusive title" to both the surface and subsurface estates. *Id.* at 1117; *see id.* at 1117-18 (citing *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 368 (Pa. 2016)). While the holder of a defective title could generally purchase a better title at a tax sale, there is a narrow exception for a tax sale caused by the purchaser's own failure to pay taxes. *Id.* at 1118 (citing *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896)). The rule in that circumstance, known as the *Powell* rule, is that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes . . . , acquire a better title, or

---

[11] We express our appreciation to the Pennsylvania Supreme Court for granting our petition.

[12] When considering the certified question of state law, the Pennsylvania Supreme Court properly accepted as true the District Court's factual findings, as well as its determination that McCauley was acting as CPLC's agent. *See Pa. Game Comm'n*, 335 A.3d at 1112 n.4, 1113 n.8.

a title adverse to that of other parties in interest." *Powell*, 34 A. at 451.

To determine whether McCauley's purchase triggered that narrow exception, the Court had to answer a novel question: "whether owners of unseated land had a legal duty to the state to pay the taxes assessed on their land." *Pa. Game Comm'n*, 335 A.3d at 1118. *Powell* held only that owners of unseated land had no obligation to pay taxes assessed prior to their ownership; it did not decide whether owners of unseated land generally owed a duty to pay assessed taxes. The Court then reviewed its caselaw that could "be read as holding such a duty both did and did not exist," and harmonized those cases by "distinguish[ing] between landowners' duty and their potential liability for failing to perform that duty." *Id.* at 1120-21. It held that owners of unseated land owed a duty to the state to pay taxes levied on their land but were not liable for those taxes, such that the landowners "could not be personally compelled to make satisfaction for the taxes." *Id.* at 1122. Instead, the land itself could be held liable through a tax sale.

Finally, the Court applied its legal conclusions to the facts of this case and determined that CPLC owed a duty to the Commonwealth to pay taxes on the Josiah Haines warrant but failed to do so in 1907. Therefore, the *Powell* Rule applied and "the existence of that duty resulted in McCauley," as CPLC's agent, "being barred from purchasing the entirety of the [Josiah] Haines Warrant at the 1908 tax sale." *Id.* at 1123. Instead, McCauley's purchase "operated merely as a payment

of the taxes owed by CPLC, resulting in a redemption of CPLC's pre-existing title in the warrant's surface rights" and leaving intact the Trust's interest in the subsurface estate. *Id.*

The Pennsylvania Supreme Court's opinion "on matters of Pennsylvania state law constitutes precedent that we are bound to follow," so we will answer the question certified for our interlocutory review in accord with the Court's holding. *Wirth*, 469 F.3d at 311. On this record, the 1908 tax sale of the Josiah Haines warrant—to McCauley, CPLC's agent, and induced by the failure of CPLC, the surface estate owner, to pay taxes on the unseated land—did not constitute a title wash and, therefore, did not divest the Trust of its interest in the subsurface estate.[13]

[13] We recognize the potentially significant consequences of the outcome of this bellwether case, as raised by *amici curiae*, as well as the distinctly local quality of the issues before us, and we certified the controlling question of state law to the Pennsylvania Supreme Court for those reasons. Given the diverse citizenship of the parties and our "virtually unflagging obligation to hear and decide cases within [our] limited jurisdiction," *Borowski v. Kean Univ.*, 68 F.4th 844, 850 (3d Cir. 2023) (citation modified), we merely apply the Pennsylvania Supreme Court's precedential guidance to the dispute that the Game Commission chose to litigate in federal court.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment in favor of the Trust on the issue of subsurface ownership of the Josiah Haines warrant, and we will remand for further proceedings consistent with this opinion.

*Counsel for Appellant*
Bradley C. Bechtel
William C. Martson
PENNSYLVANIA GAME COMMISSION

Michael J. Scarinci **[Argued]**
OFFICE OF ATTORNEY GENERAL OF PENNSYLVANIA

*Counsel for Amici Curiae EQT AMD LLC and EQT ARO LLC in Support of Appellant*
Richard L. Armezzani
Daniel T. Brier
John B. Dempsey **[Argued]**
MYERS BRIER & KELLY

Daniel T. Donovan
Gabrielle Durling
Aaron L. Nielson
KIRKLAND & ELLIS

*Counsel for Amicus Curiae International Development Corp in Support of Appellant*
Robert J. Burnett
HOUSTON HARBAUGH

*Counsel for Amicus Curiae Pennsylvania Department of Conservation and Natural Resources in Support of Appellant*
Curtis C. Sullivan
PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION

*Counsel for Appellee*
Christopher R. Healy
Justin G. Weber
TROUTMAN PEPPER LOCKE

Laura A. Lange **[Argued]**